# EXHIBIT D

LOAN AGREEMENT

Dated as of May 28, 2019

Between

**APEX SIERRA HERMOSA TX LP**,

as Borrower

and

**THE BANCORP BANK**,

as Lender

# TABLE OF CONTENTS

**Page**

1.   DEFINITIONS; PRINCIPLES OF CONSTRUCTION ................................................. 1

   1.1   Specific Definitions ................................................................................... 1

   1.2   Index of Other Definitions ....................................................................... 18

   1.3   Principles of Construction ......................................................................... 20

2.   GENERAL LOAN TERMS ................................................................................... 20

   2.1   The Loan .................................................................................................. 20

   2.2   Interest; Monthly Payments ...................................................................... 20

   2.3   Loan Repayment ....................................................................................... 23

   2.4   Release of Property ................................................................................... 25

   2.5   Payments and Computations ..................................................................... 25

   2.6   Interest Rate Protection Agreements ........................................................ 25

   2.7   Fees; Prepayment; Spread Maintenance Premium .................................. 28

   2.8   Extension Options .................................................................................... 28

3.   EXCULPATION ................................................................................................... 30

   3.1   Exculpation ............................................................................................... 30

4.   CASH MANAGEMENT AND RESERVES ........................................................ 34

   4.1   Cash Management Arrangements .............................................................. 34

   4.2   Required Repairs ...................................................................................... 34

   4.3   Taxes and Insurance ................................................................................. 35

   4.4   Capital Expense Reserves ......................................................................... 35

   4.5   Intentionally Omitted ............................................................................... 36

   4.6   Casualty/Condemnation Subaccount ........................................................ 36

   4.7   Security Deposits ...................................................................................... 36

   4.8   Excess Cash Subaccount .......................................................................... 37

   4.9   Grant of Security Interest; Application of Funds ...................................... 37

   4.10  Property Cash Flow Allocation ................................................................. 38

   4.11  Cash Flow Shortfall Reserve .................................................................... 39

   4.12  Security Reserve ....................................................................................... 39

5.   REPRESENTATIONS AND WARRANTIES ..................................................... 40

   5.1   Organization; Special Purpose ................................................................. 40

   5.2   Proceedings; Enforceability ...................................................................... 40

   5.3   No Conflicts ............................................................................................. 41

## TABLE OF CONTENTS
(continued)

| 5.4 | Litigation | 41 |
|---|---|---|
| 5.5 | Agreements | 41 |
| 5.6 | Title | 41 |
| 5.7 | No Bankruptcy Filing | 42 |
| 5.8 | Full and Accurate Disclosure | 43 |
| 5.9 | Tax Filings | 43 |
| 5.10 | ERISA; No Plan Assets | 43 |
| 5.11 | Compliance | 43 |
| 5.12 | Contracts | 44 |
| 5.13 | Federal Reserve Regulations; Investment Company Act | 44 |
| 5.14 | Easements; Utilities and Public Access | 44 |
| 5.15 | Physical Condition | 45 |
| 5.16 | Leases | 45 |
| 5.17 | Fraudulent Transfer | 46 |
| 5.18 | Ownership of Borrower | 46 |
| 5.19 | Purchase Options | 46 |
| 5.20 | Management Agreement | 46 |
| 5.21 | Hazardous Substances | 47 |
| 5.22 | Name; Principal Place of Business | 47 |
| 5.23 | Other Debt | 47 |
| 5.24 | Insurance | 47 |
| 5.25 | FIRPTA | 48 |
| 5.26 | Operations Agreements | 48 |
| 6. | COVENANTS | 48 |
| 6.1 | Existence | 48 |
| 6.2 | Taxes and Other Charges | 48 |
| 6.3 | Access to Property | 49 |
| 6.4 | Repairs; Maintenance and Compliance; Alterations | 49 |
| 6.5 | Performance of Other Agreements | 50 |
| 6.6 | Cooperate in Legal Proceedings | 50 |
| 6.7 | Further Assurances | 50 |
| 6.8 | Environmental Matters | 50 |

## TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 6.9 | Title to the Property | 53 |
| 6.10 | Leases | 53 |
| 6.11 | Estoppel Statement | 54 |
| 6.12 | Property Management | 54 |
| 6.13 | Special Purpose Bankruptcy Remote Entity | 55 |
| 6.14 | Intentionally Omitted | 56 |
| 6.15 | Intentionally Omitted | 56 |
| 6.16 | Change in Business or Operation of Property | 56 |
| 6.17 | Debt Cancellation | 56 |
| 6.18 | Affiliate Transactions | 56 |
| 6.19 | Zoning | 56 |
| 6.20 | No Joint Assessment | 56 |
| 6.21 | Principal Place of Business | 56 |
| 6.22 | Change of Name, Identity or Structure | 56 |
| 6.23 | Indebtedness | 57 |
| 6.24 | Licenses | 57 |
| 6.25 | Compliance with Restrictive Covenants, Etc. | 57 |
| 6.26 | ERISA | 57 |
| 6.27 | Prohibited Transfers | 58 |
| 6.28 | Liens | 58 |
| 6.29 | Dissolution | 58 |
| 6.30 | Expenses | 58 |
| 6.31 | Indemnity | 59 |
| 6.32 | Patriot Act Compliance | 60 |
| 6.33 | Approval of Major Contracts | 61 |
| 7. | NOTICES AND REPORTING | 62 |
| 7.1 | Notices | 62 |
| 7.2 | Borrower Notices and Deliveries | 63 |
| 7.3 | Financial Reporting | 63 |
| 8. | INSURANCE; CASUALTY; AND CONDEMNATION | 66 |
| 8.1 | Insurance | 66 |
| 8.2 | Casualty | 69 |

# TABLE OF CONTENTS
(continued)

|  |  |  |  |
|---|---|---|---|
| | 8.3 | Condemnation | 70 |
| | 8.4 | Application of Proceeds or Award | 71 |
| 9. | | DEFAULTS | 72 |
| | 9.1 | Events of Default | 72 |
| | 9.2 | Remedies | 74 |
| 10. | | SPECIAL PROVISIONS | 76 |
| | 10.1 | Sale of Mortgage and Securitization | 76 |
| | 10.2 | Securitization Indemnification | 79 |
| | 10.3 | Severance of Loan | 81 |
| | 10.4 | Costs and Expenses | 82 |
| 11. | | MISCELLANEOUS | 82 |
| | 11.1 | Intentionally Omitted | 82 |
| | 11.2 | Brokers and Financial Advisors | 82 |
| | 11.3 | Retention of Servicer | 83 |
| | 11.4 | Survival; Successors and Assigns | 83 |
| | 11.5 | Lender's Discretion; Rating Agency Review Waiver | 83 |
| | 11.6 | Governing Law | 84 |
| | 11.7 | Modification, Waiver in Writing | 84 |
| | 11.8 | Trial by Jury | 84 |
| | 11.9 | Headings/Schedules | 84 |
| | 11.10 | Severability | 85 |
| | 11.11 | Preferences | 85 |
| | 11.12 | Waiver of Notice | 85 |
| | 11.13 | Remedies of Borrower | 85 |
| | 11.14 | Prior Agreements | 85 |
| | 11.15 | Offsets, Counterclaims and Defenses | 85 |
| | 11.16 | Publicity | 86 |
| | 11.17 | No Usury | 86 |
| | 11.18 | Conflict; Construction of Documents; Reliance | 86 |
| | 11.19 | No Third Party Beneficiaries | 87 |
| | 11.20 | Intentionally Omitted | 87 |
| | 11.21 | Spread Maintenance Premium | 87 |

## TABLE OF CONTENTS
(continued)

**Page**

11.22 Assignments and Participations ........................................................................ 88

11.23 Waiver of Marshalling of Assets .................................................................... 88

11.24 Joint and Several Liability ............................................................................. 88

11.25 Creation of Security Interest ......................................................................... 88

11.26 Certain Additional Rights of Lender.............................................................. 88

11.27 Set-Off89

11.28 Counterparts .................................................................................................. 90

12. LOCAL LAW PROVISIONS.......................................................................... 90


Schedule 1A    Required Repairs
Schedule 1B    Security Upgrades
Schedule 2     Exceptions to Representations and Warranties
Schedule 3     Rent Roll
Schedule 4     Organization of Borrower
Schedule 5     Definitions of Special Purpose Bankruptcy Remote Entity
Schedule 6     Secondary Market Transaction Information
Schedule 7     REA Schedule
Exhibit A      Capital Improvements Budget
Exhibit B      Zoning Non-Conformance Addendum

56436067v.6

## LOAN AGREEMENT

**LOAN AGREEMENT** dated as of May 28, 2019 (as the same may be modified, supplemented, amended or otherwise changed, this "*Agreement*") between **APEX SIERRA HERMOSA TX LP**, a Texas limited partnership (together with its permitted successors and assigns, "*Borrower*"), and **THE BANCORP BANK**, a Delaware state-chartered bank (together with its successors and assigns, "*Lender*").

## 1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

    **1.1**    **Specific Definitions**.  The following terms have the meanings set forth below:

    *Acceptable Replacement Guarantor*:  one or more Persons that satisfy the criteria set forth in clauses (1) through (4) of the defined term "Qualified Transferees" for whom Lender shall have received a credit check reasonably acceptable to Lender and whose identity, experience, financial condition and creditworthiness, including net worth and liquidity, is acceptable to Lender in Lender's sole discretion, and for which Lender has received a Rating Comfort Letter from each applicable Rating Agency and, in each case, (i) either Controls Borrower or owns a direct or indirect interest in Borrower and (ii) is otherwise reasonably acceptable to Lender in all respects.

    *Addendum*: shall have the meaning set forth in Section 6.34 hereof.

    *Adjusted Net Cash Flow*: shall mean Net Operating Income minus normalized capital improvements equal to $250.00 per unit per annum.

    *Affiliate*:  as to any Person, any other Person (i) which directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such Person; or (ii) which, directly or indirectly, beneficially owns or holds ten percent (10%) or more of any class of stock or any other ownership interest in such Person; or (iii) ten percent (10%) or more of the direct or indirect ownership of which is beneficially owned or held by such Person; or (iv) which is a member of the family (as defined in Section 267(c)(4) of the Code) of such Person or which is a trust or estate, the beneficial owners of which are members of the family (as defined in Section 267(c)(4) of the Code) of such Person; or (v) which directly or indirectly is a general partner, controlling shareholder, managing member, officer, director, trustee or employee of such Person.

    *Amortization Commencement Date*:  July 9, 2022, as such date may be changed in accordance with Section 2.2.5 hereof.

    *Approved Capital Expenses*:  Capital Expenses incurred by Borrower, which Capital Expenses shall either be (i) described in the Capital Improvements Budget, (ii) included in the Approved Capital Budget for the current calendar month or (iii) approved by Lender.

    *Approved Leasing Expenses*: actual out-of-pocket expenses incurred by Borrower and payable to third parties that are not Affiliates of Borrower or Guarantor in leasing space at the Property pursuant to Leases entered into in accordance with the Loan Documents, including brokerage commissions and tenant improvements, which expenses are (A) specifically approved by Lender in connection with approving the applicable Lease, or (B) incurred in the ordinary

course of business and on market terms and conditions in connection with Leases which do not require Lender's approval under the Loan Documents, and Lender shall have received (and approved, if applicable) a budget for such tenant improvement costs and a schedule of leasing commission payments payable in connection therewith, or (C) otherwise approved by Lender, which approval shall not be unreasonably withheld or delayed.  Approved Leasing Expenses shall be substantiated by executed Lease documents and brokerage agreements.

*Approved Operating Expenses*:  during a Cash Management Period, operating expenses incurred by Borrower that (i) are included in the Approved Operating Budget for the current calendar month provided, however, in all instances, property management fees shall be capped at four percent (4%) of Rents, (ii) are for real estate taxes, insurance premiums, electric, gas, oil, water, sewer or other utility service to the Property, (iii) are other similar operating expenses that are non-discretionary in nature, (iv) are Emergency Expenditures or (v) are approved by Lender.

*Available Cash*:  as of each Payment Date during the continuance of Cash Management Period, the amount of Rents, if any, remaining in the Deposit Account after the application of all of the payments required under clauses (i) through (vi) of Section 4.10.1 hereof.

*Bail-In Action*: means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

*Bail-In Legislation*: means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

*Bancorp*:  shall mean The Bancorp Bank, a Delaware state-chartered bank.

*Bankruptcy Code*: Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

*Business Day*:  any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required to close.

*Calculation Date*:  the last day of each calendar quarter during the Term.

*Capital Expenses*:  expenses that are capital in nature or required under GAAP to be capitalized.

*Capital Improvements Budget*: shall mean that certain capital improvements budget attached hereto as Exhibit A.

*Cash Management Period*:  shall commence upon Lender giving notice to the Clearing Bank of the occurrence of any of the following: (i) the Stated Maturity Date, (ii) an Event of Default, or (iii) if, as of any Calculation Date, the Debt Yield (calculated based on the ratio for the immediately preceding twelve (12) month period) is less than 3.5% for two (2) consecutive

Calculation Dates (a "***Debt Yield Cash Management Period***"); and shall end upon Lender giving notice to the Clearing Bank that the sweeping of funds into the Deposit Account may cease, which notice Lender shall only be required to give if (1) the Loan and all other obligations under the Loan Documents have been repaid in full or (2) the Stated Maturity Date has not occurred and Lender has received a satisfactory appraisal of the Property ordered by Lender and Lender has otherwise reasonably determined Borrower to be in compliance with the terms of the Loan Documents and (A) with respect to the matters described in clause (ii) above, such Event of Default has been cured and no other Event of Default has occurred and is continuing or (B) with respect to the matter described in clause (iii) above, the Property has achieved a Debt Yield (calculated based on the ratio for the immediately preceding twelve (12) month period) of at least 7.0% for two (2) consecutive Calculation Dates.

***Code***:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

***Control***: with respect to any Person, either (i) ownership directly or indirectly of forty-nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and Common Control shall have correlative meanings.

***Debt***: the unpaid Principal, all interest accrued and unpaid thereon, all Exit Fees, any Spread Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document.

***Debt Service***: with respect to any particular period, the scheduled Principal and interest payments due under the Note in such period.

***Debt Service Coverage Ratio***: as of any date, the ratio calculated by Lender of (i) the Net Operating Income for the twelve (12) month period ending with the most recently completed calendar month to (ii) the Debt Service with respect to such period (but assuming during any interest only period, that the Amortization Commencement Date has already occurred and shall be based on the aggregate principal and interest projected to be due and payable during such period).

***Debt Yield***: shall mean, as of the last day of the calendar month immediately preceding the applicable date of determination, the quotient (expressed as a percentage) obtained by dividing (a) Adjusted Net Cash Flow as of such date by (b) the outstanding principal amount of the Loan as of such date.  Lender's calculation of the Debt Yield, and all component calculations, shall be conclusive and binding on Borrower absent manifest error.

***Default***:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

***Default Rate***:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate, compounded monthly.

3

***Deposit Bank***:  Wells Fargo Bank, N.A., or such other bank or depository selected by Lender in its discretion.

***EEA Financial Institution*** means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

***EEA Member Country*** means any of the member states of the European Union, Iceland, Liechtenstein, United Kingdom and Norway.

***EEA Resolution Authority*** means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

***Eligible Account***: a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (or subaccounts thereof) (A) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (B) if a Securitization has occurred, as to which Lender has received a Rating Comfort Letter from each of the applicable Rating Agencies with respect to holding funds in such account, or (ii) a segregated trust account or accounts (or subaccounts thereof) maintained with the corporate trust department of a federal depository institution or state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(b), having in either case corporate trust powers, acting in its fiduciary capacity, and a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authorities.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

***Eligible Institution***: a depository institution insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1+ by Fitch, in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least  (i) "AA" by S&P, (ii) "AA" and/or "F1+" (for securities) and/or "AAAmmf" (for money market funds), by Fitch and (iii) "Aa2" by Moody's; provided, however, for purposes of the Deposit Bank, the definition of Eligible Institution shall have the meaning set forth in the Deposit Account Agreement.

***Emergency Expenditures***:  the incurrence of expenses that were necessary in order to (A) avoid imminent bodily injury, harm or damage to individuals or the Property, (B) avoid the suspension of any necessary service to the Property, or (C) comply with Legal Requirements, and, in each such case, with respect to which it would be impractical, in Borrower's reasonable judgment, under the circumstances, to obtain Lender's prior written consent; provided that Borrower shall give Lender notice of such Emergency Expenditures as soon as practicable.

*ERISA*:  the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

*ERISA Affiliate*: means any trade or business (whether or not incorporated) which is a member of the same controlled group of corporations or group of trades or businesses under common control with Borrower or Guarantor, or is treated as a single employer together with Borrower or Guarantor under Section 414 of the Code or Title IV of ERISA.

*Exit Fee*: with respect to any repayment or prepayment of the Principal, shall mean an amount equal to one-half of one percent (0.50%) of the Principal or, in connection with a partial prepayment of the Principal, of the principal amount of the Loan being prepaid.

*Fiscal Year*: each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the Term.

*Funding Losses*: shall have the meaning set forth to such term in Section 2.2.4.

*Funding Party*: shall mean any bank or other entity, if any, which is indirectly or directly funding Lender with respect to the Loan, in whole or in part, including, without limitation, any direct or indirect assignee of, or participant in, the Loan.

*GAAP*:  generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

*Governmental Authority*:  any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

*Guarantor*:  Aron Puretz, an individual, or any other Person that now or hereafter guarantees any of Borrower's obligations hereunder or any other Loan Document.

*Interest Period*:  (i) the period from the date hereof through the eighth (8th) day of the next calendar month (the "*Initial Interest Period*") and (ii) each period thereafter from the ninth (9th) day of each calendar month through the eighth (8th) day of the next such calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date.  Notwithstanding the foregoing, if Lender exercises its right to change the Payment Date to a New Payment Date in accordance with Section 2.2.5 hereof, then from and after such election, each Interest Period shall be the period from the New Payment Date in each calendar month through the day in the next succeeding calendar month immediately preceding the New Payment Date in such calendar month.

*Interest Rate*: shall mean, with respect to each Interest Period, an interest rate per annum equal to: (i) for a LIBOR Loan, the sum of (a) the greater of (1) LIBOR, determined as of the Determination Date immediately preceding the commencement of such Interest Period and (2) the LIBOR Floor, plus (b) the Spread (or, when applicable pursuant to this Agreement or any other Loan Document, the Default Rate); (ii) for a Substitute Rate Loan, the sum of (a) the greater of (1) the Substitute Rate and (2) the Substitute Rate Floor, plus (b) the Substitute Rate Spread (or, when applicable pursuant to this Agreement or any other Loan Document, the applicable Default Rate);

5

and (iii) for a Prime Rate Loan, the sum of (a) the greater of (1) the Prime Rate and (2) the Prime Rate Floor, plus (b) the Prime Rate Spread (or, when applicable pursuant to this Agreement or any other Loan Document, the applicable Default Rate).

*Key Principal(s)*:  Aron Puretz.

*Leases*:  all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.

*Lease Termination Payments*:  (i) all fees, penalties, commissions or other payments made to Borrower in connection with or relating to the rejection, buy-out, termination, surrender or cancellation of any Lease (including in connection with any bankruptcy proceeding), (ii) any security deposits or proceeds of letters of credit held by Borrower in lieu of cash security deposits, which Borrower is permitted to retain pursuant to the applicable provisions of any Lease and (iii) any payments made to Borrower relating to unamortized tenant improvements and leasing commissions under any Lease.

*Legal Requirements*:  statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including those regarding fire, health, handicapped access, sanitation, ecological, historic, zoning, environmental protection, wetlands and building laws and the Americans with Disabilities Act of 1990, Pub. L. No. 89-670, 104 Stat. 327 (1990), as amended, and all regulations promulgated pursuant thereto) affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in force affecting all or part of the Property.

*LIBOR*:  with respect to any Interest Period, a floating interest rate per annum (expressed as a percentage per annum rounded upwards, if necessary, to the nearest one sixteenth (1/16th) of one percent (1%)) for deposits in U.S. Dollars for a one (1) month period that appears on Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on the related Determination Date.  If such rate does not appear on Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on the applicable Determination Date, Lender shall request the principal London office of any four (4) prime banks in the London interbank market selected by Lender to provide such banks' quotations of the rates at which deposits in U.S. Dollars are offered by such banks at approximately 11:00 a.m., London time, to prime banks in the London interbank market for a one (1) month period commencing on the first day of the related Interest Period and in a principal amount that is representative for a single transaction in the relevant market at the relevant time. If at least two (2) such offered quotations are so provided, LIBOR will be the arithmetic mean of such quotations (expressed as a percentage and rounded upwards, if necessary, to the nearest one sixteenth (1/16th) of one percent (1%)).  If fewer than two (2) rates are so provided, the Loan shall be converted, as of the first day of the next succeeding Interest Period, to a Prime Rate Loan in accordance with <u>Section 2.2.6</u>. Notwithstanding the foregoing, if LIBOR cannot be determined in accordance with

6

the first sentence of the definition of "LIBOR", then Lender may use a successor to the LIBOR benchmark upon its determination in its commercially reasonable judgment that such successor index has become generally accepted in the commercial mortgage lending industry as a replacement to LIBOR for monthly pay floating rate obligations.  For purposes hereof, (i) "*Determination Date*" shall mean, (A) with respect to the Initial Interest Period, the date which is two (2) Eurodollar Business Days prior to the date hereof and (B) with respect to any other Interest Period, the date which is two (2) Eurodollar Business Days prior to the fifteenth (15th) day of the calendar month occurring during such Interest Period; and (ii) "*Eurodollar Business Day*" shall mean any day other than a Saturday, Sunday or other day on which banks in the City of London, England are closed for interbank or foreign exchange transactions.

*LIBOR Floor*: shall mean two and one-half percent (2.50%).

*LIBOR Loan*: shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon LIBOR.

*Lien*:  any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, PACE Loan or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower or SPE Party, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

*Loan-To-Value Ratio*: shall mean a percentage calculated by multiplying (i) a fraction, the numerator of which is the outstanding principal balance of the Loan and the denominator of which is the value of the Property based on a current appraisal thereof, ordered by Lender, by (ii) one hundred (100).

*Loan Documents*:  this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof:  (i) the Promissory Note or Promissory Notes made by Borrower to Lender in the aggregate principal amount equal to the Loan (the "*Note*"), (ii) the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Borrower to a trustee in favor of Lender which covers the Property (the "*Mortgage*"), (iii) Assignment of Leases and Rents from Borrower to Lender (the "*Assignment of Leases and Rents*"), (iv) Assignment of Agreements, Licenses, Permits and Contracts from Borrower to Lender, (v) the Deposit Account Control Agreement (the "*Clearing Account Agreement*") among Borrower, Lender, and the Clearing Bank, (vi) the Cash Management Agreement (the "*Deposit Account Agreement*") among Borrower, Lender, Manager and the Deposit Bank, (vii) the Assignment of Interest Rate Cap As Collateral ("*Collateral Assignment of Rate Cap*"), (viii) (A) the Guaranty of Recourse Obligations and (B) the Guaranty of Completion, each made by Guarantor (collectively, the "*Guaranty*") and (ix) the Environmental Indemnity Agreement (the "*Environmental Indemnity*") made by Borrower and Guarantor; as each of the foregoing may be (and each of the foregoing defined terms shall refer to such

7

documents as they may be) amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time (including pursuant to Section 10.3 hereof).

***Major Contract***: (i) any management, brokerage or leasing agreement or (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than Leases) of a material nature (materiality for these purposes to include, without limitation, contracts which extend beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind)), in either case relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property, whether written or oral.

***Management Agreement***:  the management agreement between Borrower and Manager, pursuant to which Manager is to manage the Property, as same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with Section 6.12 hereof.

***Manager***:  ALOFT MGT LLC, a New York limited liability company, or any successor, assignee or replacement manager appointed by Borrower in accordance with Section 6.12 hereof.

***Material Alteration***:  any alteration affecting structural elements of the Property the cost of which exceeds $250,000; provided, however, that in no event shall (i) any Required Repairs, (ii) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, or (iii) alterations performed as part of a Restoration, constitute a Material Alteration.

***Material Lease***:  shall mean (i) any Lease which, individually or when aggregated with all other leases at the Property with the same Tenant or its Affiliate, demises two (2) or more of the Property's individual dwelling units, (ii) any Lease which contains any option or other preferential right to purchase all or any portion of the Property, (iii) any Lease with a tenant who is an Affiliate of Borrower, or (iv) any non-residential Lease.

***Maturity Date***:  the date on which the final payment of Principal of the Note becomes due and payable as provided herein, whether at the Stated Maturity Date, the First Extended Maturity Date or the Second Extended Maturity Date, as applicable, by declaration of acceleration, or otherwise.

***Minor Lease***:  any Lease that is not a Material Lease.

***Monthly Operating Expense Budgeted Amount***:  the monthly amount set forth in the Approved Operating Budget incurred or to be incurred for or as of the calendar month in which such Payment Date occurs.

***Monthly Payment Amount***: shall mean the sum of (i) the monthly interest accrued on the Loan for the preceding Interest Period and (ii) upon the Amortization Commencement Date, the Principal Payment.

***Net Operating Income***:  for any period, the underwritten net cash flow of the Property for such period determined by Lender in its sole and absolute discretion in accordance with Lender's then current underwriting standards for loans of this type and the then current underwriting

standards of the Rating Agencies (including adjustments for market vacancy, bankrupt tenants, leasing costs and capital items).

*NRSRO*:  any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged by Lender or its designees in connection with, or in anticipation of, a Securitization.

*Officer's Certificate*:  a certificate delivered to Lender by Borrower which is signed by a senior executive officer of SPE Party.

*Operations Agreements*: any REA, and any other covenants, restrictions, easements, declarations or agreements of record relating to the construction, operation or use of the Property, together with all amendments, modifications or supplements thereto

*Other Charges*:  all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

*PACE Loan*: shall mean (x) any "Property-Assessed Clean Energy loan" or (y) any other indebtedness, without regard to the name given to such indebtedness, which is (i) incurred for improvements to the Property for the purpose of increasing energy efficiency, increasing use of renewable energy sources, resource conservation, or a combination of the foregoing, and (ii) repaid through multi-year assessments against the Property.

*Payment Date*:  the 9th day of each calendar month or, upon Lender's exercise of its right to change the Payment Date in accordance with Section 2.2.5 hereof, the New Payment Date (in either case, if such day is not a Business Day, the Payment Date shall be the immediately preceding Business Day).  The first Payment Date hereunder shall be July 9, 2019.

*Permitted Encumbrances*:  (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes or Other Charges not yet due and payable and not delinquent, (iv) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within forty-five (45) days after Borrower first receives notice of such Lien and (v) such other title and survey exceptions as Lender approves in writing in Lender's discretion.

*Permitted Investments*: shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by Servicer or the trustee under any Securitization or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the first Payment Date following the date of acquiring such investment and meeting one of the appropriate standards set forth below:

> (i)    obligations of, or obligations directly and unconditionally guaranteed as to principal and interest by, the U.S. government or any agency or

9

instrumentality thereof, when such obligations are backed by the full faith and credit of the United States of America and have maturities not in excess of one year;

(ii)     Federal funds, unsecured certificates of deposit, time deposits, banker's acceptances, and repurchase agreements having maturities of not more than 90 days of any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia, the short-term debt obligations of which are rated (a) "A-1+" (or the equivalent) by S&P and, if it has a term in excess of three months, the long-term debt obligations of which are rated "AAA" (or the equivalent) by S&P, and that (1) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (2) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000, (b) in one of the following Moody's rating categories:  (1) for maturities less than one month, a long-term rating of "A2" or a short-term rating of "P-1", (2) for maturities between one and three months, a long-term rating of "A1" and a short-term rating of "P-1", (3) for maturities between three months to six months, a long-term rating of "Aa3" and a short-term rating of "P-1" and (4) for maturities over six months, a long-term rating of "Aaa" and a short-term rating of "P-1", or such other ratings as confirmed in a Rating Agency confirmation;

(iii)    deposits that are fully insured by the Federal Deposit Insurance Corp. ("**FDIC**");

(iv)    commercial paper rated (a) "A–1+" (or the equivalent) by S&P and having a maturity of not more than 90 days and (b) in one of the following Moody's rating categories:  (i) for maturities less than one month, a long-term rating of "A2" or a short-term rating of "P-1", (ii) for maturities between one and three months, a long-term rating of "A1" and a short-term rating of "P-1", (iii) for maturities between three months to six months, a long-term rating of "Aa3" and a short-term rating of "P-1" and (iv) for maturities over six months, a long-term rating of "Aaa" and a short-term rating of "P-1";

(v)     any money market funds that (a) has substantially all of its assets invested continuously in the types of investments referred to in clause (i) above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from S&P and Moody's; and

(vi)    such other investments as to which each Rating Agency shall have delivered a Rating Agency confirmation.

Notwithstanding the foregoing, "Permitted Investments" (i) shall exclude any security with the S&P's "r" symbol (or any other Approved Rating Agency's corresponding symbol) attached to the rating (indicating high volatility or dramatic fluctuations in their expected returns because of market risk), as well as any mortgage-backed securities and any security of the type commonly known as "strips"; (ii) shall be limited to those instruments that have a predetermined fixed dollar of principal due at maturity that cannot vary or change; (iii) shall only include instruments that qualify as "cash flow investments" (within the meaning of Section 860G(a)(6) of the Code); and (iv) shall exclude any investment where the right to receive principal and interest derived from the underlying investment provides a yield to maturity in excess of 120% of the yield to maturity at

10

par of such underlying investment.  Interest may either be fixed or variable, and any variable interest must be tied to a single interest rate index plus a single fixed spread (if any), and move proportionately with that index.  No investment shall be made which requires a payment above par for an obligation if the obligation may be prepaid at the option of the issuer thereof prior to its maturity.  All investments shall mature or be redeemable upon the option of the holder thereof on or prior to the earlier of (x) three months from the date of their purchase and (y) the Business Day preceding the day before the date such amounts are required to be applied hereunder.

**Permitted Prepayment Date**: the eighteenth (18th) Payment Date after the closing of the Loan.

**Permitted Transfers**:

(i)    a Lease entered into in accordance with the Loan Documents; or

(ii)    a Permitted Encumbrance; or

(iii)    Intentionally Omitted; or

(iv)    any Transfer in respect of, of a direct or indirect interest in, any Person listed on a nationally or internationally recognized stock exchange or stock quotation system; or

(v)    provided no Event of Default shall then exist, a Transfer of any direct or indirect interest in Borrower (other than the partnership interest in Borrower held by SPE Party) that occurs by devise or bequest or by operation of law upon the death of a natural person that was the holder of such interest, provided that:

(A)    if such Transfer would cause the transferee, together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), or to acquire direct or indirect Control of Borrower, (x) Borrower shall provide Lender with notice of such Transfer not more than thirty (30) days after the date of such Transfer and (y) such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower, shall be a Qualified Transferee;

(B)    Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not more than thirty (30) days after the date of such Transfer;

(C)    each of Borrower and SPE Party shall continue to be a Special Purpose Bankruptcy Remote Entity and SPE Party shall continue to be the sole general partner of Borrower;

(D)    if such Transfer results in a change of Control of Borrower to a Person other than (x) Key Principal (directly or indirectly) or (y) the estate of Key Principal (during the pendency of the settlement by the estate of Key Principal and if such Transfer occurs as a result of the death of Key Principal) (the "**Key**

11

***Principal Estate***"): if such Transfer occurs (1) prior to the occurrence of a Securitization, such Transfer is approved by Lender in writing within thirty (30) days after any such Transfer, which approval shall not be unreasonably withheld or (2) from an after a Securitization, Borrower shall deliver a Rating Comfort Letter from each applicable Rating Agency within ninety (90) days after any such Transfer (or such longer time as may reasonably be necessary for Borrower to obtain the Rating Comfort Letters, provided Borrower is diligently pursuing same);

        (E)     intentionally omitted; and

        (F)     such Transfer shall not otherwise result in a change of control over the day to day operation of any Property; or

        (vi)     provided that no Event of Default shall then exist, a Transfer of an interest in Borrower (other than the partnership interest in Borrower held by SPE Party), or a Transfer of an interest in SPE Party to any Person provided that:

        (A)     such Transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of Borrower or SPE Party or to acquire or to increase its direct or indirect interest in Borrower or in SPE Party to an amount which equals or exceeds 49% or (y) result in Borrower or SPE Party no longer being Controlled by Key Principal;

        (B)     if such Transfer would cause the transferee, together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), (x) Borrower shall provide to Lender thirty (30) days prior written notice thereof and (y) such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower, shall be a Qualified Transferee;

        (C)     each of Borrower and SPE Party shall continue to be a Special Purpose Bankruptcy Remote Entity and SPE Party shall continue to be the sole general partner of Borrower;

        (D)     after giving effect to such Transfer, Key Principal shall continue to Control the day to day operations of Borrower and SPE Party and shall continue to own at least fifty-one percent (51%) of all equity interests (direct or indirect) of Borrower; and

        (E)     such Transfer shall not otherwise result in a change of control over the day to day operation of any Property; or

        (vii)     provided that no Event of Default shall then exist, any other Transfer of a direct or indirect interest in Borrower (other than the partnership interest in Borrower held by SPE Party) provided that:

        (A)     Borrower shall provide to Lender thirty (30) days prior written notice thereof;

        (B)     each of Borrower and SPE Party shall continue to be a Special Purpose Bankruptcy Remote Entity and SPE Party shall continue to be the sole general partner of Borrower;

        (C)     if such Transfer would cause the transferee (other than Key Principal, together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower, shall be a Qualified Transferee;

        (D)     if such Transfer shall cause (x) a change of Control of Borrower or SPE Party to a Person other than Key Principal or (y) the transferee (other than Key Principal), together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds forty-nine percent (49%), then prior to a Securitization, such transferee shall be approved by Lender, or, from and after a Securitization, Borrower shall deliver a Rating Comfort Letter from each applicable Rating Agency; and

        (E)     such Transfer shall not otherwise result in a change of control over the day to day operation of any Property.

As used in clauses (v) through (vii), "Transfer" shall mean the sale or conveyance of such interests (and not the encumbrance or pledge of such interests).

If any Transfer will result in Guarantor no longer owning a direct or indirect equity interest in Borrower (or otherwise receiving consideration to act as Guarantor), Guarantor shall (in connection with such Transfer) be replaced with an Acceptable Replacement Guarantor or another replacement guarantor acceptable to Lender in its sole discretion.  Such replacement guarantor(s) shall as a condition to such Transfer execute and deliver a guaranty of recourse obligations and completion guaranty (in substantially the form as each such Guaranty delivered to Lender by Guarantor on the date hereof) and an environmental indemnity agreement (in substantially the form as the Environmental Indemnity delivered to Lender by Guarantor on the date hereof) on or prior to the date of such Permitted Transfer (or, in the case of a Permitted Transfer described in clause (v), within thirty (30) days after the date of such Permitted Transfer), pursuant to which, in each case, such replacement guarantor(s) agree(s) to be liable under each such guaranty of recourse obligations and other obligations under such completion guaranty and under such environmental indemnity from and after the date of such Permitted Transfer; whereupon the Guarantor being replaced shall be released from any further liability under the Loan Documents to which it is a party from and after the date of such Transfer and such replacement guarantor(s) shall be a "Guarantor" for all purposes from and after the date of such Transfer.

***Person:***  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

***Physical Conditions Report:*** that certain Property Condition Report, prepared by Partner Engineering and Science, Inc. and dated as of May 6, 2019.

***Plan:*** (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

***Pooling and Servicing Agreement:*** any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction.

***Prime Rate:*** shall mean the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate". If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" will be used, and such average will be rounded up to the nearest 1/100th of one percent (0.01%). If The Wall Street Journal ceases to publish the "Prime Rate," Lender will select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Lender will select a comparable interest rate index.

***Prime Rate Floor:*** shall mean, in connection with any conversion of the Loan from a LIBOR Loan to a Prime Rate Loan, the difference between (a) the sum of the LIBOR Floor plus the Spread, minus (b) the Prime Rate Spread; provided, however, that if such difference is a negative number, then the Prime Rate Floor shall be zero.

***Prime Rate Loan:*** shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Prime Rate.

***Prime Rate Spread:*** shall mean, in connection with any conversion of the Loan from a LIBOR Loan to a Prime Rate Loan, the difference (expressed as the number of basis points) between (a) the sum of (i) LIBOR, determined as of the Determination Date for which LIBOR was last available, plus (ii) the Spread, minus (b) the Prime Rate as of such Determination Date; provided, however, that if such difference is a negative number, then the Prime Rate Spread shall be zero.

***Principal Payment:*** shall mean a constant monthly payment to Lender of principal in an amount calculated by Lender, which amount will be based on the Interest Rate, the outstanding principal balance of the Loan and a thirty (30) year amortization schedule.

***Property:*** the parcel of real property and Improvements thereon owned by Borrower and encumbered by the Mortgage; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Granting Clauses of the Mortgage and referred to therein as the Trust Property. The Property is located in City of Fort Worth, County of Tarrant, State of Texas.

***Qualified Transferee:*** a transferee for whom, prior to the Transfer, Lender shall have received: evidence that the proposed transferee (1) has never been convicted of a felony, (2) has never been indicted or convicted for a Patriot Act Offense and is not on any Government List, (3)

14

has never been the subject of a voluntary or involuntary (to the extent the same has not been discharged) bankruptcy proceeding and (4) has no material outstanding judgments or litigations or regulatory actions continuing or threatened against such proposed transferee or its interests.

**Rating Agency:**  prior to the final Securitization of the Loan (or if a Securitization has not occurred), each of Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("**S&P**"), Moody's Investors Service, Inc. ("**Moody's**"), Fitch, Inc., a division of Fitch Ratings Ltd. ("**Fitch**"), DBRS, Inc. and Morningstar, Inc. or any other nationally-recognized statistical rating organization which has been designated by Lender, and after the final Securitization of the Loan, any of the foregoing that have rated any of the securities issued in connection with the Securitization.

**Rating Comfort Letter**:  a letter issued by each of the applicable Rating Agencies which confirms that the taking of the action referenced to therein will not result in any qualification, withdrawal or downgrading of any existing ratings of Securities created in a Secondary Market Transaction.

**REA:**  collectively, those certain agreements more particularly described on Schedule 7 attached hereto and made a part hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

**Regulation AB:**  Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

**Regulation S-K:**  Regulation S-K of the Securities Act, as such regulation may be amended from time to time.

**Regulation S-X:**  Regulation S-X of the Securities Act, as such regulation may be amended from time to time.

**Related Loan:**  a loan to an Affiliate of Borrower or any Guarantor or secured by a Related Property, that is included in a Securitization with the Loan, and any other loan that is cross-collateralized with the Loan.

**Related Property:**  a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" (within the meaning of the definition of Significant Obligor) to the Property.

**REMIC Trust:**  a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

**Rents:**  all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable

15

to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager or any of their agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

**Servicer:**   a servicer selected by Lender to service the Loan, including any "master servicer" or "special servicer" appointed under the terms of any Pooling and Servicing Agreement.

**Significant Obligor:**   has the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

**SPE Party:**   Apex Sierra TX LLC, a Texas limited liability company, the sole general partner of Borrower.

**Spread:**   three and four-tenths percent (3.40%).

**Spread Maintenance Premium**:   with respect to any payment or prepayment of Principal (or acceleration of the Loan) prior to the Permitted Prepayment Date, an amount equal to the product of the following: (A) the amount of such prepayment (or the amount of Principal so accelerated), multiplied by (B) the Spread, multiplied by (C) a fraction (expressed as a percentage) having a numerator equal to the number of months difference between the Permitted Prepayment Date, and the date such prepayment occurs (or the next succeeding Payment Date through which interest has been paid by Borrower) and a denominator equal to twelve (12).

**State:**   the State of Texas.

**Stated Maturity Date:**   June 9, 2022, as such date may be changed in accordance with Section 2.2.5 hereof.

**Substitute Interest Rate Cap Agreement**:   shall mean an interest rate cap agreement between a Counterparty and Borrower, obtained by Borrower and collaterally assigned to Lender pursuant to this Agreement which satisfies all of the conditions set forth in the definition of "Interest Rate Cap Agreement" (provided that references therein to LIBOR shall be replaced with the Prime Rate or Substitute Rate, as applicable) and provides to Lender and Borrower (as determined by Lender in its sole but good faith discretion), for the term of the Substitute Interest Rate Cap Agreement, a hedge against rising interest rates that is no less beneficial to Borrower, and Lender than the Interest Rate Cap Agreement being replaced or required to be purchased, as applicable.

**Substitute Rate:**   shall mean an interest rate determined by a successor to the LIBOR benchmark that, in Lender's commercially reasonable judgment, has become generally accepted in the commercial mortgage lending industry as a replacement to LIBOR for monthly pay floating rate obligations.

**Substitute Rate Floor:**   shall mean, in connection with any conversion of the Loan from a LIBOR Loan to a Substitute Rate Loan, the difference between (a) the sum of the LIBOR Floor

plus the Spread, minus (b) the Substitute Rate Spread; provided, however, that if such difference is a negative number, then the Substitute Rate Floor shall be zero.

**Substitute Rate Loan:** shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Substitute Rate.

**Substitute Rate Spread:** shall mean, in connection with any conversion of the Loan from a LIBOR Loan to a Substitute Rate Loan, the difference (expressed as the number of basis points) between (a) the sum of (1) LIBOR, determined as of the Determination Date for which LIBOR was last available, plus (2) the Spread minus (b) the per annum rate of interest of the Substitute Rate as of such Determination Date; provided, however, that if such difference is a negative number, the Substitute Rate Spread shall be zero.

**Survey:** a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

**Taxes:** all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property. In no event shall any Pace Loan be considered Taxes for purposes of this Agreement.

**Term:** the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

**Title Insurance Policy:** the ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the Lien of the Mortgage.

**Transfer:** (i) any sale, conveyance, transfer, encumbrance, pledge, lease or assignment, or the entry into any agreement to sell, convey, transfer, encumber, pledge, lease or assign, whether by law or otherwise, of, on, in or affecting (x) all or part of the Property (including any legal or beneficial direct or indirect interest therein), (y) any direct or indirect interest in Borrower (including any profit interest), or (z) any direct or indirect interest in any SPE Party, (ii) any change of Control of Borrower or SPE Party, or (iii) enter into or subject the Property to a PACE Loan.

**UCC:** the Uniform Commercial Code as in effect in the State or the state in which any of the Cash Management Accounts are located, as the case may be.

**Welfare Plan:** an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

**Write-Down and Conversion Powers:** means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**1.2** **Index of Other Definitions**. The following terms are defined in the sections or Loan Documents indicated below:

*"Acceptable Counterparty"* - 2.6.1
*"Additional Operating Expense"* – 7.36
*"Annual Budget"* - 7.3.5
*"Applicable Taxes"* - 2.2.3
*"Approved Additional Operating Expense"* – 7.36
*"Approved Annual Budget"* - 7.3.5
*"Approved Capital Budget"* - 7.3.5
*"Approved Operating Budget"* - 7.3.5
*"Assignment of Leases and Rents"* - 1.1 (Definition of Loan Documents)
*"Award"* - 8.3.2
*"Bankruptcy Proceeding"* - 5.7
*"Borrower's Recourse Liabilities"* - 3.1
*"Broker"* – 11.2
*"Capital Reserve Subaccount"* - 4.4
*"Cash Flow Shortfall Reserve Subaccount"* – 4.11.1
*"Cash Management Accounts"* - 4.9
*"Casualty"* - 8.2.1
*"Casualty/Condemnation Prepayment"* - 2.3.2
*"Casualty/Condemnation Subaccount"* - 4.6
*"Cause"* – Schedule 5
*"Clearing Account"* - 4.1
*"Clearing Account Agreement"* - 1.1 (Definition of Loan Documents)
*"Clearing Bank"* - 4.1
*"Condemnation"* - 8.3.1
*"Converted Interest Rate Cap Agreement"* – 2.6.5(a)
*"Debt Service Reserve Subaccount"* – 4.13
*"Debt Yield Cash Management Period"* - 1.1 (Definition of Cash Management Period).
*"Delaware Act"* - Schedule 5
*"Deposit Account"* - 4.1
*"Deposit Account Agreement"* - 1.1 (Definition of Loan Documents)
*"Determination Date"* - 1.1 (Definition of LIBOR)
*"Disclosure Document"* - 10.2(a)
*"Easements"* - 5.14
*"Endorsement"* - 6.26.2
*"Environmental Laws"* - 5.21
*"Equipment"* – Mortgage
*"Eurodollar Business Day"* - 1.1 (Definition of LIBOR)
*"Event of Default"* - 9.1
*"Excess Cash Subaccount"* - 4.8
*"Exchange Act"* - 10.2(a)
*"Exchange Act Filing"* - 10.1(d)
*"First Extended Maturity Date"* - 2.8
*"First Extension Term"* - 2.8
*"Fitch"* – 1.1 (Definition of Rating Agency)

*"Government Lists"* - 6.32
*"Guaranty"* - 1.1 (Definition of Loan Documents)
*"Hazardous Substances"* -  5.21
*"Holder"* - 11.20.1
*"Improvements"* - Mortgage
*"Indemnified Liabilities"* - 6.31
*"Indemnified Party"* - 6.31
*"Initial Interest Period"* - 1.1 (Definition of Interest Period)
*"Insurance Premiums"* - 8.1.2
*"Insured Casualty"* - 8.2.2
*"Interest Rate Protection Agreement"* - 2.6.1
*"Issuer"* - 10.2(b)
*"Key Principal Estate"* - 1.1 (Definition of Permitted Transfers)
*"Late Payment Charge"* - 2.5.3
*"Lender's Consultant"* - 6.8.1
*"Lender Group"* - 10.2(b)
*"Liabilities"* - 10.2(b)
*"Licenses"* - 5.11
*"Loan"* - 2.1
*"Moody's"* - 1.1 (Definition of Rating Agency)
*"Mortgage"* - 1.1 (Definition of Loan Documents)
*"Nationally Recognized Service Company"* - Schedule 5
*"New Payment Date"* - 2.2.5
*"Note"* - 1.1 (Definition of Loan Documents)
*"Notice"* - 7.1
*"O & M Program"* - 6.8.3
*"OFAC"* - 6.32
*"Patriot Act"* - 6.32
*"Patriot Act Offense"* - 6.32
*"Permitted Indebtedness"* - 6.22
*"Permitted Investments"* - Deposit Account Agreement
*"Policies"* - 8.1.2
*"Principal"* - 2.1
*"Proceeds"* - 8.2.2
*"Proposed Material Lease"* - 6.10.2
*"Qualified Carrier"* - 8.1.1
*"Remedial Work"* - 6.8.2
*"Rent Roll"* - 5.16
*"Required Records"* - 7.3.7
*"Required Repairs"* - 4.2.1
*"Required Repairs Subaccount"* - 4.2.2
*"Restoration"* - 8.4.1
*"Review Waiver"* - 11.5
*"Rollover Reserve Subaccount"* - 4.5
*"S&P"* - 1.1 (Definition of Rating Agency)
*"Second Extended Maturity Date"* - 2.8

*"Second Extension Term"* – 2.8
*"Secondary Market Transaction"* - 10.1(a)
*"Securities"* - 10.1(a)
*"Securities Act"* - 10.2(a)
*"Securitization"* - 10.1(a)
*"Security Deposit Subaccount"* - 4.7
*"Significant Casualty"* - 8.2.2
*"Single Member Bankruptcy Remote LLC"* - Schedule 5
*"Special Member"* - Schedule 5
*"Special Purpose Bankruptcy Remote Entity"* - 6.13
*"Springing Recourse Event"* - 3.1
*"Subaccounts"* - 4.1
*"Tax and Insurance Subaccount"* - 4.3
*"Toxic Mold"* - 5.21
*"Transferee Borrower"* - 6.26.2
*"Underwriter Group"* - 10.2(b)

**1.3** **Principles of Construction**.  Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

## 2.   GENERAL LOAN TERMS

**2.1** **The Loan.**  Lender is making a loan (the "***Loan***") to Borrower on the date hereof, in the original principal amount (the "***Principal***") of $7,099,600.00, which shall mature on the Stated Maturity Date.  Borrower acknowledges receipt of the Loan, the proceeds of which are being and shall be used to (i) acquire the Property, (ii) fund certain of the Subaccounts, and (iii) pay transaction costs.  Any excess proceeds may be used for any lawful purpose. No amount repaid in respect of the Loan may be reborrowed.  The Loan shall be evidenced by the Note and shall be repaid in accordance with the terms of this Agreement, the Note and the other Loan Documents.

**2.2** **Interest; Monthly Payments.**

**2.2.1** **Generally**.  From and after the date hereof, interest on the unpaid Principal shall accrue at the Interest Rate and be payable as hereinafter provided.  On the date hereof, Borrower shall pay interest on the unpaid Principal from the date hereof through and including June 8, 2019.  On July 9, 2019 and each Payment Date thereafter through and including the Maturity Date, Borrower shall pay to Lender the Monthly Payment Amount.  All accrued and unpaid interest and unpaid Principal shall be due and payable on the Maturity Date.  If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid Principal to but not including the next Payment Date.  In no event shall the Interest Rate be less than 5.90% per annum.

**2.2.2    Default Rate.** After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, calculated from the date such payment was due or such underlying Default shall have occurred without regard to any grace or cure periods contained herein, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

**2.2.3    Taxes.** Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by the law or regulation of any Governmental Authority (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this Section 2.2.3 as "Applicable Taxes"). If Borrower shall be required by law to deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply: (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. Payments pursuant to this Section 2.2.3 shall be made within ten (10) days after the date Lender makes written demand therefor.

**2.2.4    Breakage Indemnity**.

(a)    Borrower hereby agrees to pay to Lender any amount necessary to compensate Lender and any Funding Party for any losses or costs (including, without limitation, the costs of breaking any "LIBOR" contract, if applicable, or funding losses determined on the basis of Lender's or such Funding Party's reinvestment rate and the interest rate thereon) (collectively, "***Funding Losses***") sustained by Lender or any Funding Party: (i) if the Loan, or any portion hereof, is repaid for any reason whatsoever on any date other than a Payment Date (including, without limitation, from condemnation or insurance proceeds); (ii) as a consequence of (A) any increased costs that Lender or any Funding Party may sustain in maintaining the borrowing evidenced hereby, or (B) the reduction of any amounts received or receivable from Borrower, in either case, due to the introduction of, or any change in, any law or any applicable regulation or treaty (including the administration or interpretation thereof), whether or not having the force of law, or due to the compliance by Lender or the Funding Party, as the case may be, with any directive, whether or not having the force of law, or request from any central bank or domestic or foreign governmental authority, agency or instrumentality having jurisdiction; and/or (iii) any other set of circumstances not attributable to Lender's or a Funding Party's acts. Payment of Funding Losses hereunder shall be in addition to any obligation to pay a prepayment premium under Section 2.3 hereof in circumstances where such prepayment premium would be due and owing.

(b)    If Lender or a Funding Party, as the case may be, shall have determined that the applicability of any law, rule, regulation or guideline adopted pursuant to or arising out of the July 1988 report of the Basel Committee on Banking Regulations and Supervisory Practices entitled "International Convergence of Capital Measurement and Capital Standards", or the

adoption of any other law, rule, regulation or guideline (including, but not limited to, any United States law, rule, regulation or guideline) regarding capital adequacy, or any change becoming effective in any of the foregoing or in the enforcement or interpretation or administration of any of the foregoing by any court or any domestic or foreign governmental authority, central bank or comparable agency charged with the enforcement or interpretation or administration thereof, or compliance by Lender or its holding company or such Funding Party or its holding company, as the case may be, with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of Lender, Lender's holding company, such Funding Party or such Funding Party's holding company, as the case may be, to a level below that which Lender or its holding company or the Funding Party or its holding company, as the case may be, could have achieved but for such applicability, adoption, change or compliance (taking into consideration Lender's or its holding company's or such Funding Party's or its holding company's, as the case may be, policies with respect to capital adequacy) (the foregoing being hereinafter referred to as "*Capital Adequacy Events*"), then, upon demand by Lender, Borrower shall pay to Lender, from time to time, such additional amount or amounts as will compensate Lender or such Funding Party for any such reduction suffered.

        **2.2.5**  **New Payment Date.**  Lender shall have the right, to be exercised not more than once during the term of the Loan, to change the Payment Date to a date other than the ninth day of each month (a "*New Payment Date*"), on thirty (30) days' written notice to Borrower; provided, however, that any such change in the Payment Date: (i) shall not modify the amount of regularly scheduled monthly principal and interest payments, except that the first payment of principal and interest payable on the New Payment Date shall be accompanied by interest at the interest rate herein provided for the period from the Payment Date in the month in which the New Payment Date first occurs to the New Payment Date, (ii) shall change the Stated Maturity Date to the New Payment Date occurring in the month set forth in the definition of Stated Maturity Date; and (iii) shall extend the Amortization Commencement Date to the New Payment Date occurring in the month set forth in the definition of Amortization Commencement Date.

        **2.2.6**  **Conversion to a Prime Rate Loan or a Substitute Rate Loan**.

        (a)    Subject to the terms and conditions hereof, the Loan shall be a LIBOR Loan. In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances affecting the interbank Eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR, then Lender shall forthwith give notice by telephone of such determination, confirmed in writing, to Borrower at least one (1) day prior to the next succeeding Determination Date.  If such notice is given, Lender shall, as of the first day of the next succeeding Interest Period, convert the Loan to a Substitute Rate Loan upon its determination, in its commercially reasonable judgment, that the Substitute Rate has become generally accepted in the commercial mortgage lending industry as a replacement to LIBOR for monthly pay floating rate obligations and the Loan shall not be converted to a Prime Rate Loan; provided however, in the event that in Lender's commercially reasonable judgment that there is no successor index in place or such successor index has not become generally accepted in the commercial mortgage lending industry as a replacement to LIBOR for monthly pay floating rate obligations, the Loan shall, as of the first day of the next succeeding Interest Period, be converted to a Prime Rate Loan.  Notwithstanding any provision of

this Agreement to the contrary, in no event shall Borrower have the right to convert a LIBOR Loan to a Prime Rate Loan or a Substitute Rate Loan.

(b)     If, pursuant to the terms hereof, the Loan has been converted to a Prime Rate Loan or a Substitute Rate Loan and Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice by telephone of such determination, confirmed in writing, to Borrower at least one (1) day prior to the next succeeding Determination Date.  If such notice is given, the Loan shall be converted, as of the first day of the next succeeding Interest Period, to a LIBOR Loan.  Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a Prime Rate Loan or a Substitute Rate Loan to a LIBOR Loan.

(c)     If the adoption of any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender to maintain a LIBOR Loan as contemplated hereunder, (i) the obligation of Lender hereunder to make or maintain a LIBOR Loan or to convert a Prime Rate Loan to a LIBOR Loan shall be canceled forthwith and (ii) any outstanding LIBOR Loan shall be converted automatically to a Prime Rate Loan on the first day of the next succeeding Interest Period, or upon such earlier date as may be required by law.  Borrower hereby agrees to promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for any costs incurred by Lender in making any conversion in accordance with this Agreement, including without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the LIBOR Loan hereunder.  Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

**2.2.7   <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>**. Notwithstanding anything to the contrary in any of the Loan Documents or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any of the Loan Documents, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by: (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and (b) the effects of any Bail-in Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**2.3   <u>Loan Repayment</u>**.

**2.3.1   <u>Repayment</u>**. Borrower shall repay the entire outstanding principal balance of the Note in full on the Maturity Date, together with interest thereon to (but excluding) the date

of repayment and any other amounts due and owing under the Loan Documents. Borrower shall have no right to prepay all or any portion of the Principal except in accordance with <u>Section 2.3.2</u> below and <u>Section 2.3.3</u> below. Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loan, shall be applied by Lender as follows in the following order of priority: *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third*, to Exit Fee, and any other amounts then due and owing under the Loan Documents, including the Spread Maintenance Premium (if such repayment or prepayment occurs prior to the Permitted Prepayment Date). If prior to the Stated Maturity Date the Debt is accelerated by reason of an Event of Default, then Lender shall be entitled to receive, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Spread Maintenance Premium (if such repayment or prepayment occurs prior to the Permitted Prepayment Date), and Exit Fee applicable to such Principal so accelerated. During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

     **2.3.2    <u>Mandatory Prepayments.</u>** The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "***Casualty/Condemnation Prepayment***"), in the manner and to the extent set forth in <u>Section 8.4.2</u> hereof. Each Casualty/Condemnation Prepayment, after deducting Lender's costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under <u>Section 2.3.1</u> above, and if such Casualty/Condemnation Prepayment is made on any date other than a Payment Date, then such Casualty/Condemnation Prepayment shall include interest that would have accrued on the Principal prepaid to but not including the next Payment Date. Provided that no Event of Default is continuing, any such mandatory prepayment under this <u>Section 2.3.2</u> shall be without the payment of the Spread Maintenance Premium, but subject to the payment of the Exit Fee. Notwithstanding anything to the contrary contained herein, each Casualty/Condemnation Prepayment shall be applied in inverse order of maturity and shall not extend or postpone the due dates of the monthly installments due under the Note or this Agreement, or change the amounts of such installments.

     **2.3.3    <u>Optional Prepayments.</u>** At any time prior to the Permitted Prepayment Date, provided no Event of Default has occurred and is continuing, Borrower shall have the right to prepay the Principal in whole, but not in part, on any Payment Date provided that Borrower gives Lender at least thirty (30) days prior written notice thereof and such prepayment is accompanied by (a) the Spread Maintenance Premium applicable thereto, (b) the Exit Fee applicable thereto, and (c) all other sums due and owing under this Agreement. At any time from and after the Permitted Prepayment Date, provided no Event of Default has occurred and is continuing, Borrower shall have the right to prepay the Principal in whole, but not in part, on any Payment Date provided that Borrower gives Lender at least thirty (30) days prior written notice thereof and such prepayment is accompanied by the Exit Fee applicable thereto. If any such prepayment is not made on a Payment Date, Borrower shall also pay interest that would have accrued on such prepaid Principal to but not including the next Payment Date.

**2.4**     **Release of Property**.

**2.4.1**     Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever), the Lien of the Loan Documents if not theretofore released**.**  In connection with the release of the Lien, Borrower shall submit to Lender, not less than thirty (30) days prior to the date of repayment (or such shorter time as is acceptable to Lender in its sole discretion), a release of Lien (and related Loan Documents) for execution by Lender.  Such release shall be in a form appropriate in the jurisdiction in which the Property is located and contain standard provisions protecting the rights of the releasing lender.  In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement.  Borrower shall pay all costs, taxes and expenses associated with the release of the Lien of the Mortgage, including Lender's reasonable attorneys' fees.

**2.5**     **Payments and Computations**.

**2.5.1**     **Making of Payments**.  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 3:00 p.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the immediately preceding Business Day.  All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

**2.5.2**     **Computations**.  Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360-day year.

**2.5.3**     **Late Payment Charge**.  If any Principal or interest due under any Loan Document is not paid by Borrower on the date on which it is due; or if any or other sum due under any Loan Document is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "***Late Payment Charge***"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Such amount shall be secured by the Loan Documents.

**2.6**     **Interest Rate Protection Agreements**.

**2.6.1**     **Interest Rate Protection Agreement**.

(a)     As of the date hereof, Borrower has entered into, made all payments required under, and satisfied all conditions precedent to the effectiveness of, an interest rate protection agreement that satisfies all of the following conditions  (such interest rate protection

25

agreement, together with any extension thereof and/or any other interest rate protection agreement entered into pursuant to <u>Section 2.8</u> hereof, being referred to herein as the "***Interest Rate Protection Agreement***"): (i) is with a bank or other financial institution which has (A) a long-term unsecured debt or counterparty rating of "A" or higher by S&P, and (B) a long-term unsecured debt rating of not less than "A2" by Moody's (an "***Acceptable Counterparty***"); (ii) has a term ending no earlier than the Stated Maturity Date; (iii) is an interest rate cap in respect of a notional amount not less than the maximum principal amount of the Loan that shall have the effect of capping LIBOR at (A) 3.0% per annum for the first twenty-four (24) Payment Dates of the Loan, and (B) 4.0% per annum for the next twelve (12) Payment Dates of the Loan; and (iv) provides that the only obligation of Borrower thereunder is the making of a single payment upon the execution and delivery thereof.

(b)     Borrower's interest in such Interest Rate Protection Agreement has been assigned to Lender pursuant to documentation satisfactory to Lender in form and substance, and the counterparty to such Interest Rate Protection Agreement has executed and delivered to Lender an acknowledgment of such assignment, which acknowledgment includes such counterparty's agreement to pay directly into the Clearing Account all sums payable by such counterparty pursuant to the Interest Rate Protection Agreement and shall otherwise be satisfactory to Lender in form and substance.

(c)     In connection with an Interest Rate Protection Agreement, Borrower shall obtain and deliver to Lender an opinion of counsel from counsel (in-house or independent) for the issuer of the Interest Rate Protection Agreement (upon which Lender and its successors and assigns may rely) which shall provide in relevant part, that: (a) the issuer is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Protection Agreement; (b) the execution and delivery of the Interest Rate Protection Agreement by the issuer, and any other agreement which the issuer has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property; (c) all consents, authorizations and approvals required for the execution and delivery by the issuer of the Interest Rate Protection Agreement, and any other agreement which the issuer has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and (d) the Interest Rate Protection Agreement, and any other agreement which the issuer has executed and delivered pursuant thereto, has been duly executed and delivered by the issuer and constitutes the legal, valid and binding obligation of the issuer, enforceable against the issuer in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(d)     In the event of any downgrade, withdrawal or qualification of the rating of the issuer of the Interest Rate Protection Agreement below an "A-" by S&P or below an "A3" by

Moody's, Borrower shall replace the Interest Rate Protection Agreement with a replacement Interest Rate Protection Agreement from an Acceptable Counterparty (with terms identical to the Interest Rate Protection Agreement being replaced, or otherwise approved by Lender in its reasonable discretion and the Rating Agencies) not later than thirty (30) days following receipt of notice from Lender or Servicer of such downgrade, withdrawal or qualification.

2.6.2   **Execution of Documents**. Borrower shall promptly execute and deliver to the counterparty of the Interest Rate Protection Agreement such confirmations and agreements as may be requested by such counterparty in connection with such Interest Rate Protection Agreement.

2.6.3   **No Obligation of Lender**. Borrower agrees that Lender shall not have any obligation, duty or responsibility to Borrower or any other Person by reason of, or in connection with, any Interest Rate Protection Agreement (including any duty to provide or arrange any Interest Rate Protection Agreement, to consent to any mortgage or pledge of the Property or any portion thereof as security for Borrower's performance of its obligations under any Interest Rate Protection Agreement, or to provide any credit or financial support for the obligations of Borrower or any other Person thereunder or with respect thereto). No Interest Rate Protection Agreement shall alter, impair, restrict, limit or modify in any respect the obligation of Borrower to pay interest on the Loan as and when the same becomes due and payable in accordance with the provisions of the Loan Documents.

2.6.4   **Receipts from Interest Rate Protection Agreements**. All payments made by the counterparty to the Interest Rate Protection Agreement shall be deposited into the Clearing Account and applied in the same manner as Rents are applied under Section 4.10.

2.6.5   **Substitute Rate Hedging**. Notwithstanding anything to the contrary set forth in this Section 2.6 or elsewhere in this Agreement (including Section 2.8 below), if the Loan is converted to a Prime Rate Loan or a Substitute Rate Loan, then, Borrower shall, within twenty (20) days of receiving written notice from Lender, either:

(a)      (i) Make all payments under, and satisfy all conditions precedent to the effectiveness of, a Substitute Interest Rate Cap Agreement or (ii) cause the then-existing Interest Rate Cap Agreement to be modified such that the then-existing Interest Rate Cap Agreement satisfies, in Lender's reasonable discretion, the requirements for a Substitute Interest Rate Cap Agreement as set forth in the definition thereof (a "*Converted Interest Rate Cap Agreement*"); or

(b)      If a Substitute Interest Rate Cap Agreement or Converted Interest Rate Cap Agreement is not generally commercially available from Acceptable Counterparties, Borrower shall purchase such other hedging product as reasonably determined by Lender.

From and after the delivery by Lender of the notice referenced in this Section 2.6.5, the references to "*Interest Rate Cap Agreement*" and related provisions herein shall be deemed modified to refer either to a Substitute Interest Rate Cap Agreement, Converted Interest Rate Cap Agreement or the alternative hedging terms as reasonably determined by Lender, as applicable. In connection therewith, but not prior to, the purchase by Borrower of the applicable hedging product required

27

pursuant to this <u>Section 2.6.5</u>, Borrower may terminate any then-existing Interest Rate Cap Agreement.

To the extent amounts are returned by the Counterparty under the then existing Interest Rate Cap Agreement in connection with its termination, such amounts shall be made available to Borrower for the purpose of purchasing (or reimbursing Borrower for the purchase of) the Substitute Interest Rate Cap Agreement

### 2.7    <u>Fees; Prepayment; Spread Maintenance Premium</u>.

**2.7.1    <u>Origination Fee</u>**. On the date hereof, Borrower shall pay to Lender an origination fee in an amount equal to 1.0% of the Principal.

**2.7.2    <u>Exit Fee</u>**. Borrower agrees that in all events and under all circumstances, Borrower shall be obligated to pay to Lender the Exit Fee, which shall be payable upon (i) any partial prepayment of the Loan by Borrower and (ii) the earlier of (x) the payment by Borrower of the Loan in full, or (y) the Maturity Date (or any acceleration of the Loan following an Event of Default). In furtherance of the foregoing, Borrower acknowledges and agrees that Lender shall have no obligation to accept any payment of the Loan unless and until Borrower shall have also paid the Exit Fee, and Lender shall have no obligation to release any Loan Document upon payment of the Debt unless and until Lender shall have received the entire Exit Fee. Notwithstanding the foregoing, provided there is no Event of Default, to the extent that (i) the Loan is repaid with the proceeds of a mortgage loan from Bancorp (or any Affiliate thereof or syndicate including Bancorp or any such Affiliate), and (ii) the initial Guarantor continues to Control the Borrower and have a direct or indirect interest in the Property after the Loan is paid, the Exit Fee that would otherwise be payable with respect to the portion of the Loan refinanced by Bancorp shall be waived, provided that Bancorp shall have no obligation to offer to provide such financing.

**2.7.3    <u>Spread Maintenance Premium</u>**. Upon any repayment or prepayment of Principal made prior to the Permitted Prepayment Date, Borrower shall pay to Lender on the date of such repayment or prepayment the Spread Maintenance Premium applicable thereto. All Spread Maintenance Premiums hereunder shall be deemed to be earned by Lender upon the funding of the Loan.

**2.8    <u>Extension Options</u>**. Borrower shall have the right, at its option, to extend the Term (the "***First Extension Term***") until (i) June 9, 2023 (the "***First Extended Maturity Date***"), and in the event Borrower shall have exercised its right to extend to the First Extended Maturity Date, Borrower shall have the right, at its option, to extend the Term (the "***Second Extension Term***") until (ii) June 9, 2024 (the "***Second Extended Maturity Date***") by giving notice of such extension to Lender in accordance with Section 2.8(c) below. Upon receipt of such request to extend the Term until the First Extended Maturity Date, or the Second Extended Maturity Date, as the case may be, Lender will promptly confirm to Borrower in writing whether or not the Stated Maturity

Date will be so extended, which extension will be granted upon the satisfaction of the following conditions:

(a)    no Event of Default or Cash Management Period exists at the time such request is made and on the originally scheduled Stated Maturity Date, or the First Extended Maturity Date, as applicable;

(b)    there has been no material adverse change in the financial condition of Borrower, Key Principal and/or Guarantor;

(c)    Borrower delivers to Lender an Officer's Certificate confirming the accuracy of the information contained in clauses (a) and (b) above;

(d)    Borrower shall provide Lender with written irrevocable notice of its election to extend the Maturity Date as aforesaid not later than forty-five (45) days and not earlier than sixty (60) days prior to Stated Maturity Date, or the First Extended Maturity Date, as applicable;

(e)    on or prior to the originally scheduled Stated Maturity Date, or the First Extended Maturity Date, as the case may be, Borrower either (i) extends the term of the Interest Rate Protection Agreement to a date not earlier than the First Extended Maturity Date, or the Second Extended Maturity Date, as applicable, or (ii) enters into a new interest rate protection agreement which expires no earlier than the First Extended Maturity Date, or the Second Extended Maturity Date, as applicable, and which extension or new agreement is in respect of a notional amount of the then outstanding Principal and is otherwise on the same terms set forth in Section 2.6.1 hereof and has the effect of capping LIBOR at the lesser of (x) 4.0% per annum and (y) the rate determined by Lender such that, if it were then the LIBOR component of the Interest Rate under the Loan, would result in a Debt Service Coverage Ratio of at least 1.00:1.00 based on the then outstanding principal balance;

(f)    on the originally scheduled Stated Maturity Date, and the First Extended Maturity Date, as applicable, the Debt Yield is at least 8.0% for the previous two (2) consecutive Calculation Dates; provided that Borrower may, at its option, prepay the then outstanding principal balance in an amount necessary to achieve the Debt Yield required hereunder, subject to the payment of any applicable Spread Maintenance Premium and Exit Fee which may be required in accordance with the terms and conditions of this Agreement;

(g)    if the option to extend the Term until the First Extended Maturity Date is exercised, Borrower pays to Lender concurrently with the request to so extend the Term until the First Extended Maturity Date, an extension fee in an amount equal to 0.25% of the then-outstanding Principal;

(h)    if the option to extend the Term until the Second Extended Maturity Date is exercised, Borrower pays to Lender concurrently with the request to so extend the Term until the Second Extended Maturity Date, an extension fee in an amount equal to 0.25% of the then-outstanding Principal;

(i)    Borrower shall deposit with Lender such amounts required by Lender to be deposited into any one or more of the Subaccounts, as Lender shall reasonably require to ensure

29

sufficient funds will be on deposit in such accounts to satisfy Borrower's obligations with respect to such accounts during the First Extension Term or Second Extension Term, as applicable, which determination shall be made in Lender's sole but reasonable discretion;

(j)     on the originally scheduled Stated Maturity Date, and the First Extended Maturity Date, as applicable, the Loan-to-Value Ratio, based upon the "as-stabilized" appraised value, shall not be greater than 75%; provided that Borrower may, at its option, prepay the then outstanding principal balance in an amount necessary to achieve the Loan-to-Value Ratio required hereunder, subject to the payment of any applicable Spread Maintenance Premium and Exit Fee which may be required in accordance with the terms and conditions of this Agreement; and

(k)     on the First Extended Maturity Date, the Property shall have an economic and physical occupancy of at least ninety percent (90%) for the three (3) calendar months immediately preceding the commencement of the Second Extension Term, as determined by Lender in its sole but good faith discretion.

(l)     on the Stated Maturity Date, a final certificate of occupancy has been issued with respect to the Property.

(m)     on the Stated Maturity Date, the capital improvement work associated with and described in the Capital Improvements Budget shall be substantially completed in a lien-free, good and workmanlike manner, in accordance with all Legal Requirements, as reasonably determined by Lender.

If Borrower is unable to satisfy all of the foregoing conditions within the applicable time frames for each such condition, Lender shall have no obligation to extend the Stated Maturity Date or the First Extended Maturity Date, as applicable, hereunder.  In the event that Borrower is able to satisfy all of the foregoing conditions within the applicable time frames for each such condition, all references in this Agreement and in the other Loan Documents to the Stated Maturity Date shall automatically mean the First Extended Maturity Date or the Second Extended Maturity Date, as applicable, without further action by Borrower or Lender, provided, however, that upon Borrower's written request, Lender will confirm the effectiveness of such Extension Period.

## 3.     EXCULPATION.

3.1     **Exculpation.**  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document.  The provisions of this Section 3.1 shall not, however, (i) constitute a

waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases and Rents; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Mortgage or to exercise its remedies against the Property; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

        (a)      fraud, willful misconduct, misrepresentation or failure to disclose a material fact by or on behalf of Borrower, Guarantor, any Affiliate of Borrower or Guarantor, or any of their respective agents or representatives in connection with the Loan, including by reason of any claim under the Racketeer Influenced and Corrupt Organizations Act (RICO);

        (b)      the forfeiture by Borrower of the Property, or any portion thereof, because of the conduct or purported conduct of criminal activity by Borrower or Guarantor or any of their respective agents or representatives in connection therewith;

        (c)      physical waste of the Property or any portion thereof, or after an Event of Default the removal or disposal of any portion of the Property;

        (d)      any Proceeds paid by reason of any Insured Casualty or any Award received in connection with a Condemnation or other sums or payments attributable to the Property not applied in accordance with the provisions of the Loan Documents (except to the extent that Borrower did not have the legal right, because of a bankruptcy, receivership or similar judicial proceeding, to direct disbursement of such sums or payments);

        (e)      all Rents of the Property received or collected by or on behalf of the Borrower after an Event of Default and not applied to payment of Principal and interest due under the Note, and to the payment of actual and reasonable operating expenses of the Property, as they become due or payable (except to the extent that such application of such funds is prevented by bankruptcy, receivership, or similar judicial proceeding in which Borrower is legally prevented from directing the disbursement of such sums);

        (f)      misappropriation, misapplication or conversion by or on behalf of Borrower (including failure to turn over to Lender on demand following an Event of Default) of any gross revenues (including Rents, security deposits, advance deposits, any other deposits, rents collected in advance, funds held by Borrower for the benefit of another party and Lease Termination Payments);

(g)    the failure to pay Taxes or to obtain and maintain the fully paid for Policies in accordance with Section 8.1 of this Loan Agreement, provided Borrower shall not be liable to the extent funds to pay such amounts are available in the Tax and Insurance Subaccount and Lender failed to pay same;

(h)    the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Section 5.21 hereof and Section 6.8 hereof, and clauses (viii) through (xi) of Section 6.31 hereof;

(i)    any cost or expense incurred by Lender in connection with the enforcement of its rights and remedies hereunder or any other Loan Document;

(j)    failure to pay charges (including charges for labor or materials) that can create Liens on any portion of the Property, to the extent such Liens are not bonded over or discharged in accordance with this Agreement and the other Loan Documents; or

(k)    Borrower's failure to pay any amount resulting in a lien as described in Section 61 of the Texas Labor Code.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "*Springing Recourse Event*"):

(i)    an Event of Default described in Section 9.1(d) hereof shall have occurred;

(ii)    a breach of the representation set forth in Section 5.1(b) hereof or a breach in the covenants set forth in Section 6.13 hereof;

(iii)    Borrower or SPE Party files a voluntary petition under the Bankruptcy Code or files a petition for bankruptcy, reorganization or similar proceeding pursuant to any other Federal or state bankruptcy, insolvency or similar law;

(iv)    Borrower is substantively consolidated with any other Person; unless such consolidation was involuntary and not consented to by Borrower, SPE Party or Guarantor and is discharged, stayed or dismissed within thirty (30) days following the occurrence of such consolidation;

(v)    the filing of an involuntary petition against Borrower and/or SPE Party under the Bankruptcy Code or an involuntary petition for bankruptcy, reorganization or similar proceeding pursuant to any other Federal or state bankruptcy, insolvency or similar law by any other Person in which (x) Borrower and/or SPE Party or any Affiliate, officer, director or representative which, directly or indirectly, Controls Borrower and/or

SPE Party colludes with or otherwise assists such Person, and/or (y) Borrower and/or SPE Party or any Affiliate, officer, director or representative which, directly or indirectly, Controls Borrower and/or SPE Party solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower and/or SPE Party by any Person;

(vi)     Borrower and/or SPE Party or any Affiliate, officer, director or representative which, directly or indirectly, Controls Borrower and/or SPE Party files an answer consenting to, or otherwise acquiescing in, or joining in, any involuntary petition filed against it by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law;

(vii)    Borrower or any Affiliate, officer, director or representative which, directly or indirectly, Controls Borrower consents to, or acquiesces in, or joins in, an application for the appointment of a custodian, receiver, liquidator, trustee or examiner for Borrower, and SPE Party or any portion of the Property;

(viii)   Borrower or SPE Party makes an assignment for the benefit of creditors; or

(ix)     if Guarantor, Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Notes, the Mortgage or any other Loan Document, seeks a defense, judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan.

In addition to the foregoing and Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower for payment of the Borrower's Casualty Shortfall Liability (as defined in the Addendum), as and when determined by Lender in accordance with the Addendum.  Borrower agrees that no portion of any sums received by or on behalf of Borrower or Guarantor, from time to time, in reduction of the outstanding amount of the Debt shall be deemed to have been applied in reduction of Borrower's Casualty Shortfall Liability until such time as the entire outstanding amount of the Debt shall be reduced by payments by or on behalf of Borrower or Guarantor to an amount equal to or less than the Required Casualty Paydown (as defined in the Addendum).  In addition for the purpose of this subsection, Borrower's Casualty Shortfall Liability shall not be deemed reduced by application of any of the following: (i) payments made during the continuation of an Event of Default (unless any such payment reduces the amount of the Debt below the Required Casualty Paydown amount), (ii) proceeds from any foreclosure sale or liquidation of the Property or (iii) the fair market value of the Property in the event that Lender takes title to the Property by foreclosure, deed-in-lieu of foreclosure or otherwise.  Notwithstanding the foregoing, in no event shall Lender collect from Borrower and/or Guarantor, in the aggregate, an amount in excess of the total amount due under

33

the Loan and Loan Documents.

## 4.    CASH MANAGEMENT AND RESERVES

**4.1    Cash Management Arrangements.**   Borrower shall from and after the first occurrence of a Cash Management Period cause all Rents to be transmitted directly by non-residential tenants of the Property into an Eligible Account (the "*Clearing Account*") established and maintained by Borrower at a local bank selected by Borrower and reasonably approved by Lender, which shall at all times be an Eligible Institution (the "*Clearing Bank*") as more fully described in the Clearing Account Agreement.  Without in any way limiting the foregoing, all Rents received by Borrower or Manager, during a Cash Management Period shall be deposited into the Clearing Account within one (1) Business Day of receipt.  Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into Borrower's operating account at the Clearing Bank, unless a Cash Management Period is continuing, in which event such funds shall be swept on a daily basis into an Eligible Account at the Deposit Bank controlled by Lender (the "*Deposit Account*") and applied and disbursed in accordance with this Agreement.  Funds in the Deposit Account shall be invested at Lender's discretion only in Permitted Investments.  Lender will also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "*Subaccounts*").  The Deposit Account and any Subaccount will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom.  Borrower shall pay for all expenses of opening and maintaining all of the above accounts.

**4.2    Required Repairs.**

**4.2.1    Completion of Required Repairs.**  Borrower shall perform and complete each item of the repairs and environmental remedial work at the Property described on Schedule 1A hereto (the "*Required Repairs*") within six (6) months of the date hereof or such shorter period of time for such item set forth on Schedule 1A hereto.

**4.2.2    Required Repairs Reserves.**  On the date hereof, Borrower shall deposit with Lender the aggregate amount set forth on Schedule 1A hereto as being required to complete the Required Repairs and Lender shall cause such amount to be transferred to a Subaccount (the "*Required Repairs Subaccount*").  Provided no Default or Event of Default shall have occurred and is continuing, Lender shall disburse funds held in the Required Repairs Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, accompanied by the following items (which items shall be in form and substance satisfactory to Lender): (i) an Officer's Certificate (A) certifying that the Required Repairs or any portion thereof which are the subject of the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with such Required Repairs or any portion thereof and (C) stating that each such Person has been or, upon receipt of the requested disbursement, will be paid in full with respect to the portion of the Required Repairs which is the subject of the requested disbursement; (ii) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender; (iii) at Lender's option, if the requested disbursement exceeds $25,000, a title search for

34

the Property indicating that it is free from all Liens not previously approved by Lender; (iv) a copy of each License required to be obtained, if applicable, with respect to the portion of the Required Repairs which is the subject of the requested disbursement; and (v) such other evidence as Lender shall reasonably request that the Required Repairs which are the subject of the requested disbursement have been completed and paid for.  Provided no Default or Event of Default shall have occurred and is continuing, upon Borrower's completion of all Required Repairs in accordance with this Section 4.2, Lender shall release any funds remaining in the Required Repairs Subaccount, if any, to Borrower.

**4.3**     **Taxes and Insurance.**  Borrower shall pay to Lender (i) $53,487.92 on the date hereof on account of Taxes, (ii) $14,445.03 on the date hereof on account of Insurance Premiums, and (iii) on each Payment Date, (x) one-twelfth (1/12) of the Taxes that Lender estimates will be payable during the next twelve (12) months (initially $10,697.58 per month) in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (y) one-twelfth (1/12) of the Insurance Premiums that Lender estimates will be payable (initially $7,222.52 per month) for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies.  Such amounts will be transferred by Lender to a Subaccount (the "***Tax and Insurance Subaccount***").  Provided that no Default or Event of Default has occurred and is continuing, Lender will (a) apply funds in the Tax and Insurance Subaccount to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 6.2 hereof and Section 8.1 hereof, provided that Borrower has promptly supplied Lender with notices of all Taxes and Insurance Premiums due, or (b) reimburse Borrower for such amounts upon presentation of evidence of payment; subject, however, to Borrower's right to contest Taxes in accordance with Section 6.2 hereof.  In making any payment relating to Taxes and Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If Lender determines in its reasonable judgment that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Taxes or Insurance Premiums next coming due, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Tax and Insurance Subaccount.

**4.4**     **Capital Expense Reserves.**

**4.4.1**     Borrower shall pay to Lender (i) $850,000.00 on the date hereof (the "***Upfront Capital Reserve Deposit***") and (ii) on each Payment Date during the First Extension Term and Second Extension Term, an amount initially equal to $3,500.00 per month.  Lender will transfer such amounts into a Subaccount (the "***Capital Reserve Subaccount***").  Additionally, upon thirty (30) days' prior notice to Borrower, Lender may reassess the amount of the monthly payment required under this Section 4.4 from time to time in its reasonable discretion (based upon its then current underwriting standards).  Borrower shall perform and complete (in a lien-free, good and workmanlike manner, in accordance with all Legal Requirements) the roof capital improvement work associated with and described in the Capital Improvements Budget at the Property within six (6) months of the date hereof, the failure to do so shall constitute an Event of Default under this Agreement.

35

**4.4.2**    Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Capital Reserve Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000 provided that (i) such disbursement is for an Approved Capital Expense or costs described in the Capital Improvements Budget; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of the work associated with such Approved Capital Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (1) that such funds will be used to pay or reimburse Borrower for Approved Capital Expenses and a description thereof, (2) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (3) that the same has not been the subject of a previous disbursement, and (4) that all previous disbursements have been used to pay the previously identified Approved Capital Expenses, and (B) lien waivers or other evidence of payment satisfactory to Lender, (C) at Lender's option, if the requested disbursement exceeds $25,000, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender and (D) such other evidence as Lender shall reasonably request that the Approved Capital Expenses at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower.  Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Capital Expenses may, at Lender's option, be made by direct check payable to the payee on such Approved Capital Expenses.

**4.4.3**    Anything contained herein to the contrary notwithstanding, upon disbursement to Borrower of a portion of the Upfront Capital Reserve Deposit in the aggregate amount of 50% of the Upfront Capital Reserve Deposit, Lender shall have the right in its sole discretion to withhold further disbursements of funds in the Capital Reserve Subaccount if Lender determines based on the financial statements delivered by Borrower pursuant to Section 7.3.2 and Section 7.3.3 hereof that the then current Rents are less than seventy-five percent (75%) of the projected increased levels in Borrower's proforma financial statements provided to Lender on or prior to the date hereof.

**4.5**    **Intentionally Omitted.**

**4.6**    **Casualty/Condemnation Subaccount.**  Borrower shall pay, or cause to be paid, to Lender all Proceeds or Awards due to any Casualty or Condemnation to be transferred to a Subaccount (the "*Casualty/Condemnation Subaccount*") in accordance with the provisions of Article 8 hereof.  All amounts in the Casualty/Condemnation Subaccount shall disbursed in accordance with the provisions of Article 8 hereof.

**4.7**    **Security Deposits.**    Borrower shall keep and hold all security deposits under Leases in accordance with applicable Legal Requirements and at a separately designated account under Borrower's control at the Clearing Bank (and in the case of a letter of credit, assigned with full power of attorney and executed sight drafts to Lender) so that the security deposits shall not be commingled with any other funds of Borrower (such account, the "*Security Deposit Account*"). During a Cash Management Period, Borrower shall, upon Lender's request, if permitted by applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) under Leases, to be held by Lender in a Subaccount (the "*Security*

36

*Deposit Subaccount*") subject to the terms of the Leases. Security deposits held in the Security Deposit Subaccount will be released by Lender upon notice from Borrower together with such evidence as Lender may reasonably request that such security deposit is required to be returned to a tenant pursuant to the terms of a Lease or may be applied as Rent pursuant to the rights of Borrower under the applicable Lease. Any letter of credit or other instrument that Borrower receives in lieu of a cash security deposit under any Lease entered into after the date hereof shall (i) be maintained in full force and effect in the full amount unless replaced by a cash deposit as hereinabove described and (ii) if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender).

**4.8    Excess Cash Subaccount.**  If a Cash Management Period shall have commenced, then on the immediately succeeding Payment Date and on each Payment Date thereafter during the continuance of such Cash Management Period, all Available Cash shall be paid to Lender, which amounts shall be transferred by Lender into a Subaccount (the "*Excess Cash Subaccount*") as cash collateral for the Debt. Any funds in the Excess Cash Subaccount and not previously disbursed or applied shall be disbursed to Borrower upon the termination of such Cash Management Period. Lender shall have the right, but not the obligation, at any time (i) during the continuance of an Event of Default or (ii) subsequent to the second Calculation Date following the commencement of a Debt Yield Cash Management Period (whether or not an Event of Default is then continuing), in its sole and absolute discretion to apply all sums then on deposit in the Excess Cash Subaccount to the Debt, in such order and in such manner as Lender shall elect in its sole and absolute discretion, including to make a prepayment of Principal (together with the applicable Exit Fee, and Spread Maintenance Premium applicable thereto).

**4.9    Grant of Security Interest; Application of Funds.**  As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all Borrower's right, title and interest in and to all Rents and in and to all payments to or monies held in the Clearing Account, the Deposit Account, all Subaccounts created pursuant to this Agreement and all other Eligible Accounts created pursuant to this Agreement (collectively, the "*Cash Management Accounts*"). Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the (i) payment of such Rents to Lender or (ii) deposit of such Rents into the Deposit Account. Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Mortgage or exercise its other rights under the Loan Documents. Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender. Provided no Event of Default is continuing, all interest which accrues on the funds in any Cash Management Account (other than the Tax and Insurance Subaccount) shall accrue for the benefit of Borrower and shall be taxable to Borrower and shall be added to and disbursed in the same manner and under the same conditions as the principal sum on

which said interest accrued.  Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower.

### 4.10    **Property Cash Flow Allocation.**

**4.10.1**  During any Cash Management Period, all Rents deposited into the Deposit Account during the immediately preceding Interest Period shall be applied on each Payment Date as follows in the following order of priority:

(i)      First, to make payments into the Tax and Insurance Subaccount as required under Section 4.3 hereof;

(ii)      Second, to pay the monthly portion of the fees charged by the Deposit Bank in accordance with the Deposit Account Agreement;

(iii)      Third, to Lender to pay the Monthly Payment Amount, due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this Section 4.10.1, then due to Lender under the Loan Documents);

(iv)      Fourth, to make payments into the Capital Reserve Subaccount as required under Section 4.4.1 hereof;

(v)      Intentionally omitted;

(vi)      Fifth, funds in an amount equal to the Monthly Operating Expense Budgeted Amount and any then-current Approved Additional Operating Expenses shall be disbursed to Borrower (or to an account designated by Borrower); and

(vii)      Lastly, all amounts remaining after payment of the amounts set forth in clauses (i) through (vi) above (the "*Available Cash*"), (A) during the continuance of a Cash Management Period, into the Excess Cash Subaccount in accordance with Section 4.8 hereof, and (B) provided no Cash Management Period is continuing, to Borrower as directed by Borrower in writing.

**4.10.2**  The failure of Borrower to make all of the payments required under clauses (i) through (vi), of Section 4.10.1 above in full on each Payment Date shall constitute an Event of Default under this Agreement; provided, however, if adequate funds are available in the Deposit Account for such payments, the failure by the Deposit Bank to allocate such funds into the appropriate Subaccounts shall not constitute an Event of Default**.**

**4.10.3**  Notwithstanding anything to the contrary contained in this Section 4.10 or elsewhere in the Loan Documents, after the occurrence of a Default or an Event of Default, Lender may apply all Rents deposited into the Deposit Account and other proceeds of repayment in such order and in such manner as Lender shall elect**.**  Lender's right to withdraw and apply any of the foregoing funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

**4.11**    **Cash Flow Shortfall Reserve**.

**4.11.1**  Borrower shall pay to Lender the amount of $60,000.00 on the date hereof**.** Lender will transfer such amounts into a Subaccount (the "*Cash Flow Shortfall Reserve Subaccount*"). Provided no Event of Default has occurred and is continuing, within ten (10) Business Days after receiving a written notice from Borrower (such tenth Business Day, a "*Disbursement Date*") advising Lender of an actual shortfall in Net Operating Income for the purpose of paying, in the following order of priority, (i) the Monthly Payment Amount then due and payable, (ii) deposits into the Capital Reserve Subaccount and Tax and Insurance Subaccount as required pursuant to the terms of this Loan Agreement, (iii) the Monthly Operating Expense Budgeted Amount and (iv) any then-current Approved Additional Operating Expenses (clauses (i) through (iv) hereof, collectively, "*Qualified Disbursements*"), Lender shall apply funds held in the Cash Flow Shortfall Reserve Subaccount to the Qualified Disbursements due on the immediately following Payment Date, but only to the extent that Net Operating Income is not sufficient to pay same, and provided that Lender's failure to do so shall not relieve Borrower of its obligation to make said payments.  Notwithstanding anything contained herein to the contrary, the amount disbursed from the Cash Flow Shortfall Reserve Subaccount on the applicable Disbursement Date shall be the amount requested by Borrower, not to exceed the actual shortfall in Net Operating Income in the calendar month immediately preceding the subject Disbursement Date (e.g., for a Disbursement Date in July, the relevant actual shortfall in Net Operating Income would be based on the actual shortfall in June) for the purpose of paying, in full (but only to the extent that Net Operating Income is not sufficient to pay same), the Qualified Disbursements due on the immediately following Payment Date.  Borrower acknowledges that Lender has no obligation to disburse more than the remaining balance of funds on deposit in the Cash Flow Shortfall Reserve Subaccount if such amount is less than the full payment requested, and that Lender has no obligation to disburse amounts more than once in each calendar month. Notwithstanding the foregoing, provided no Event of Default has occurred and is continuing and provided that the Property has achieved a Debt Yield (calculated based on the ratio for the immediately preceding twelve (12) month period) of at least 7.0% for two (2) consecutive Calculation Dates, Lender shall disburse any remaining funds in the Cash Flow Shortfall Reserve Subaccount to Borrower.

**4.11.2**  If, at any time during the Term, Lender reasonably determines that the balance of funds on deposit in the Cash Flow Shortfall Reserve Subaccount is not sufficient to pay projected Debt Service during the remaining Term due to shortfalls in Net Operating Income, then, within ten (10) Business Days after demand by Lender, Borrower shall deposit with Lender the amount reasonably required by Lender to satisfy such obligations.

**4.12**    **Security Reserve.**

**4.12.1 Security Upgrades Reserves.**  On the date hereof, Borrower shall deposit with Lender the aggregate amount set forth on Schedule 1B hereto as being required to complete the security improvement upgrade work at the Property described on Schedule 1B hereto (the "*Security Upgrades*") and Lender shall cause such amount to be transferred to a Subaccount (the "*Security Upgrades Subaccount*").  Provided no Default or Event of Default shall have occurred and is continuing, Lender shall disburse funds held in the Security Upgrades Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor

(but not more often than once per month), in increments of at least $5,000, accompanied by the following items (which items shall be in form and substance satisfactory to Lender): (i) an Officer's Certificate (A) certifying that the Security Upgrades or any portion thereof which are the subject of the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with such Security Upgrades or any portion thereof and (C) stating that each such Person has been or, upon receipt of the requested disbursement, will be paid in full with respect to the portion of the Security Upgrades which is the subject of the requested disbursement; (ii) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender; (iii) at Lender's option, if the requested disbursement exceeds $25,000, a title search for the Property indicating that it is free from all Liens not previously approved by Lender; (iv) a copy of each License required to be obtained, if applicable, with respect to the portion of the Security Upgrades which is the subject of the requested disbursement; and (v) such other evidence as Lender shall reasonably request that the Security Upgrades which are the subject of the requested disbursement have been completed and paid for. Provided no Default or Event of Default shall have occurred and is continuing, upon Borrower's completion of all Security Upgrades in accordance with this Section 4.12, Lender shall release any funds remaining in the Security Upgrades Subaccount, if any, to Borrower.

## 5.    **REPRESENTATIONS AND WARRANTIES**

Borrower represents and warrants to Lender as of the date hereof that, except to the extent (if any) disclosed on Schedule 2 hereto with reference to a specific Section of this Article 5:

### 5.1    **Organization; Special Purpose.**

(a)    Each of Borrower and SPE Party is duly organized, validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged. Borrower is duly qualified to do business and is in good standing in the jurisdiction in which the Property is located and in each other jurisdiction where it is required to be so qualified in connection with its properties, business and operations.

(b)    Each of Borrower and SPE Party has at all times since its formation been, and as of the date hereof is, a Special Purpose Bankruptcy Remote Entity.

### 5.2    **Proceedings; Enforceability**.  Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents by it, and has the power and authority to execute, deliver and perform under the Loan Documents and all the transactions contemplated thereby. The Loan Documents have been duly authorized, executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, SPE Party or

Guarantor including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and none of Borrower, SPE Party or Guarantor have asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

      **5.3**    **No Conflicts.**  The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with any provision of any law or regulation to which Borrower is subject, or conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties.  Borrower's rights under the Licenses and the Management Agreement will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's performance thereunder, the recordation of the Mortgage, or the exercise of any remedies by Lender.  Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, the Loan Documents or the consummation of the transactions contemplated hereby, has been obtained and is in full force and effect.

      **5.4**    **Litigation.**  There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened against or affecting Borrower, SPE Party, Guarantor, Manager or the Property, in any court or by or before any other Governmental Authority, which, if adversely determined, might materially and adversely affect the condition (financial or otherwise) or business of Borrower (including the ability of Borrower to carry out its obligations under the Loan Documents), SPE Party, Guarantor, Manager or the use, value, condition or ownership of the Property.

      **5.5**    **Agreements.**  Borrower is not a party to any agreement or instrument or subject to any restriction which might materially or adversely affect Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise.  Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially or adversely affect the condition (financial or other) or operations of Borrower or its properties or might have consequences that would adversely affect its performance hereunder.  Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound.

      **5.6**    **Title.**  Borrower has good, marketable and indefeasible title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith.  The Mortgage when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will

create (i) a valid, perfected first priority lien on Borrower's interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Mortgage, have been paid or are being paid simultaneously herewith. All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policy. The Permitted Encumbrances, individually or in the aggregate, do not (a) materially interfere with the benefits of the security intended to be provided by the Mortgage and this Agreement, (b) materially and adversely affect the value, operation or use of the Property, or (c) impair Borrower's ability to repay the Loan. No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property. There are no mechanics', materialman's or other similar Liens or claims which have been filed for work, labor or materials affecting the Property which are or may become a Lien prior to, or equal or coordinate priority with, the Liens created by the Loan Documents. There are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property. The Survey does not fail to reflect any material matter affecting the Property or the title thereto. All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property, except those which are set forth on the Survey and insured against by the Title Insurance Policy. Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments. With respect to the Title Insurance Policy, to the best of Borrower's knowledge after due inquiry, (i) the Title Insurance Policy is in full force and effect, (ii) the Title Insurance Policy is freely assignable by Lender to and will inure to the benefit of the transferee (subject to recordation of an assignment of mortgage) without the consent or any notification to the insurer, (iii) the premium with respect thereto has been paid in full (or will be paid in full with a portion of the proceeds of the Loan), (iv) the Title Insurance Policy is issued by a title insurance company licensed to issue policies in the State, (v) no claims have been made under the Title Insurance Policy and no other action has been taken that would materially impair the Title Insurance Policy and (vi) the Title Insurance Policy contains no exclusions for any of the following circumstances, or it affirmatively insures Lender against losses relating to any of the following circumstances (unless the Property is located in a jurisdiction where such affirmative insurance is not available): (a) that the Property has access to a public road and (b) that the area shown on the Survey is the same as the property legally described in the Mortgage.

     **5.7**    <u>**No Bankruptcy Filing.**</u>  Neither Borrower nor any of its constituent Persons are contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or properties (a "***Bankruptcy Proceeding***"), and Borrower has no knowledge of any Person contemplating the

filing of any such petition against it or such constituent Persons. In addition, neither Borrower nor SPE Party nor any principal nor Affiliate of Borrower or SPE Party has been a party to, or the subject of a Bankruptcy Proceeding for the past ten (10) years.

**5.8    Full and Accurate Disclosure.**  No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.  There is no material fact presently known to Borrower that has not been disclosed to Lender which adversely affects, or, as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of  Borrower and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein.  Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

**5.9    Tax Filings.**  To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state, and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state, and local taxes, charges and assessments payable by Borrower.  Borrower's tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**5.10    ERISA; No Plan Assets.**  As of the date hereof and throughout the Term (i) Borrower, Guarantor or any ERISA Affiliate do not sponsor, are not obligated to contribute to, and are not themselves an "employee benefit plan," as defined in Section 3(3) of ERISA or Section 4975 of the Code, (ii) none of the assets of Borrower or Guarantor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA, (iii) Borrower and Guarantor are not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrower or Guarantor are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.  As of the date hereof, neither Borrower, Guarantor nor any ERISA Affiliate maintains, sponsors or contributes to, or has any obligations with respect to, a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA). Neither Borrower nor Guarantor has engaged in any transaction in connection with which it could be subject to either a material civil penalty assessed pursuant to the provisions of Section 502 of ERISA or a material tax imposed under the provisions of Section 4975 of the Code.

**5.11    Compliance.**  Borrower and the Property (including the Improvements) and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking, building and applicable zoning and land use laws, codes, regulations and

ordinances).  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower.  The Property is used exclusively for multi-family residential use and other appurtenant and related uses.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property.  All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required of Borrower for the legal use, occupancy and operation of the Property for its current use (collectively, the "*Licenses*"), have been obtained and are in full force and effect.  The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

      **5.12**    <u>Contracts.</u> Borrower has not entered into, or is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender.  Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the best knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto.  None of Borrower, Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.  Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.  Except for Manager under the Management Agreement, no Major Contract has as a party an Affiliate of Borrower.

      **5.13**    **<u>Federal Reserve Regulations; Investment Company Act.</u>**  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document.  Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

      **5.14**    **<u>Easements; Utilities and Public Access.</u>**  All easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "*Easements*"), if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder.  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses.  All public

utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid irrevocable easement. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

5.15 **Physical Condition.** Except as may be expressly set forth in the Physical Conditions Report, the Property, including all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages to the Property, whether latent or otherwise. Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or any termination or threatened termination of any policy of insurance or bond. No portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located the flood insurance required pursuant to Section 8.1.1 hereof is in full force and effect with respect to the Property. The Improvements have suffered no material casualty or damage which has not been fully repaired and the cost thereof fully paid.

5.16 **Leases.** The rent roll attached hereto as Schedule 3 (the "*Rent Roll*") is true, complete and correct and the Property is not subject to any Leases other than the Leases described in the Rent Roll. Except as set forth on the Rent Roll: (i) each Lease is in full force and effect; (ii) the tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises, have commenced the payment of rent under the Leases, and there are no offsets, claims or defenses to the enforcement thereof; (iii) all rents due and payable under the Leases have been paid and no portion thereof has been paid for any period more than thirty (30) days in advance; (iv) the rent payable under each Lease is the amount of fixed rent set forth in the Rent Roll, and there is no claim or basis for a claim by the tenant thereunder for an adjustment to the rent; (v) no tenant has made any claim against the landlord under any Lease which remains outstanding, there are no defaults on the part of the landlord under any Lease, and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default; (vi) to Borrower's best knowledge, there is no present material default by the tenant under any Lease; (vii) all security deposits under Leases are as set forth on the Rent Roll and are held consistent with Section 4.7 hereof; (viii) Borrower is the sole owner of the entire lessor's interest in each Lease; (ix) each Lease is the valid, binding and enforceable obligation of Borrower and the applicable tenant thereunder; (x) no Person has any possessory interest in, or right to occupy, the Property except under the terms of the Leases; (xi) each Lease is subordinate to the Loan Documents, either pursuant to its terms or pursuant to a subordination and attornment agreement; (xii) all work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable tenant under such Lease; (xiii) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any tenant under any Lease has already been received by such tenant; (xiv) no tenant under any Lease (or any sublease) is an Affiliate of Borrower; (xv) intentionally omitted; (xvi) intentionally omitted; (xvii) no tenant under any Lease has assigned its Lease or

45

sublet all or any portion of the premises demised thereby, no such tenant holds its leased premises under assignment or sublease, nor does anyone except such tenant and its employees occupy such leased premises; (xviii) no tenant under any Lease has any right or option for additional space in the Improvements; and (xix) each tenant under a Material Lease is free from bankruptcy or reorganization proceedings.  The copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto.  None of the Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof.  Neither the Leases nor the Rents have been assigned or pledged except to Lender, and no other Person has any interest therein except the tenants thereunder.

**5.17** **Fraudulent Transfer.**  Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total probable liabilities, including subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Borrower's assets is, and immediately following the making of the Loan, will be, greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower).

**5.18** **Ownership of Borrower.**  Borrower's exact legal name is: APEX SIERRA HERMOSA TX LP. Borrower is of the following organizational type (e.g., corporation, limited liability company): limited partnership, and the jurisdiction in which Borrower is organized is: Texas.  Borrower's Tax I.D. number is 83-4622737 and Borrower's Texas SOS File number is 0803306492.  The sole general partner of Borrower is SPE Party.  Aron Puretz is the owner of all of the membership interests of SPE Party, all of which membership interests has been validly issued and are nonassessable.  The only other limited partners of Borrower are APJS TX LP, FW Real Estate Partners LLC, Eliezer Sorotzkin, Moshe Lachover, Avi Jankelovits.  The membership interests of SPE Party and the partnership interests in Borrower are owned free and clear of all Liens, warrants, options and rights to purchase.  Borrower has no obligation to any Person to purchase, repurchase or issue any ownership interest in it.  The organizational chart attached hereto as Schedule 4 is true, complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower.

**5.19** **Purchase Options.**  Neither the Property nor any part thereof is subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of third parties.

**5.20** **Management Agreement.**  The Management Agreement is in full force and effect.  There is no default, breach or violation existing thereunder, and no event has occurred (other than

payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto.

**5.21** **Hazardous Substances.** (i) The Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes (including with respect to Toxic Mold), any local law requiring related permits and licenses and all amendments to and regulations in respect of the foregoing laws (collectively, "***Environmental Laws***"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, toxic mold or fungus of a type that may pose a risk to human health or the environment or would negatively impact the value of the Property ("***Toxic Mold***") or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "***Hazardous Substances***"); (iii) to the best of Borrower's knowledge, after due inquiry, no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of Borrower's knowledge, after due inquiry, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) to the best of Borrower's knowledge, after due inquiry, no Toxic Mold is on or about the Property which requires remediation; (vi) no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vii) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which have not been provided to Lender.

**5.22** **Name; Principal Place of Business.** Borrower does not use and will not use any trade name and has not done and will not do business under any name other than its actual name set forth herein. The principal place of business of Borrower is its primary address for notices as set forth in Section 7.1 hereof, and Borrower has no other place of business.

**5.23** **Other Debt.** There is no indebtedness with respect to the Property or any excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**5.24** **Insurance.** Borrower has obtained and has delivered to Lender certificates of all of the Policies, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any of the

47

Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**5.25** **FIRPTA.** Borrower is not a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

**5.26** **Operations Agreements.** Each Operations Agreement is in full force and effect and neither Borrower nor, to Borrower's knowledge, any other party to any Operations Agreement, is in default thereunder, and to the best of Borrower's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder. Except as described herein, each REA has not been modified, amended or supplemented.

All of the representations and warranties in this Article 5 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 5.21 above shall survive in perpetuity.

## 6. **COVENANTS**

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

**6.1** **Existence.** Each of Borrower and SPE Party shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses and all applicable governmental authorizations, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property.

**6.2** **Taxes and Other Charges.** Borrower shall pay all Taxes and Other Charges as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and the Other Charges have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay such Taxes nor furnish such receipts for payment of Taxes paid by Lender pursuant to Section 4.3 hereof). Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and is continuing, (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances, (iii) such proceeding shall suspend the collection of the Taxes or such Other Charges, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (vi) Borrower shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest

48

and penalties thereon, which shall not be less than 125% of the Taxes and Other Charges being contested, (vii) Borrower shall promptly upon final determination thereof pay the amount of such Taxes or Other Charges, together with all costs, interest and penalties, and (viii)  Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in clauses (i) through (vii) of this Section 6.2.  Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage being primed by any related Lien.

**6.3**     **Access to Property.**   Borrower shall permit agents, representatives, consultants and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice (which may be given verbally).

**6.4**     **Repairs; Maintenance and Compliance; Alterations.**

**6.4.1**     **Repairs; Maintenance and Compliance.**   Borrower shall at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 6.4.2 below and normal replacement of Equipment with Equipment of equivalent value and functionality).  Borrower shall promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement.  Borrower shall notify Lender in writing within one (1) Business Day after Borrower first receives notice of any such non-compliance. Borrower shall promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair. Notwithstanding the foregoing, there are currently violations outstanding affecting the Property as disclosed in that certain Zoning Report prepared by Partner dated as of May 3, 2019, as revised, with project number 19-245461.1. Borrower represents and warrants that no such violations are fire or life and safety in nature and Borrower shall diligently, properly and promptly cure such violations and have them removed of record within one hundred-twenty (120) days of the date hereof and the failure to do so shall be an Event of Default.

**6.4.2**     **Alterations.**   Borrower may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's financial condition or the value or Net Operating Income of the Property and (iii) are in the ordinary course of Borrower's business.  Borrower shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, however, that Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to 125% of the cost of the Material Alteration as estimated by Lender.  Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who

provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien and (iii) all material Licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued. Borrower shall reimburse Lender upon demand for all out-of-pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 6.4.2.

**6.5     Performance of Other Agreements.** Borrower shall observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property, including the Loan Documents.

**6.6     Cooperate in Legal Proceedings.** Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document.

**6.7     Further Assurances.** Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Debt and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; (ii) provide all such information as Lender may reasonably require to ensure Borrower's ongoing compliance with Sections 6.26 and 6.32, including ensuring compliance with all "know your customer" procedures as Lender may from time-to-time institute with respect to loans that are of a similar size and nature as the Loan; and (iii) upon Lender's request therefor given from time to time after the occurrence of any Default or Event of Default pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and SPE Party and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

**6.8     Environmental Matters.**

**6.8.1     Hazardous Substances.** So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property free from Hazardous Substances and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in violation of any Environmental Laws or (C) any condition on or near the Property shall pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("***Lender's Consultant***")), promptly after Borrower becomes aware of same, at Borrower's sole expense. Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal or cure.

### 6.8.2   **Environmental Monitoring.**

(a)      Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law.  Upon becoming aware of the presence of mold or fungus at the Property, Borrower shall (i) undertake an investigation to identify the source(s) of such mold or fungus and shall develop and implement an appropriate remediation plan to eliminate the presence of any Toxic Mold, (ii) perform or cause to be performed all acts reasonably necessary for the remediation of any Toxic Mold (including taking any action necessary to clean and disinfect any portions of the Property affected by Toxic Mold, including providing any necessary moisture control systems at the Property), and (iii) provide evidence reasonably satisfactory to Lender of the foregoing.  Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

(b)      Upon Lender's request, at any time and from time to time (but no more than once annually; provided, however, such limitation shall not apply during the continuance of an Event of Default or if Lender determines in its reasonable discretion that there exists cause to request an inspection/audit more often), Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower. Such inspections and audit may include soil borings and ground water monitoring.  If Borrower fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)      If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender, and with respect to any Toxic Mold, Borrower shall take all action necessary to clean and disinfect any portions of the Improvements affected by Toxic Mold in or about the Improvements, including providing any necessary moisture control systems at the Property.  If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("***Remedial Work***"), Borrower shall commence all such Remedial Work within thirty (30) days after written demand

by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law. All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender. All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work. If Borrower does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense. Notwithstanding the foregoing, Borrower shall not be required to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work. Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in such contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than 125% of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such contest.

(d)     Borrower shall not install or permit to be installed on the Property any underground storage tank.

**6.8.3   O & M Program.**   In the event any environmental report delivered to Lender in connection with the Loan recommends the development of or continued compliance with an operation and maintenance program for the Property (including, without limitation, with respect to the presence of asbestos and/or lead-based paint) ("*O & M Program*"), Borrower shall develop (or continue to comply with, as the case may be) such O & M Program and shall, during the term of the Loan, including any extension or renewal thereof, comply in all material respects with the terms and conditions of the O & M Program.

**6.9**    **Title to the Property.**  Borrower will warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons.

**6.10**    **Leases.**

**6.10.1  Generally.**    Upon request, Borrower shall furnish Lender with executed copies of all Leases then in effect.  All renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to existing local market rates and shall be arm's length transactions with bona fide, independent third-party tenants.

**6.10.2  Material Leases.**    Borrower shall not enter into a proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed.  Prior to seeking Lender's consent to any Material Lease, Borrower shall deliver to Lender a copy of such proposed lease (a "***Proposed Material Lease***").  Lender shall approve or disapprove each Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease for which Lender's approval is required under this Agreement within fifteen (15) Business Days of the submission by Borrower to Lender of a written request for such approval, accompanied by a final copy of the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.  If requested by Borrower, Lender will grant conditional approvals of Proposed Material Leases or proposed renewals, extensions or modifications of existing Material Leases at any stage of the leasing process, from initial "term sheet" through negotiated lease drafts, provided that Lender shall retain the right to disapprove any such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease, if subsequent to any preliminary approval material changes are made to the terms previously approved by Lender, or additional material terms are added that had not previously been considered and approved by Lender in connection with such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.

**6.10.3  Minor Leases.**    Notwithstanding the provisions of Section 6.10.2 above, provided that no Event of Default is continuing, renewals, amendments and modifications of existing Leases and proposed leases shall not be subject to the prior approval of Lender provided (i) the proposed lease would be a Minor Lease or the existing Lease as amended or modified or the renewal Lease is a Minor Lease, (ii) the proposed lease shall be written substantially in accordance with the standard form of Lease which shall have been approved by Lender, (iii) the Lease as amended or modified or the renewal Lease or series of leases or proposed lease or series of leases: (a) shall provide for net effective rental rates comparable to existing local market rates or more favorable to Borrower, (b) shall have an initial term (together with all renewal options) of not less than twelve (12) months (provided, however, up to ten percent (10%) of the Leases at the Property may be for a term of less than twelve (12) months but not less than six (6)  months in any event) or greater than two (2) years, (c) shall provide for automatic self-operative subordination to the Mortgage and, at Lender's option, attornment to Lender, and (d) shall not contain any option to purchase, any right of first refusal to purchase, any right to terminate (except in the event of the destruction or condemnation of substantially all of the Property), any requirement for a non-disturbance or recognition agreement, or any other provision which might adversely affect the rights of Lender under the Loan Documents in any material respect.  Borrower shall deliver to

53

Lender copies of all Leases which are entered into pursuant to the preceding sentence together with Borrower's certification that it has satisfied all of the conditions of the preceding sentence within ten (10) days after the execution of the Lease.

**6.10.4  Additional Covenants with respect to Leases.**  Borrower (i) shall observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of (x) all notices of default that Borrower shall send or receive under any Lease, (y) any material communication that Borrower shall send or receive with respect to the Property or from any Tenant under any Lease, or (z) any communication to or from any Tenant that would trigger a Cash Management Period or Event of Default; (iii) shall enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv)  shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (vi) shall not modify any Lease in a manner inconsistent with the Loan Documents; (vii) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases; (viii) shall not consent to any assignment of or subletting under any Material Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing,  be unreasonably withheld or delayed; and  (ix) shall not cancel or terminate any Lease  or accept a surrender thereof (except in the exercise of Borrower's commercially reasonable judgment in connection with a tenant default under a Minor Lease) without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be  unreasonably withheld or delayed.

**6.11    Estoppel Statement.**

(a)    After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest and/or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, and (v) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)    Borrower shall deliver to Lender, upon request, estoppel certificates from each party under any Operations Agreement, in form and substance reasonably satisfactory to Lender; provided, that Borrower shall not be required to deliver such certificates more than three (3) times during the Term and not more frequently than once per calendar year (or twice during any calendar year in which a Securitization occurs).

**6.12    Property Management.**

**6.12.1  Management Agreement.**  Borrower shall (i) cause the Property to be managed pursuant to the Management Agreement; (ii) promptly perform and observe all of the covenants required to be performed and observed by it under the Management Agreement and do

54

all things necessary to preserve and to keep unimpaired its rights thereunder; (iii) promptly notify Lender of any default under the Management Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other notice, report and estimate received by Borrower under the Management Agreement; and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement. Without Lender's prior written consent, Borrower shall not (a) surrender, terminate, cancel, extend or renew the Management Agreement or otherwise replace the Manager or enter into any other management agreement (except pursuant to Section 6.12.2 below); (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its rights and remedies under, the Management Agreement; (e) suffer or permit the occurrence and continuance of a default beyond any applicable cure period under the Management Agreement (or any successor management agreement) if such default permits the Manager to terminate the Management Agreement (or such successor management agreement); or (f) suffer or permit the ownership, management or control of the Manager to be transferred to a Person other than an Affiliate of Borrower.

**6.12.2   Termination of Manager.**  If (i) as of any Calculation Date, Borrower fails to maintain a Debt Yield of 3.5% (ii) an Event of Default shall be continuing, (iii) Manager is in default under the Management Agreement, (iv) Manager shall become a debtor in any bankruptcy or insolvency proceeding, or (v) upon the gross negligence, malfeasance or willful misconduct of the Manager, Borrower shall, at the request of Lender, terminate the Management Agreement and replace Manager with a replacement manager acceptable to Lender in Lender's discretion and, if a Securitization has occurred, the applicable Rating Agencies on terms and conditions satisfactory to Lender and, if a Securitization has occurred, the applicable Rating Agencies.  All calculations of the Debt Yield for purposes of this Section 6.12.2 shall be subject to verification by Lender.  Borrower's failure to appoint an acceptable manager within thirty (30) days after Lender's request of Borrower to terminate the Management Agreement shall constitute an immediate Event of Default.  Borrower may from time to time appoint a successor manager to manage the Property, provided that such successor manager and Management Agreement shall be approved in writing by Lender in Lender's discretion and, if a Securitization has occurred, the applicable Rating Agencies (and Lender's approval may be conditioned upon Borrower delivering a Rating Comfort Letter if the Loan, by itself or together with other loans, has been the subject of a Secondary Market Transaction, and if required pursuant to a Pooling and Servicing Agreement from and after the occurrence of a Secondary Market Transaction) as to such successor manager and Management Agreement).  If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, as a condition of Lender's consent, execute a consent and subordination of management agreement substantially in the form of the Consent and Subordination of Manager of even date herewith executed and delivered by Manager to Lender.

**6.13   Special Purpose Bankruptcy Remote Entity.**  Borrower shall at all times be a Special Purpose Bankruptcy Remote Entity.  SPE Party shall at all times be a Single Member Bankruptcy Remote LLC.  Neither Borrower nor SPE Party shall directly or indirectly make any change, amendment or modification to its or SPE Party's organizational documents, or otherwise take any action which could result in Borrower or SPE Party not being a Special Purpose

55

Bankruptcy Remote Entity. A "Special Purpose Bankruptcy Remote Entity" shall have the meaning set forth on Schedule 5 hereto.

**6.14    Intentionally Omitted.**

**6.15    Intentionally Omitted.**

**6.16    Change in Business or Operation of Property.** Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as a multi-family residential property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).

**6.17    Debt Cancellation.** Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**6.18    Affiliate Transactions.** Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the partners of Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

**6.19    Zoning.** Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**6.20    No Joint Assessment.** Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**6.21    Principal Place of Business.** Borrower shall not change its principal place of business or chief executive office from the address set forth in Section 7.1 hereof without first giving Lender thirty (30) days' prior written notice.

**6.22    Change of Name, Identity or Structure.** Borrower shall not change its name, identity (including its trade name or names) or Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender. Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and

priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

**6.23**   **Indebtedness.**   Borrower shall not directly or indirectly create, incur or assume any indebtedness (including guaranteeing any obligation or entering into any PACE Loan or similar transaction in which payment thereof is made through Taxes) other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, which in the case of such unsecured trade payables (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of one percent (1%) of the original amount of the Principal and (C) are paid within thirty (30) days of the date incurred (collectively, "***Permitted Indebtedness***").

**6.24**   **Licenses.**   Borrower shall not Transfer any License required for the operation of the Property.

**6.25**   **Compliance with Restrictive Covenants, Etc.**   Borrower shall at all times comply in all material respects with all Operations Agreements.  Borrower will not enter into, modify, waive in any material respect or release any Easements, Operations Agreements or other Permitted Encumbrances, or suffer, consent to or permit the foregoing, without Lender's prior written consent, which consent may be granted or denied in Lender's sole discretion.

**6.26**   **ERISA.**

(a)   Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender or any successor or assignee of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.  Borrower's covenant in this clause (a) is based on the assumption that no portion of  the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan Documents constitutes assets of a "benefit plan investor" as defined in Section 3(42) of ERISA and with respect to which Borrower is a party in interest (as defined in Section 3(14) of ERISA) or a disqualified person (as defined in Section 4975 of the Code) unless the conditions are satisfied.

(b)   Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets" within the meaning of 29 C.F.R. 2510.3-101, as modified in application by Section 3(42) of ERISA.

(c)   Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (i) Borrower and Guarantor are not and do not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower and Guarantor are not subject to state statutes regulating

57

investments and fiduciary obligations with respect to governmental plans; and (iii) the assets of Borrower and Guarantor do not constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA, and any "benefit plan investor" as defined in Section 3(42) of ERISA.

**6.27**   **Prohibited Transfers.**   Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer, other than a Permitted Transfer.  Borrower shall provide Lender with copies of all organizational documents (if any) relating to any Permitted Transfer. Borrower shall pay on demand all of the reasonable costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses, and, if a Securitization has occurred, including the fees and expenses of Rating Agencies and other outside entities, in connection with considering any proposed Transfer, whether or not the same is permitted or occurs.

**6.28**   **Liens.**   Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any direct or indirect legal or beneficial ownership interest in Borrower or any SPE Party, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien.

**6.29**   **Dissolution.**   Borrower shall not (i) engage in any division, dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents or (iv) cause, permit or suffer SPE Party to (A) divide, dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which SPE Party would be divided, dissolved, wound up or liquidated in whole or in part, or (B) amend, modify, waive or terminate the certificate of formation or operating agreement of SPE Party, in each case without obtaining the prior consent of Lender.

**6.30**   **Expenses.**

(a)   Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Borrower or required of Borrower under the terms of any Loan Document; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens in and to the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in

58

response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Servicer and, if a Securitization has occurred, the Rating Agencies in connection with the Loan or any modification thereof and (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work-out", or any insolvency or bankruptcy proceedings.

(b)     In addition, in connection with any Rating Comfort Letter, Review Waiver or other Rating Agency consent, approval or review requested or required hereunder (other than the initial review of the Loan by the Rating Agencies in connection with a Securitization), Borrower shall pay all of the reasonable costs and expenses of Lender and Servicer and the costs and expenses of each Rating Agency in connection therewith, and, if applicable, shall pay any fees imposed by any Rating Agency in connection therewith.

(c)     Any costs and expenses due and payable by Borrower hereunder which are not paid by Borrower within ten (10) days after demand may be paid from any amounts in the Deposit Account, with notice thereof to Borrower.  The obligations and liabilities of Borrower under this Section 6.30 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**6.31**     **Indemnity.**  Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Mortgage, the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous

59

Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that it is finally judicially determined that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  Any amounts payable to any Indemnified Party by reason of the application of this paragraph shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid.  The obligations and liabilities of Borrower under this Section 6.31 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

### 6.32    Patriot Act Compliance.

(a)    Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  Lender shall have the right, from time-to-time, to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause Borrower to comply therewith and any and all reasonable costs and expenses incurred by Lender in connection therewith shall be secured by the Mortgage and the other Loan Documents and shall be immediately due and payable.  For purposes hereof, the term "*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

(b)    Neither Borrower nor any partner in Borrower or member of such partner nor any owner of a direct or indirect interest in Borrower (a) is listed on any Government Lists (as defined below), (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (d) is currently under investigation by any Governmental Authority for alleged criminal activity.  For purposes hereof, the term "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of

monetary instruments, including any offense under (a) the criminal laws against terrorism; (b) the criminal laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or the (e) Patriot Act. "*Patriot Act Offense*" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "*Government Lists*" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by the Office of Foreign Assets Control ("*OFAC*"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists".

(c)     At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Key Principal or Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder, with the result that the investment in Borrower, Key Principal or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law (each, an "Embargoed Person"), or the Loan made by Lender would be in violation of law, (b) no Embargoed Person shall have any interest of any nature whatsoever in Borrower, Key Principal or Guarantor, as applicable, with the result that the investment in Borrower, Key Principal or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, Key Principal or Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, Key Principal or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

**6.33**     **Approval of Major Contracts.**     Borrower shall not, without Lender's prior consent: (a) enter into, surrender or terminate any Major Contract to which it is a party or to which Borrower or the Property is subject (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Major Contract to which it is a party or to which Borrower or the Property is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Major Contract to which it is a party or

to which Borrower or the Property is subject in any material respect, except on an arm's-length basis and commercially reasonable terms.

**6.34    The Use and Parking Requirements.**  Borrower shall comply with all of the terms and conditions set forth in the Zoning Non-Conformance Addendum attached hereto as Exhibit B (the "**Addendum**").

## 7.    NOTICES AND REPORTING

**7.1    Notices.**   All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "**Notice**") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or delivered by a nationally recognized overnight delivery service (such as Federal Express), or delivered by certified or registered United States mail, return receipt requested, postage prepaid, or by electronic mail (provided that any delivery by electronic mail is also promptly deposited for delivery by one of the other delivery methods set forth herein), in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by Notice to the other party):

If to Lender:

> The Bancorp Bank
> 3 Columbus Circle, Suite 2200,
> New York, NY 10019
> Attention: Ron Wechsler

with a copy to:

> Seyfarth Shaw LLP
> 620 Eighth Ave
> New York, New York 10018
> Attention:  Mitchell Kaplan, Esq.
> E-mail: mkaplan@seyfarth.com

and

> Wells Fargo Commercial Mortgage Servicing
> 2001 Clayton Road, 8th Floor,
> MAC A0293-080
> Concord, CA 94520
> Attn: Cash Management

If to Borrower:

> c/o APEX Equity Group
> 10 Hill Street
> Newark, NJ 07102
> Attention: Aron Puretz
> Email: aron@pfholdingsllc.com

with a copy to:

> Law Offices of Chaim C Zlotowitz, Esq. PLLC
> 140A Washington Ave, Suite 203
> Cedarhurst, New York 11516
> Attention: Chaim C Zlotowitz, Esq.
> E-mail: chaim@zlotowitzlaw.com

A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of overnight delivery, upon the first attempted delivery on a Business Day; or in the case of electronic mail, upon the confirmation of such electronic mail transmission.

**7.2**   **Borrower Notices and Deliveries.**   Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower or SPE Party which might materially adversely affect Borrower's or SPE Party's condition (financial or otherwise) or business or the Property; (ii) any material adverse change in Borrower's or SPE Party's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, SPE Party, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender.  In addition, after request by Lender (but no more frequently than twice in any year), Borrower shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) within thirty (30) days, tenant estoppel certificates addressed to Lender, its successors and assigns from each tenant at the Property in form and substance reasonably satisfactory to Lender.

**7.3**   **Financial Reporting.**

**7.3.1**   **Bookkeeping.**   Borrower shall keep on a calendar year basis, in accordance with GAAP, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, Manager or any Affiliate of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall desire.  After an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**7.3.2**   **Annual Reports.**   Borrower shall furnish to Lender annually, within 120 days after each calendar year, a complete copy of Borrower's annual financial statements prepared

63

by an independent certified public accountant reasonably acceptable to Lender (and following an Event of Default, all such financial statements shall be prepared and reviewed by an independent certified public accountant reasonably acceptable to Lender), each in accordance with GAAP, and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may request.  Such financial statements (x) shall be in form and substance satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Property, for the immediately preceding calendar year, including statements of annual Net Operating Income and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP, (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, (3) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which the amount involved is $250,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto and (4) the amount by which operating expenses incurred by Borrower for such period were greater than or less than the operating expenses reflected in the applicable Annual Budget.

       **7.3.3**   **Monthly/Quarterly Reports.**  Borrower shall furnish the following items to Lender within fifteen (15) days after (x) prior to a Securitization, the end of each calendar month or (y) from and after a Securitization, the end of each calendar quarter: (i) monthly and year-to-date operating statements, noting Net Operating Income and other information necessary and sufficient under GAAP to fairly represent the financial position and results of operation of the Property during such calendar month or quarter (as applicable), all in form satisfactory to Lender; (ii) a balance sheet for such calendar month or quarter (as applicable); (iii) a comparison of the budgeted income and expenses and the actual income and expenses for each month and year-to-date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year-to-date; (iv) a statement of the actual Capital Expenses made by Borrower during each calendar month or quarter (as applicable) as of the last day of such calendar month or quarter (as applicable); (v) a statement that Borrower has not incurred any indebtedness other than Permitted Indebtedness; (vi) an aged receivables report; (vii) any communications required to be provided to Lender under Section 6.10.4(ii) of this Agreement, or to the extent that no such communications are sent or received, Borrower shall make such certification in the accompanying Officer's Certificate; and (viii) rent rolls identifying the leased premises, names of all tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, and a delinquency report for the Property.  Each such statement shall be accompanied by an Officer's Certificate certifying, to the best of the signer's knowledge, (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP (subject to normal year-end adjustments), (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, (3) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which the amount involved is $250,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto and (4) the amount by which operating expenses incurred by Borrower for such period were greater than or less than the operating expenses reflected in the

applicable Annual Budget. Such financial statements shall contain such other information as shall be reasonably requested by Lender for purposes of calculations to be made by Lender pursuant to the terms hereof.

       **7.3.4**   **Other Reports.**  Borrower shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, SPE Party or Manager as may be reasonably requested by Lender or any applicable Rating Agency. Borrower shall submit to Lender the financial data and financial statements required, and within the time periods required, under clauses (f) and (g) of Section 10.1, if and when available.

       **7.3.5**   **Annual Budget.**    Borrower shall prepare and submit (or shall cause Manager to prepare and submit) to Lender, by November 30th of each year during the Term, a budget for the Property for the succeeding calendar year and, promptly after preparation thereof, any revisions to such Annual Budget (such budget and any revisions being the "***Annual Budget***"). Such Annual Budget shall be subject to the approval of Lender, which approval shall not (provided no Event of Default is continuing) be unreasonably withheld or delayed. Each Annual Budget submitted by Borrower and approved by Lender is referred to herein as the "***Approved Annual Budget***". The Annual Budget shall consist of (i) an operating expense budget showing, on a month-by-month basis, in reasonable detail, each line item of the Borrower's anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain and/or increase any monthly payments required hereunder (and once such Annual Budget has been approved by Lender, such operating expense budget shall be referred to herein as the "***Approved Operating Budget***"), and (ii) a Capital Expense budget showing, on a month-by-month basis, in reasonable detail, each line item of anticipated Capital Expenses (and once such Annual Budget has been approved by Lender, such Capital Expense budget shall be referred to herein as the "***Approved Capital Budget***"). Until such time that any Annual Budget has been approved by Lender, the prior Approved Annual Budget shall apply for all purposes hereunder (with such adjustments as reasonably determined by Lender (including increases for any non-discretionary expenses).

       **7.3.6**   **Additional Operating Expenses.**

       (a)    During a Cash Management Period, in the event that Borrower incurs or will incur any operating expense, including Emergency Expenditures, that is not in the Approved Annual Budget but is otherwise an Approved Operating Expense (each an "***Additional Operating Expense***"), then Borrower shall promptly (but in no event shall Borrower be required to do so more frequently than monthly) deliver to Lender a reasonably detailed explanation of such Additional Operating Expense(s) or, with respect to any such item that is subject to Lender's approval, such proposed Additional Operating Expense. Any Additional Operating Expense submitted to Lender (and, if required, approved by Lender) in accordance with this Agreement is referred to herein as an "Approved Additional Operating Expense".

       (b)    Any funds distributed to Borrower for the payment of Approved Additional Operating Expenses (including any distribution to Borrower pursuant to Section 4.10(a)(vi)) shall be used by Borrower only to pay for Approved Additional Operating Expenses or reimburse Borrower for Approved Additional Operating Expenses, as applicable.

**7.3.7** **Breach.** If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "***Required Records***") required by this Article 7 within thirty (30) days after the date upon which such Required Record is due, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $2,500 for each Required Record that is not delivered; provided Lender has given Borrower at least fifteen (15) days prior notice of such failure. In addition, thirty (30) days after Borrower's failure to deliver any Required Records, Lender shall have the option, upon fifteen (15) days notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

## 8. INSURANCE; CASUALTY; AND CONDEMNATION

### 8.1 Insurance.

**8.1.1** **Coverage.** Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term the following policies of insurance:

(a) Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including but not limited to: fire, lightning, windstorm/named storm, vandalism, malicious mischief, and subject to subsection (j) below, coverage for damage or destruction caused by the acts of "Terrorists" (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices for this loan type, from time to time are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction. Each such insurance policy shall (i) be in an amount equal to 100% full replacement cost of the Improvements without deduction for depreciation, (ii) have deductibles no greater than $25,000, or with respect to windstorm/named storm and earthquake, shall not exceed five percent (5%) of the total insurable value of the Property, (iii) be paid annually in advance and (iv) be issued on a replacement cost basis containing either no coinsurance or an agreed amount endorsement waiving any coinsurance provision, and shall cover, without limitation, all tenant improvements and betterments that Borrower is required to insure. Lender shall be named Mortgagee and Loss Payee under a Standard Mortgagee Clause, Lender's Loss Payable endorsement or equivalent.

(b) Flood insurance if any part of the Improvements or Personal Property is located in an area now or hereafter designated by the Federal Emergency Management Agency as Flood Zone "A" or "V," or such other Special Hazard Flood Area if Lender so requires in its sole discretion. Such policy shall (i) be in an amount equal to (A) the maximum amount of building and, if applicable, contents insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, plus (B) such additional coverage as reasonably required by Lender, and (ii) have a maximum permissible deductible of $10,000 per building.

(c) Liability insurance with no exclusion for terrorism including (i) commercial general liability insurance; (ii) liquor liability insurance, if the Property is a hotel and liquor is sold anywhere on the premises; and (iii) excess liability/umbrella insurance. Such liability insurance shall provide minimum limits of $1,000,000 per occurrence and $2,000,000 in the aggregate for each policy year, with a maximum deductible or self-insured retention of $25,000; with at least

56436067v.6

$5,000,000 excess liability/umbrella insurance for any and all covered claims. The policies described in this subsection shall include coverage for "Personal and Advertising Injury," "Contractual Liability" (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify Lender as required under this Agreement and the other Loan Documents), and "Products and Completed Operations." All liability policies, except excess liability/umbrella, shall name Lender as Additional Insured.

(d)     Loss of rents or business income insurance, if the Property is not a hotel, (i) with loss payable to Lender, (ii) in an amount equal to 100% of the projected Rents for a period of at least twelve (12) months for the initial period of restoration, plus a six-month Extended Period of Indemnity which provides that after the physical loss to the Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or until the limit for such coverage as required above is exhausted, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. If the Property is a hotel, business income insurance is required (i) with loss payable to Lender, (ii) in an amount equal to the projected lost net profit, continuing expenses and necessary payroll for a period of at least twelve (12) months for the initial period of restoration. The amount of such loss of rents or business income insurance shall be increased each year at renewal during the Term, as and when the estimated or actual Rents or business income exposure increases.

(e)     If applicable, Equipment breakdown insurance, formerly known as boiler and machinery insurance, covering all boilers or pressure vessels, underground piping, mechanical and electrical equipment against physical damage, as well as any resulting physical damage to the building improvements including without limitation, all tenant improvements and betterments and loss or rents or business income that Borrower is required to insure pursuant to the lease, on a replacement cost basis and in an amount acceptable to Lender.

(f)     If applicable, Worker's compensation coverage for any employees of Borrower, as required by any Legal Requirement.

(g)     During any period of restoration, renovation or construction, and if such work is excluded under the "all risk" or "special form" and/or general liability insurance policies, builder's risk or course of construction insurance on a so called completed value basis in an amount equal to not less than the 100% of the full replacement cost of the Property, and construction operations liability and Owner's and Contractor's Protective Liability (or its equivalent) on terms consistent with the coverage requirements set forth in 8.1.1.(a) and (c) above, in form and substance acceptable to Lender.

(h)     Ordinance and law coverage, if at any time during the loan term the Property is deemed to be a legal non-conforming use or structure, covering the value of the undamaged portion, demolition and debris removal and the increased cost of construction in amounts satisfactory to Lender.

(i)     Any blanket insurance Policy shall be subject to Lender's prior written approval and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 8.1.1(a).

(j)     intentionally omitted.

(k)     Such other insurance (including but not limited to  pollution legal liability insurance, earthquake insurance, mine subsidence insurance, and windstorm insurance is excluded under the "all risk" or "special form" policy) as may from time to time be reasonably required by Lender in order to protect its interests.

(l)     Notwithstanding anything in subsections (a) and (d) above to the contrary, Borrower shall be required to obtain and maintain coverage as part of its property insurance Policy against loss or damage by terrorist acts in an amount equal to 100% of the "Full Replacement Cost" of the Property plus loss of rents or business income; provided that such coverage is available.  There shall also be no exclusion for acts of terrorism under the general liability and excess liability/umbrella Policies.  In the event that such coverage with respect to terrorist acts is not included as part of the policies required by subsections (a) and (d) above and/or the general liability and excess liability/umbrella Policies required by subsection (c) above, Borrower shall, nevertheless be required to obtain coverage for terrorism (as stand-alone coverage) in an amount equal to 100% of the "Full Replacement Cost" of the Property under subsection (a) above, the loss of rents and/or business interruption coverage under subsection (d) and general liability and excess liability/umbrella coverage under subsection (c) above; provided that such coverage is available. Borrower shall obtain the coverage required under this subsection (j) from a carrier which otherwise satisfies the rating criteria specified in Section 8.1.2 below (a "Qualified Carrier") or in the event that such coverage is not available from a Qualified Carrier, Borrower shall obtain such coverage from the highest rated insurance company providing such coverage.

**8.1.2   Policies.**  All policies of insurance (the "*Policies*") required pursuant to Section 8.1.1 above shall (i) be issued by companies approved by Lender and authorized to do business in the State, with a claims paying ability rating of A-VIII or better by AM Best or "A" or better by S&P or "A2" or better by Moody's (and the equivalent by any other Rating Agency); (ii) name Lender and its successors and/or assigns as their interest may appear as the mortgagee (in the case of property insurance), loss payee (in the case of business interruption/loss of rents coverage) and an additional insured (in the case of liability insurance); (iii) contain (in the case of property insurance) a Non-Contributory Standard Mortgagee Clause or a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the person to which all payments made by such insurance company shall be paid; (iv) contain a waiver of subrogation in favor of Lender, as applicable; (v) the carrier-certified copies thereof delivered to Lender upon request; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under the Policies, (B) that Lender shall receive at least thirty (30) days prior written notice of any modification, reduction or cancellation of the property Policies, and Borrower or its management company as first named insured shall receive at least thirty (30) days prior written notice of any cancellation of liability Policies, and (C) providing that Lender is permitted to make payments to effect the continuation of such policies upon notice of cancellation due to non-payment of premiums; (vii) in the event any insurance policy (except for workers' compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the

premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds.  Borrower shall pay the premiums for such Policies (the "*Insurance Premiums*") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to Section 4.3 hereof) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.  If Borrower does not furnish such evidence and receipts at least ten (10) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.  Borrower shall deliver to Lender a certified copy of each Policy within ten (10) days after request by Lender.  Borrower shall promptly forward to Lender a copy of each written notice received by Borrower of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies. Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.  Notwithstanding the foregoing, in addition to Lender, all insurance renewals, cancellations and other notifications must be sent to:

Bancorp Bank, ISAOA, ATIMA
c/o Wells Fargo Bank NA, as servicer
D1118-02W
1525 West WT Harris Blvd.
Charlotte, NC 28262

**8.2**   **Casualty.**

**8.2.1**   **Notice; Restoration.**  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "*Casualty*"), Borrower shall give prompt notice thereof to Lender.  Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

**8.2.2**   **Settlement of Proceeds.**  If a Casualty covered by any of the Policies (an "*Insured Casualty*") occurs where the loss does not exceed $325,000, provided no Default or Event of Default has occurred and is continuing, Borrower may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrower is hereby authorized to collect and receive the insurance proceeds (the "*Proceeds*").  In the event of an Insured Casualty where the loss equals or exceeds $325,000 (a "*Significant Casualty*"), Lender may, in its sole discretion, settle and adjust any claim without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss, and the Proceeds shall be due and payable solely to Lender and held by Lender in the Casualty/Condemnation Subaccount and disbursed in accordance herewith.  If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant

69

Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender. Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse such check payable to the order of Lender. The expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand. Notwithstanding anything to the contrary contained herein, if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption insurance proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining net Proceeds that will be received from the property insurance carriers are sufficient to pay 100% of the cost of fully restoring the Improvements or, if such net Proceeds are to be applied to repay the Debt in accordance with the terms hereof, that such remaining net Proceeds will be sufficient to pay the Debt in full.

**8.3** **Condemnation.**

**8.3.1** **Notice; Restoration.** Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "***Condemnation***") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

**8.3.2** **Collection of Award.** Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "***Award***") and to make any compromise, adjustment or settlement in connection with such Condemnation. Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt. Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender. Lender shall hold such Award in the Casualty/Condemnation Subaccount and disburse such Award in accordance with the terms hereof.

### 8.4    Application of Proceeds or Award.

**8.4.1    Application to Restoration.**    If an Insured Casualty or Condemnation occurs where (i) the loss is in an aggregate amount less than the fifteen percent (15%) of the unpaid Principal; (ii) in the reasonable judgment of Lender, the Property can be restored within six (6) months, and prior to six (6) months before the Stated Maturity Date and prior to the expiration of the rental or business interruption insurance with respect thereto, to the Property's pre-existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will adequately secure the Debt; (iii) less than (x) thirty percent (30%), in the case of an Insured Casualty or (y) fifteen percent (15%), in the case of a Condemnation, of the rentable area of the Improvements has been damaged, destroyed or rendered unusable as a result of such Insured Casualty or Condemnation; (iv) Leases demising in the aggregate at least sixty-five percent (65%) of the total rentable space in the Property and in effect as of the date of the occurrence of such Insured Casualty or Condemnation remain in full force and effect during and after the completion of the Restoration (hereinafter defined); and (v) no Default or Event of Default shall have occurred and be then continuing, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrower for the cost of restoring, repairing, replacing or rebuilding the Property (the "*Restoration*"), in the manner set forth herein.   Borrower shall commence and diligently prosecute such Restoration.   Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse Borrower for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, both (x) Borrower shall pay (and if required by Lender, Borrower shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount of the Proceeds or the Award made available pursuant to the terms hereof; and (y) Lender shall have received evidence reasonably satisfactory to it that during the period of the Restoration, the Rents will be at least equal to the sum of the operating expenses and Debt Service and other reserve payments required hereunder, as reasonably determined by Lender.

**8.4.2    Application to Debt.**    Except as provided in Section 8.4.1 above, any Proceeds and/or Award may, at the option of Lender in its discretion, be applied to the payment of (i) accrued but unpaid interest on the Note, (ii) the unpaid Principal and (iii) other charges due under the Note and/or any of the other Loan Documents, or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth in Section 8.4.3 below.  Any prepayment (in whole or part) of the Loan made pursuant to this Section 8.4.2 shall be subject to the Exit Fee, but shall otherwise be without any Spread Maintenance Premium, unless an Event of Default has occurred and is continuing at the time the Proceeds are received from the insurance company or the Award is received from the condemning authority, as the case may be, in which event Borrower shall pay to Lender an additional amount equal to the Spread Maintenance Premium, if any, that may be required with respect to the amount of the Proceeds or Award applied to the unpaid Principal.

Notwithstanding the foregoing provisions of this Section 8.4, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the Lien of the Mortgage following a Casualty or Condemnation (but taking into account any proposed Restoration of the remaining Property), the ratio of the unpaid principal balance of the Loan to the value of the remaining Property is greater than 125% (such value to be determined, in Lender's sole discretion,

71

by any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of personal property or going concern value, if any), the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the net Award (after payment of Lender's costs and expenses and any other fees and expenses that have been approved by Lender), (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the Loan-To-Value Ratio of the Loan (as so determined by Lender) does not increase after the release, unless Lender receives an opinion of counsel that if such amount is not paid, the applicable Securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Mortgage. If and to the extent the preceding sentence applies, only such amount of the net Award, if any, in excess of the amount required to pay down the principal balance of the Loan may be released for purposes of Restoration or released to Borrower as otherwise expressly provided in this Section 8.4.

       **8.4.3**   **Procedure for Application to Restoration.**  If Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender, such Proceeds or Award shall be disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration reasonably satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's discretion, and (v) all plans and specifications for such Restoration, such plans and specifications to be approved by Lender prior to commencement of any work. Lender may, at Borrower's expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement. No payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Provided no Default or Event of Default then exists, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrower. Any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt or returned to Borrower.

# 9.   DEFAULTS

    **9.1**   **Events of Default.**  An "Event of Default" shall exist with respect to the Loan if any of the following shall occur:

       (a)    any portion of the Debt is not paid when due or Borrower shall fail to pay when due any payment required under Sections 4.3, 4.4, 4.5, 4.6 or 4.8 hereof;

(b)     any of the Taxes are not paid when due (unless Lender is paying such Taxes pursuant to Section 4.3 hereof), subject to Borrower's right to contest Taxes in accordance with Section 6.2 hereof;

(c)     the Policies are not kept in full force and effect, or are not delivered to Lender upon request;

(d)     a Transfer other than a Permitted Transfer occurs;

(e)     any representation or warranty made by Borrower or Guarantor or in any Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or Guarantor in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made;

(f)     Borrower, SPE Party or Guarantor shall make an assignment for the benefit of creditors, or shall generally not be paying its debts as they become due;

(g)     a receiver, liquidator or trustee shall be appointed for Borrower, SPE Party or Guarantor; or Borrower, SPE Party or Guarantor shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, SPE Party or Guarantor, as the case may be; or any proceeding for the division, dissolution or liquidation of Borrower, SPE Party or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, SPE Party or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within sixty (60) days;

(h)     Borrower breaches any covenant contained in Sections 6.12.1 (a) - (f), 6.13, 6.15, 6.22, 6.25 or 6.28 hereof;

(i)     except as expressly permitted hereunder, the actual or threatened alteration, improvement, demolition or removal of all or any portion of the Improvements without the prior written consent of Lender;

(j)     an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs; or any other event shall occur or condition shall exist, if the effect of such event or condition is to accelerate or to permit Lender to accelerate the maturity of any portion of the Debt;

(k)     a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(l)     a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 9.1, for ten (10) days after notice to Borrower (and Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days

after notice from Lender in the case of any other default; provided, however, that if such non-monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30)-day period, and Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days.

### 9.2    Remedies.

**9.2.1    Acceleration.**  Upon the occurrence of an Event of Default (other than an Event of Default described in paragraph (f) or (g) of Section 9.1 above) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand, (and Borrower hereby expressly waives any such notice or demand) that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest, Default Rate interest, Late Payment Charges, Spread Maintenance Premium, and Exit Fees and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in paragraph (f) or (g) of Section 9.1 above, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Spread Maintenance Premium, Exit Fees and any other amounts owing by Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

**9.2.2    Remedies Cumulative.**  Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Mortgage has been foreclosed, the Property has been sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.  To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

**9.2.3    Severance.**

(a)       During the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of the sums secured by the Mortgage and not previously recovered.

(b)       During the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

**9.2.4   Delay.**  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Mortgage to the extent necessary to foreclose on all or any portion of the Property, the Rents, the Cash Management Accounts or any other collateral.

**9.2.5   Lender's Right to Perform.**  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Mortgage and other Loan Documents) and shall bear interest thereafter at the Default Rate.  Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

## 10.    SPECIAL PROVISIONS

**10.1    Sale of Mortgage and Securitization.**  Subject to Section 10.4 hereof and the limitations set forth in Section 10.3 hereof:

(a)    Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, (ii) to sell participation interests in the Loan, or (iii) to securitize the Loan or any portion thereof in a single asset securitization or a pooled loan securitization.  (The transactions referred to in clauses (i), (ii) and (iii) are each hereinafter referred to as a "***Secondary Market Transaction***" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "***Securitization***".  Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "***Securities***").  At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

(b)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be required in the marketplace, by prospective investors, the Rating Agencies, applicable Legal Requirements and/or otherwise in the marketplace in connection with any Secondary Market Transactions, including to:

(i)    (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower and Manager, including the information set forth on Schedule 6 attached hereto, (B) provide updated budgets and rent rolls (including itemized percentage of floor area occupied and percentage of aggregate base rent for each tenant) relating to the Property, and (C) provide updated appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (collectively, the "***Updated Information***"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii)    provide opinions of counsel, which may be relied upon by Lender, the trustee in any Securitization, underwriters, NRSROs and their respective counsel, agents and representatives, as to fraudulent conveyance and true sale or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, the Loan Documents, and Borrower and its Affiliates, which counsel and opinions shall be satisfactory to Lender and the Rating Agencies;

(iii)    provide updated, as of the closing date of any Secondary Market Transaction, representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require; and

(iv)    If requested by Lender, provide an updated Survey (at sole cost and expense of Borrower) reasonably acceptable to Lender, the Rating Agencies and any investor or prospective investor in connection with a Secondary Market Transaction.

(c)    If, at the time a Disclosure Document is being prepared for a Securitization, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower (including any guarantor or other Person that is directly or indirectly committed by contract or otherwise to make payments on all or a part of the Loan) collectively, or the Property alone or the Property and

Related Properties collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request the following financial information:

(i)      if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included in the Securitization, net operating income for the Property and the Related Properties for the most recent Fiscal Year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB), or

(ii)      if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included in the Securitization, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X, and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d)      Further, if requested by Lender, Borrower shall, promptly upon Lender's request, furnish to Lender financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, for any tenant of the Property if, in connection with a Securitization, Lender expects there to be, as of the cut-off date for such Securitization , a concentration with respect to such tenant or group of Affiliated tenants within all of the mortgage loans included or expected to be included in the Securitization such that such tenant or group of Affiliated tenants would constitute a Significant Obligor. Borrower shall furnish to Lender, in connection with the preparation of the Disclosure Documents and on an ongoing basis, financial data and/or financial statements with respect to such tenants meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filings pursuant to the Exchange Act in connection with or relating to the Securitization (an "***Exchange Act Filing***") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e)      If Lender determines that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and Related Properties

collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) Exchange Act Filings are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(f)     Any financial data or financial statements provided pursuant to this Section 10.1 shall be furnished to Lender within the following time periods:

(i)     with respect to information requested in connection with the preparation of Disclosure Documents for a Securitization, within ten (10) Business Days after notice from Lender; and

(ii)     with respect to ongoing information required under Section 10.1(d) and (e) above, (1) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (2) not later than seventy-five (75) days after the end of each Fiscal Year of Borrower.

(g)     If requested by Lender, Borrower shall provide Lender, promptly, and in any event within five (5) Business Days following Lender's request therefor, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall reasonably determine to be required pursuant to Regulation S-K or Regulation S-X, as applicable, Regulation AB, or any amendment, modification or replacement thereto or other Legal Requirements relating to a Securitization or as shall otherwise be reasonably requested by the Lender.

(h)     If requested by Lender, whether in connection with a Securitization or at any time thereafter during which the Loan and any Related Loans are included in a Securitization, Borrower shall provide Lender, promptly upon request, a list of tenants of the Property (including all affiliates of such tenants) that in the aggregate (1) occupy 10% or more (but less than 20%) of the total floor area of the improvements or represent 10% or more (but less than 20%) of aggregate base rent, and (2) occupy 20% or more of the total floor area of the improvements or represent 20% or more of aggregate base.

(i)     All financial statements provided by Borrower pursuant to this Section 10.1(c), (d), (e) or (f) shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and other applicable Legal Requirements.  All financial statements relating to a Fiscal Year shall be audited by independent accountants in accordance with generally accepted auditing standards, Regulation S-X or Regulation S-K, as applicable, Regulation AB, and all other applicable Legal Requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and all other applicable Legal Requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference

to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing (or comparable information is required to otherwise be available to holders of the Securities under Regulation AB or applicable Legal Requirements), all of which shall be provided at the same time as the related financial statements are required to be provided.  All other financial statements shall be certified by the chief financial officer of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this paragraph.

### 10.2    Securitization Indemnification.

(a)    Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with any Secondary Market Transaction, including a Securitization, including an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "Disclosure Document") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "*Securities Act*"), or the Securities and Exchange Act of 1934, as amended (the "*Exchange Act*"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-party advisory and service providers relating to any Secondary Market Transaction, including a Securitization.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by Lender, the Issuer or the Securitization placement agent or underwriter may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

(b)    Borrower hereby agrees to indemnify The Bancorp Bank (whether or not it is Lender), any Affiliate of The Bancorp Bank that has filed any registration statement relating to the Securitization or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of The Bancorp Bank that acts as an underwriter, placement agent or initial purchaser of Securities issued in the Securitization, Lender (and for purposes of this Section 10.2, Lender shall include its officers and directors) and each Person who controls the Lender within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Lender Group*"), the issuer of the Securities (the "Issuer" and for purposes of this Section 10.2, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Securitization, each of their respective officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Underwriter Group*") for any losses, claims, damages or liabilities (collectively, the "*Liabilities*") to which Lender, the Lender Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, (A) any untrue statement of any material fact contained in the information provided to Lender by Borrower and its agents, counsel and representatives, (B) the omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, or (C) a breach of the representations and warranties made by Borrower in Section 5.8 of this Agreement.  Borrower also agrees to reimburse Lender, the Lender Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred

by Lender, the Lender Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities.  Borrower's liability under this paragraph will be limited to Liability that arises out of, or is based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property.  This indemnification provision will be in addition to any liability which Borrower may otherwise have.

(c)     In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrower agrees to (i) indemnify Lender, the Lender Group, the Issuer and the Underwriter Group for Liabilities to which Lender, the Lender Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, an alleged untrue statement or alleged omission or an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property, and (ii) reimburse Lender, the Lender Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)     Promptly after receipt by an indemnified party under this Section 10.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 10.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 10.2, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.  The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party.  Without the prior written consent of Lender

80

(which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given Lender reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 10.2(b) or (c) is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 10.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the Issuer's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.  Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f)     The liabilities and obligations of both Borrower and Lender under this Section 10.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**10.3**   <u>**Severance of Loan.**</u>  Subject to Section 10.4 below, Lender shall have the right, at Lender's sole expense (other than as set forth in Section 10.4 below), at any time (whether prior to, in connection with, or after any Secondary Market Transaction), with respect to all or any portion of the Loan, to modify, split and/or sever all or any portion of the Loan as hereinafter provided.  Without limiting the foregoing, Lender may (i) cause the Note and the Mortgage to be split into a first and second mortgage loan, (ii) create one or more senior and subordinate notes (i.e., an A/B or A/B/C structure), (iii) create multiple components of the Note or Notes (and allocate or reallocate the principal balance of the Loan among such components), (iv) otherwise sever the Loan into two (2) or more loans secured by mortgages and by a pledge of partnership or membership interests (directly or indirectly) in Borrower (i.e., a senior loan/mezzanine loan structure), in each such case described in clauses (i) through (iv) above, in whatever proportion and whatever priority Lender determines, and (v) modify the Loan Documents with respect to the newly created Notes or components of the Note or Notes such that the pricing and marketability of the Securities and the size of each class of Securities and the rating assigned to each such class by the Rating Agencies shall provide the most favorable rating levels and achieve the optimum rating levels for the Loan.  Notwithstanding the foregoing, no such amendment described above shall (i) modify or amend any material economic term of the Loan, or (ii) materially increase the obligations, or decrease the rights, of Borrower under the Loan Documents; provided, however, in each such instance the outstanding principal balance of all the Notes evidencing the Loan (or

components of such Notes) immediately after the effective date of such modification equals the outstanding principal balance of the Loan immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification until Maturity (as such interest rate may increase or decrease from time to time pursuant to the terms of this Agreement) equals the interest rate of the original Note immediately prior to such modification.  If requested by Lender, Borrower (and Borrower's constituent members, if applicable, and Guarantor) shall execute within seven (7) Business Days after such request, such documentation as Lender may reasonably request to evidence and/or effectuate any such modification or severance.  At Lender's election, each note comprising the Loan may be subject to one or more Securitizations.  Lender shall have the right to modify the Note and/or Notes and any components in accordance with this Section 10.3 and, provided that such modification shall comply with the terms of this Section 10.3, it shall become immediately effective.

**10.4    Costs and Expenses.**  Notwithstanding anything to the contrary contained in this Article 10, Borrower shall not be required to incur any costs or expenses in the performance of its obligations under Sections 10.1 or 10.2 (excluding the indemnity obligations set forth therein) or Section 10.3 above, other than expenses of Borrower's counsel, accountants and consultants.

## 11.    MISCELLANEOUS

### 11.1    Intentionally Omitted.

### 11.2    Brokers and Financial Advisors.

(a)    Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than Meridian Capital Group - NJ0 MJ ("***Broker***") whose fees shall be paid by Borrower pursuant to a separate agreement.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this Section 11.2 shall survive the expiration and termination of this Agreement and the repayment of the Debt.

(b)    Notwithstanding anything in Section 11.2(a) above to the contrary, Borrower hereby acknowledges that (i) at Lender's sole discretion, Broker may receive further consideration from Lender relating to the Loan or any other matter for which Lender may elect to compensate Broker pursuant to a separate agreement between Lender and Broker (which compensation may include a one-time payment on the date hereof and/or ongoing payments from Lender to Broker), (ii) Lender shall have no obligation to disclose to Borrower the existence of any such agreement or the amount of any such additional consideration paid or to be paid to Broker whether in connection with the Loan or otherwise and (iii) Borrower has had the opportunity to speak with Broker regarding such additional consideration.

**11.3    Retention of Servicer.**    Lender reserves the right to retain Servicer to act as its agent hereunder with such powers as are specifically delegated to Servicer by Lender, whether pursuant to the terms of this Agreement, any Pooling and Servicing Agreement, the Deposit Account Agreement or otherwise, together with such other powers as are reasonably incidental thereto.  Borrower shall pay any customary fees and expenses of Servicer (i) in connection with a release of the Property (or any portion thereof), (ii) from and after a transfer of the Loan to any "master servicer" or "special servicer" for any reason, including as a result of a decline in the occupancy level of the Property, (iii) in connection with an assumption or modification of the Loan, (iv) in connection with the enforcement of the Loan Documents, and (v) in connection with any other action or approval taken by Servicer hereunder on behalf of Lender (which shall not include ongoing regular servicing fees relating to the day-to-day servicing of the Loan, for which Borrower shall not be charged).

**11.4    Survival; Successors and Assigns.**    This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.   All of Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**11.5    Lender's Discretion; Rating Agency Review Waiver.**

(a)    Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive.  Additionally, whenever in this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender in Lender's reasonable discretion, or Lender agrees to not withhold, condition or delay its consent, the decision of Lender to approve or disapprove, to consent, condition, delay or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender while an Event of Default is continuing unless otherwise specifically herein provided.

(b)    Whenever, pursuant to this Agreement or any other Loan Documents, a Rating Comfort Letter is required from each applicable Rating Agency, in the event that any applicable Rating Agency "declines review", "waives review" or otherwise indicates in writing or otherwise to Lender's or Servicer's satisfaction that no Rating Comfort Letter will or needs to be issued with respect to the matter in question (each, a "***Review Waiver***"), then the Rating Comfort Letter requirement with respect to such Rating Agency shall be deemed to be satisfied with respect

83

to such matter.  It is expressly agreed and understood, however, that receipt of a Review Waiver (i) from any one Rating Agency shall not be binding or apply with respect to any other Rating Agency and (ii) with respect to one matter shall not apply or be deemed to apply to any subsequent matter for which Rating Comfort Letter is required.

**11.6    Governing Law.**  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED, PROVIDED THAT TO THE EXTENT ANY OF SUCH LAWS MAY NOW OR HEREAFTER BE PREEMPTED BY FEDERAL LAW, IN WHICH CASE SUCH FEDERAL LAW SHALL SO GOVERN AND BE CONTROLLING.

**11.7    Modification, Waiver in Writing.**  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on, Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.  Lender shall have the right to waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

**11.8    Trial by Jury.**  BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**11.9    Headings/Schedules.**  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Schedules attached hereto, are

hereby incorporated by reference as a part of this Agreement with the same force and effect as if set forth in the body hereof.

**11.10    Severability.**    Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**11.11    Preferences.**    Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**11.12    Waiver of Notice.**    Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**11.13    Remedies of Borrower.**    If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf, except for Lender's acts of gross negligence.

**11.14    Prior Agreements.**    This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**11.15    Offsets, Counterclaims and Defenses.**    Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against

85

it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents. Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**11.16   Publicity.**  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender or any of Lender's Affiliates, a Loan purchaser, the Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender. Lender shall have the right to issue any of the foregoing without Borrower's approval.

**11.17   No Usury.**  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 11.17 shall control every other agreement in the Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**11.18   Conflict; Construction of Documents; Reliance.**  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation, drafting, execution and delivery of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan, without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender. Lender shall not be subject to any limitation

86

whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

### 11.19  No Third Party Beneficiaries.

(a)     Borrower and Lender intend that the relationships created under the Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

### 11.20  Intentionally Omitted.

**11.21  Spread Maintenance Premium.**  Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents and (b) if payments or prepayments of Principal are made to Lender prior to the Permitted Prepayment Date, for any reason whatsoever, whether voluntary, as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower agrees that, except as expressly provided in Article 8 hereof, all payments or prepayments, if any, made prior to the Permitted Prepayment Date, whether voluntary or involuntary, will be accompanied by the Spread Maintenance Premium applicable thereto; provided, however, that the foregoing shall not be deemed to imply that the Loan may be voluntarily prepaid in any manner or under any circumstance other than as expressly set forth in this Agreement.  Such Spread Maintenance Premium shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale.  Borrower further acknowledges that (A) it is a knowledgeable real estate developer and/or investor; (B) it fully understands the effect of the provisions of this Section 11.21, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Spread Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions.  Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Spread Maintenance Premium and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the

87

consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**11.22   Assignments and Participations.**   In addition to any other rights of Lender hereunder, the Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be sold, assigned, participated or otherwise transferred by Lender and any of its successors and assigns to any Person at any time in its sole and absolute discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise without notice to or consent from Borrower or any other Person.  Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender in all respects.  Except as expressly permitted herein, Borrower may not assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**11.23   Waiver of Marshalling of Assets.**   To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's members or partners, as applicable, and others with interests in Borrower, and of the Property, and shall not assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection, or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

**11.24   Joint and Several Liability.**   If more than one Person has executed this Agreement as "Borrower," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

**11.25   Creation of Security Interest.**   Notwithstanding any other provision set forth in this Agreement, the Note, the Mortgage or any of the other Loan Documents, Lender may at any time create a security interest in all or any portion of its rights under this Agreement, the Note, the Mortgage and any other Loan Document (including the advances owing to it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System

**11.26   Certain Additional Rights of Lender.**   Notwithstanding anything to the contrary which may be contained in this Agreement, Lender shall have:

(i)   the right to routinely consult with Borrower's management regarding the significant business activities and business and financial developments of Borrower, provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances.  Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times;

(ii)     the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any time upon reasonable notice;

(iii)     the right, in accordance with the terms of this Agreement, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness;

(iv)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict financing to be obtained with respect to the Property so long as any portion of the Debt remains outstanding;

(v)     the right, without restricting any other right of Lender under this Agreement or the other Loan Documents (including any similar right), to restrict, upon the occurrence of an Event of Default, Borrower's payments of management, consulting, director or similar fees to Affiliates of Borrower from the Rents;

(vi)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any operating budget and/or capital budget of Borrower;

(vii)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Property);

(viii)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict the transfer of interests in Borrower held by its members, and the right to restrict the transfer of interests in such member, except for any transfer that is a Permitted Transfer.

The rights described above may be exercised directly or indirectly by any Person that owns substantially all of the ownership interests in Lender.  The provisions of this Section are intended to satisfy the requirement of management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3-101.

**11.27  <u>Set-Off.</u>  In addition to any rights and remedies of Lender provided by this Loan Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower.  Lender agrees promptly to notify Borrower after any such set-**

**off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.**

**11.28**   **Counterparts.**   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

## 12.   LOCAL LAW PROVISIONS

The provisions of this Agreement are amended as follows:

**12.1**   The following sentences are hereby added immediately prior to the last sentence of Section 2.5.3 of this Agreement:

> "The Late Payment Charge shall be in addition to all other rights and remedies available to Lender upon the occurrence of a default under the Documents.  The payment of the Late Payment Charge shall not be required to the extent that the amount thereof, together with all other interest payable hereunder or under any of the other Documents, results in interest being charged in excess of the Maximum Rate (as such term is defined in the Note), and if such payment has been made, at the time it is determined that such excess exists, Lender shall, at its option, either return such Excess Amount (as such term is defined in the Note) to Borrower or credit such Excess Amount against the unpaid principal balance of the Loan (the ***"Balance"***), in which event any and all penalties of any kind under applicable law as a result of such excess interest shall be inapplicable."

**12.2**   The following sentences are hereby added immediately following the last sentence of Section 2.2.2 of this Agreement:

> "The payment of interest at the Default Rate shall not be required to the extent that the amount thereof, when taken together with all other interest payable hereunder or under any of the other Documents, including without limitation any Late Payment Charge, results in interest being charged in excess of the Maximum Rate, and if such payment has been made, at the time it is determined that such excess exists, Lender shall, at its option, either return the Excess Amount to Borrower or credit such Excess Amount against the Balance, in which event any and all penalties of any kind under applicable law as a result of such excess interest shall be inapplicable. Subject to the foregoing, the charging of interest at the Default Rate shall be in addition to all other rights and remedies available to Lender upon the occurrence of a default under the Documents."

**12.3**   The following is hereby added as a new Section 2.7.4 of this Agreement:

> "2.7.4  In the event any payment under this Section 2.7 is construed to be interest under the laws of the State of Texas in any circumstance, the payment thereof shall not be required to the extent that the amount thereof, together with other interest payable hereunder or under any of the other Documents, results in interest being charged in excess of the Maximum Rate, and if such payment has been made, at the time it is determined that such excess exists, Lender shall, at its option, either return the Excess Amount to Borrower or credit such Excess Amount against the

Balance, in which event any and all penalties of any kind under applicable law as a result of such excess interest shall be inapplicable. Partial prepayments of Principal hereunder shall not entitle Borrower to have any installments of principal and interest payable under the Note reduced by reamortizing the Balance or by applying such prepayment to the next maturing installment of principal and interest under the Note."

**12.4**    The following phrase is hereby added immediately to the end of the last sentence in Section 2.2.3 of this Agreement  (with said sentence being amended by deleting the period at the end):

"; provided, however, that if, in the opinion of Lender, Borrower is not permitted by law to pay such taxes or any such law would penalize Lender or Trustee (as defined in the Mortgage) in the event of such payment or the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then Lender shall have the option to declare the Debt immediately due and payable (without any Spread Maintenance Premium or Exit Fee becoming due) upon thirty (30) days' notice to Borrower."

**12.5**    The following sentences are hereby added to the end of Section 5.16 of this Agreement:

"Notwithstanding anything to the contrary set forth herein, Lender shall be entitled to all rights and remedies of an assignee as set forth in Chapter 64 of the Texas Property Code, the Texas Assignment of Rents Act ("**TARA**").  If an Event of Default exists, Lender shall have the ability to exercise its rights related to the Leases and Rents, in Lender's sole discretion and without prejudice to any other remedy available, as provided in this Agreement, the Mortgage, or as otherwise allowed by applicable law, including, without limitation, TARA."

**12.6**    The following is hereby added as a new Section 5.27 to this Agreement:

"**5.27  Subrogation.**  If any proceeds of the Note were used to extinguish, extend or renew any indebtedness on the Property, then, to the extent of the funds so used, (a) Lender shall be subrogated to all rights, claims, liens, titles and interests existing on the Property held by the holder of such indebtedness and (b) these rights, claims, liens, titles and interests are not waived but rather shall (i) continue in full force and effect in favor of Lender and (ii) are merged with the lien and security interest created by the Loan Documents as cumulative security for the payment and performance of the Debt and obligations hereunder and under the other Loan Documents; provided, however, that the terms and provisions of this Agreement, the Mortgage and the other Documents shall govern the rights and remedies of Lender and shall supersede the terms, provisions, rights, and remedies under and pursuant to the instruments creating the lien or liens to which Lender is subrogated under the Documents."

56436067v.6

**12.7**    The following sentence is hereby added at the end of Section 6.31 of this Agreement:

> "THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNIFIED PARTY WITH RESPECT TO LOSSES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PARTY OR ANY STRICT LIABILITY (BUT NOT TO THE EXTENT CAUSED BY OR ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY INDEMNIFIED PARTY)."

**12.8**    The following is hereby inserted in substitution for the existing Section 11.17 of this Agreement:

> "**11.17 Usury Savings Clause**.  It is the intent of Borrower and Lender in the making of the Loan to contract in strict compliance with applicable usury law.  In furtherance thereof, Borrower and Lender stipulate and agree that none of the terms and provisions contained herein, or in any of the applicable Documents, or in any other instrument executed in connection herewith, shall ever be construed to create a contract to pay for the use, forbearance, or detention of money, interest at a rate in excess of the maximum interest rate permitted to be charged by applicable law; that neither Borrower nor any guarantor, endorser or other party now or hereafter becoming liable for payment of the Loan shall ever be required to pay interest on the Loan at a rate in excess of the maximum interest that may be lawfully charged under applicable law, and the provisions of this Section 11.17 shall control over all other provisions of this Agreement, the Note, the Mortgage, any Documents, and any other instruments now or hereafter executed in connection herewith which may be in apparent conflict herewith.  Lender expressly disavows any intention to charge or collect excessive or unearned interest or finance charges in the event that maturity of the Loan is accelerated.  If the maturity of the Loan shall be accelerated for any reason or if the principal of the Loan is paid prior to the end of the term of the Loan, and as a result thereof the interest received for the actual period of existence of the Loan exceeds the applicable maximum lawful rate, Lender shall, at its option, either refund to Borrower the amount of such excess or credit the amount of such excess against the Balance (without prepayment premium or similar charge) and thereby shall render inapplicable any and all penalties of any kind provided by applicable law as a result of such excess interest.  In the event that Lender or any other holder of the Loan shall contract for, charge, or receive any amount of amounts which are deemed to constitute interest which would increase the effective interest rate on the Loan to a rate in excess of that permitted to be charged by applicable law, all such amounts deemed to constitute interest in excess of the lawful rate shall, upon such determination, at the option of Lender (or other holder of the Loan), be either immediately returned to Borrower or credited against the Balance (without prepayment premium or similar charge), in which event any and all penalties of any kind under applicable law as a result of such excess interest shall be inapplicable.  By execution of this Agreement, Borrower acknowledges that it believes the Loan to be non-usurious, and agrees that if, at any time, Borrower

92

should have reason to believe that the Loan is in fact usurious, it will give Lender (or other holder of the Loan) notice of such condition, and Borrower agrees that Lender (or other holder of the Loan) shall have ninety (90) days in which to make appropriate refund or other adjustment in order to correct such condition if in fact such exists.  The term "applicable law" as used in this Section 12.8 shall mean the laws of the State of Texas or the laws of the United States, whichever laws allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future."

12.9     The following is hereby added as a new Section 11.29 of this Agreement:

"**11.29   Negation of Partnership**.  Nothing contained herein or in the other Loan Documents is intended to create any partnership, joint venture or association between Borrower and Lender, or in any way make Lender a co-principal with Borrower with reference to the Property, and any inferences to the contrary are hereby expressly negated."

12.10    The following is hereby added as a new Section 11.30 of this Agreement:

"**11.30   Modification by Subsequent Owners**.  Borrower agrees that it shall be bound by any modification of this Agreement or any of the other Loan Documents made by Lender and any subsequent owner of the Property, with or without notice to Borrower, and no such modification shall impair the obligations of Borrower under this Agreement or under any Loan Document.  Nothing in this paragraph shall be construed as permitting any transfer of the Property which would constitute a default under this Agreement."

12.11    The following is hereby added as a new Section 11.31 of this Agreement:

"**11.31   Wage Claims**.  Borrower represents and warrants that (i) no wage claim is currently pending with the Texas Workforce Commission (the "**Commission**") against Borrower pursuant to Section 61 of the Texas Labor Code and (ii) to Borrower's knowledge, no lien exists against the Property pursuant to Section 61 of the Texas Labor Code.  Borrower shall not permit any lien to attach to the Property pursuant to Section 61 of the Texas Labor Code, unless the same has been bonded around in a manner reasonably satisfactory to Lender.  Borrower covenants and agrees to provide Lender with copies of any notices or orders received by Borrower from the Commission or any court in connection with any wage claim under Section 61 of the Texas Labor Code."

12.12    The following is hereby added as a new Section 11.32 of this Agreement:

"**11.32  Elimination of Architectural Barriers**.  Borrower represents and warrants to Lender that, to the best of Borrower's knowledge, after due inquiry, the Property is in compliance with the provisions of Chapter 469 of the Texas Government Code and any other applicable laws, statutes or ordinances related thereto, and any amendments in effect as of the date hereof, and all rules, regulations, and guidelines issued thereunder, all as are in force as of the date hereof."

**12.13**   The following is hereby added as a new Section 11.33 of this Agreement:

"**11.33    TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE**. (A) BORROWER IS REQUIRED TO: (i) KEEP THE PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT LENDER SPECIFIES; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR AS OTHERWISE PROVIDED HEREIN; AND (iii) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) BORROWER MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) IF BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN PARAGRAPH (A) OR (B), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWER AT BORROWER'S EXPENSE."

**12.14**   The following is hereby added as a new Section 11.34 of this Agreement:

"**11.34 THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT  ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**"

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

56436067v.6

**IN WITNESS WHEREOF,** the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**APEX SIERRA HERMOSA TX LP,**
a Texas limited partnership

By:   Apex Sierra TX LLC,
a Texas limited liability company,
its general partner

By: _____
Name: Aron Puretz
Title:  Sole Member

LENDER:

**THE BANCORP BANK,**
a Delaware state-chartered bank

By: _____
Name: Ron Wechsler
Title:  Executive Vice President,
Commercial Mortgage Securitization

[Signature page to Loan Agreement]

**IN WITNESS WHEREOF,** the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**APEX SIERRA HERMOSA TX LP,**
a Texas limited partnership

By:   Apex Sierra TX LLC,
        a Texas limited liability company,
        its general partner

        By: _____
        Name: Aron Puretz
        Title:   Sole Member

LENDER:

**THE BANCORP BANK,**
a Delaware state-chartered bank

By: _____
Name: Ron Wechsler
Title:   Executive Vice President,
            Commercial Mortgage Securitization

[Signature page to Loan Agreement]

## SCHEDULE 1A

## REQUIRED REPAIRS

| Required Repair Item | Completion Deadline | Estimated Repair Cost |
|---|---|---|
| Repair of the rolling security gates | Within 60 days of the date hereof | $2,500 |
| Repair of six down units with extensive suspect microbial growth, water damage, damaged flooring, damaged drywall, missing cabinets, appliances and other finishes. Units such at unit 141 appeared to be at the re-development stage with noted recently installed drywall. According to a capital expenditure budget, $40,000 has been provided for the restoration of six down units. Additional costs to restore the down units is anticipated | Within 60 days of the date hereof | $20,000 |
| Installation of one ADA van accessible parking space with proper identification and signage near an accessible curb cut accessible to the leasing office | Within 60 days of the date hereof | $250 |
| Toilet facilities in the leasing office are not generally accessible. Areas of non-accessibility include: missing wall grab bars, lavatory faucets, counter clearance and height, dispensers, pipe protection, and emergency fire alarms and strobes. Installation of a "For employee use only" sign at the leasing office restroom | Within 60 days of the date hereof | $50 |
| A total of approximately 231 square feet of suspect microbial growth. Areas of water damaged drywall, framing, flooring and miscellaneous materials were noted throughout the above-mentioned areas. Due to the extent of the suspect microbial growth, completion of a survey/assessment by a licensed professional to assess the extent of the suspect microbial growth damage is recommended. Necessary treatment and procedures of action to be obtained from the licensed professional. | Within 60 days of the date hereof | $2,500 |
| | | |
| Escrow Amount: $31,625.00, which is 125% of the Estimated Repair Cost | | |

Schedule 1

## SCHEDULE 1B

## SECURITY UPGRADES

| Security Upgrade Item | Completion Deadline | Estimated Upgrade Cost |
|---|---|---|
| Such security improvement work from time to time that is approved by Lender in writing | As approved by Lender | As approved by Lender |
| | | |
| | | |
| | | |
| | | |
| | | |
| Escrow Amount: $12,500.00 | | |

Schedule 1

## SCHEDULE 2

## EXCEPTIONS TO REPRESENTATIONS AND WARRANTIES

None.

## **SCHEDULE 3**

## **RENT ROLL**

[Attached]

# Summary Rent Roll

*Current tenants in the period 04/01/19 - 04/30/19*
*Security Deposit based on date: 4/1/2019*

05/09/19

| Tenant Name | Unit | Sq Ft | Unit Type | Deposit Held | 100% Rented | Vacancy Loss | Loss to Lease | Rent Charges | Misc Charges | Credits |
|---|---|---|---|---|---|---|---|---|---|---|
| **Sierra Hermosa** | | | | | | | | | | |
| Lusk, Icyesiss | 101 | 1032 | 2X2 A | 0.00 | 795.00 | 0.00 | 3.00 | 792.00 | 0.00 | 0.00 |
| Guy, Kabione | 102 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 100.00 | 0.00 |
| Roberts, Jesse | 103 | 1200 | 2x2.5 | 0.00 | 825.00 | 495.00 | -18.00 | 348.00 | 0.00 | 0.00 |
| Vazquez, Maria | 104 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Foreman, Shakia | 105 | 1032 | 2X2 A | 0.00 | 795.00 | 0.00 | -45.00 | 840.00 | 3.00 | 0.00 |
| Dacosta, Bill | 106 | 1032 | 2X2 A | 0.00 | 795.00 | 0.00 | 0.00 | 795.00 | 0.00 | 0.00 |
| McDonald FWH, Carrie | 107 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Nelson, Autmn | 108 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Jones, Marcia | 109 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 25.00 | 0.00 |
| Gonzalez, Arcenia | 110 | 1032 | 2X2 A | 0.00 | 795.00 | 0.00 | -75.00 | 870.00 | 100.00 | 0.00 |
| Montes, Silvia | 111 | 792 | 2X1 A | 0.00 | 793.00 | 687.27 | 12.41 | 93.32 | 130.00 | 0.00 |
| Spacek, Brittany | 112 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 20.93 | 0.00 |
| Moore, Marquarious | 113 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 35.00 | 0.00 |
| Dawkins, Branisha | 114 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 0.00 | 0.00 |
| VACANT | 115 | 792 | 2x1 | 0.00 | 730.00 | 730.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Jaramillo, Apolinar | 116 | 1032 | 2X2 A | 0.00 | 795.00 | 0.00 | -45.00 | 840.00 | 0.00 | 0.00 |
| Reyes, Francisco | 117 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -25.00 | 850.00 | 0.00 | 0.00 |
| Harris Jr, Leo | 118 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Perkins, Sharon | 119 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 45.00 | 780.00 | 0.00 | 0.00 |
| Cavanaugh, Tabidrick | 120 | 1032 | 2X2 A | 0.00 | 795.00 | 0.00 | -45.00 | 840.00 | 0.00 | 0.00 |
| Sanchez, Flavio | 121 | 1032 | 2X2 A | 0.00 | 795.00 | 0.00 | -45.00 | 840.00 | 0.00 | 0.00 |
| Nava, Juan | 122 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 170.00 | 0.00 |
| Neria, Payton | 123 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 35.00 | 0.00 |
| LeBlanc, Lenwanda | 124 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 60.00 | 0.00 |
| VACANT | 125 | 1032 | 2X2 A | 0.00 | 795.00 | 795.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Cortez, Lucia | 126 | 715 | 1x1 | 0.00 | 715.00 | 95.33 | -1,255.33 | 1,875.00 | 1,211.25 | 0.00 |
| Turner, Terry | 127 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 15.00 | 700.00 | 0.00 | 0.00 |
| King, Kiva | 128 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 0.00 | 0.00 |
| Lavaly, Bianca | 129 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 0.00 | 0.00 |
| Espinoza, Raul | 130 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 75.00 | 640.00 | 0.00 | 0.00 |
| Martgan, Marta | 131 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 175.00 | 0.00 |
| Jones, Yvette | 132 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 165.00 | 555.00 | 0.00 | 0.00 |
| Faye(TC), Ora | 133 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 215.00 | 500.00 | 0.00 | 0.00 |
| Smith, Jamar | 134 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 0.00 | 0.00 |
| Kendrix, Nettie | 135 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 0.00 | 0.00 |
| Clevela, Kimberly | 136 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 70.00 | 645.00 | 0.00 | 0.00 |
| VACANT | 137 | 720 | 1x1 A | 0.00 | 720.00 | 720.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Warren, Tysha | 138 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 0.00 | 720.00 | 0.00 | 0.00 |
| McGinnis FWH, Chelsea | 139 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Nava, Sherry | 140 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 70.00 | 0.00 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| VACANT | 141 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 142 | 720 | 1x1 A | 0.00 | 720.00 | 720.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 143 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 144 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lopez, Exequiel | 145 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |

| Name | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Jordan, Diamond | 146 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -75.00 | 900.00 | 0.00 | 0.00 |
| Carter, Kalin | 147 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Walker, David | 148 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 0.00 | 720.00 | 0.00 | 0.00 |
| Fajardo, Pedro | 149 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 65.00 | 650.00 | 0.00 | 0.00 |
| Jones, Nyeisha | 150 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 0.00 | 0.00 |
| Gordon, Duewa | 151 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 65.00 | 0.00 |
| Griffin, Ilka Joshu | 152 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 15.00 | 700.00 | 0.00 | 0.00 |
| Smith Jr, James | 153 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 0.00 | 720.00 | 0.00 | 0.00 |
| VACANT | 154 | 720 | 1x1 A | 0.00 | 720.00 | 720.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Aguirre, Griselda | 155 | 715 | 1x1 | 0.00 | 715.00 | 667.33 | 1.34 | 46.33 | 180.00 | 0.00 |
| Pierce, Mike | 156 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 10.00 | 0.00 |
| Bolden, Kenneth | 157 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 15.00 | 700.00 | 0.00 | 0.00 |
| Rhodes, Jamesha | 158 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 0.00 | 0.00 |
| Manuel, Antonio | 159 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 5.00 | 715.00 | 0.00 | 0.00 |
| McCall, Lynesha | 160 | 720 | 1x1 A | 0.00 | 720.00 | 96.00 | -1.00 | 625.00 | 0.00 | 0.00 |
| Cantu Garza, Eduardo | 161 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 15.00 | 700.00 | 0.00 | -350.00 |
| Quintero, Maria J | 162 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 70.00 | 650.00 | 0.00 | 0.00 |
| Whitesides, Ryan | 163 | 792 | 2X1 A | 0.00 | 793.00 | 0.00 | 1.00 | 792.00 | 100.00 | 0.00 |
| Lemay, Amanda L | 164 | 792 | 2X1 A | 0.00 | 793.00 | 0.00 | -7.00 | 800.00 | 100.00 | 0.00 |
| Branch, Tieya | 165 | 1200 | 2x2.5 | 0.00 | 825.00 | 495.00 | -18.00 | 348.00 | 285.00 | 0.00 |
| VACANT | 166 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Morris, Kathrina | 167 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Mora, Jose | 168 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 100.00 | 0.00 |
| Perez, Ernest | 169 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| VACANT | 170 | 735 | 1X1 B | 0.00 | 735.00 | 735.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salinas, Patricia | 171 | 735 | 1X1 B | 0.00 | 735.00 | 0.00 | 20.00 | 715.00 | 60.00 | 0.00 |
| Campbell, Sheila | 172 | 735 | 1X1 B | 0.00 | 735.00 | 0.00 | 20.00 | 715.00 | 0.00 | 0.00 |
| Rodney, Rodell | 173 | 735 | 1X1 B | 0.00 | 735.00 | 0.00 | 20.00 | 715.00 | 0.00 | 0.00 |
| Williams  FWH, Terry | 174 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 0.00 | 720.00 | 0.00 | 0.00 |
| VACANT | 175 | 715 | 1x1 | 0.00 | 715.00 | 715.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Goss, Linda | 176 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 105.00 | 610.00 | 0.00 | 0.00 |
| Dawn Moore | 177 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 0.00 | 715.00 | 0.00 | 0.00 |
| Barker FWH, LeeAnn | 178 | 715 | 1x1 | 0.00 | 715.00 | 23.83 | -23.73 | 714.90 | 0.00 | 0.00 |
| Johnson Ginger | 179 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 0.00 | 720.00 | 0.00 | 0.00 |
| Malone, Aubrey | 180 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | -25.00 | 820.00 | 0.00 | 0.00 |
| Schneider, Desiree | 181 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 50.00 | 775.00 | 0.00 | 0.00 |
| Audriana Simpson | 182 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 0.00 | 825.00 | 0.00 | 0.00 |
| Michelle Riffle, Colby Ray | 183 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -85.00 | 910.00 | 180.00 | 0.00 |
| Palomares, Marina | 184 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | -25.00 | 820.00 | 0.00 | 0.00 |
| Gonzale, Leonardo | 185 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | -25.00 | 820.00 | 0.00 | 0.00 |
| Longstreet, Janequa | 186 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 180.00 | 0.00 |
| Odonnell, Elyse | 187 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Insel, Bobby | 188 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 35.00 | 790.00 | 0.00 | -50.00 |
| Juarez, Miguel Jo | 189 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | -25.00 | 820.00 | 0.00 | 0.00 |
| Smith 2, Ebony | 190 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | -50.00 |
| Vasquez, Leonardo | 191 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Gentry, Erica | 192 | 1200 | 2x2.5 | 0.00 | 825.00 | 687.50 | 137.50 | 0.00 | 0.00 | 0.00 |
| Fuente, Jacque | 193 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | -400.00 |
| Mergerson, Nitiya | 194 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | |

| Name | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Hall, Typhanie | 195 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | -25.00 | 820.00 | 0.00 | 0.00 |
| Miller, Regina | 196 | 1200 | 2x2.5 | 0.00 | 825.00 | 302.50 | 174.50 | 348.00 | 0.00 | 0.00 |
| Cortez, Nora | 197 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 25.00 | 800.00 | 0.00 | 0.00 |
| Rodrig, Gaudencio | 198 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 40.00 | 785.00 | 0.00 | 0.00 |
| Martin, Luis | 199 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | -25.00 | 820.00 | 0.00 | 0.00 |
| Lander, Ron | 200 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | 0.00 | 795.00 | 0.00 | 0.00 |
| VACANT | 201 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| Name | Unit | SqFt | Type | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| VACANT | 202 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 203 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 204 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Morris, . | 205 | 1018 | 2x2 | 0.00 | 795.00 | 106.00 | -21.00 | 710.00 | 0.00 | 0.00 |
| Rodrgiue, Mariana | 206 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | -25.00 | 820.00 | 0.00 | 0.00 |
| VACANT | 207 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Pena, Edgar | 208 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 0.00 | 825.00 | 0.00 | 0.00 |
| Mehan, Vallery | 209 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 0.00 | 825.00 | 0.00 | 0.00 |
| Campbell, Jacob | 210 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 160.00 | 0.00 |
| Thomas, Wendy | 211 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | -400.00 |
| Brown, Kevin H | 212 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 30.00 | 690.00 | 150.00 | 0.00 |
| Vargas, Jose | 213 | 715 | 1x1 | 0.00 | 700.00 | 0.00 | 5.00 | 695.00 | 0.00 | 0.00 |
| Bradley, Aerial | 214 | 715 | 1x1 | 0.00 | 715.00 | 667.33 | 24.34 | 23.33 | 1,330.00 | 0.00 |
| Villarreal, Adrian | 215 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 15.00 | 700.00 | 180.00 | 0.00 |
| Baltimore FWH, Steve | 216 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 15.00 | 700.00 | 0.00 | 0.00 |
| Mendez, Esteban | 217 | 720 | 1x1 A | 0.00 | 720.00 | 0.00 | 70.00 | 650.00 | 0.00 | 0.00 |
| Cook, Ruby | 218 | 792 | 2X1 A | 0.00 | 793.00 | 0.00 | 18.00 | 775.00 | 0.00 | 0.00 |
| Lopez, Placido | 219 | 1032 | 2X2 A | 0.00 | 795.00 | 0.00 | 35.00 | 760.00 | 0.00 | 0.00 |
| VACANT | 220 | 792 | 2X1 A | 0.00 | 793.00 | 793.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Posada, Jose | 221 | 735 | 1X1 B | 0.00 | 735.00 | 0.00 | 20.00 | 715.00 | 0.00 | 0.00 |
| Dawson, Kerry | 222 | 735 | 1X1 B | 0.00 | 735.00 | 0.00 | 20.00 | 715.00 | 0.00 | 0.00 |
| VACANT | 223 | 1018 | 2x2 | 0.00 | 795.00 | 795.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 224 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 225 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 226 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Palomare, Macario | 227 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | 35.00 | 760.00 | 0.00 | 0.00 |
| Cisneros, Carmen | 228 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | 25.00 | 770.00 | 0.00 | 0.00 |
| VACANT | 229 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 230 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 231 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Trejo, Anjelica | 232 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | -25.00 | 820.00 | 10.00 | 0.00 |
| VACANT | 233 | 1018 | 2x2 | 0.00 | 795.00 | 795.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Moreno, Marisol E | 234 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Lambert, Iris | 235 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Sierra, Hector | 236 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | -270.00 |
| Hawkins, Afrique | 237 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 5.00 | 820.00 | 0.00 | 0.00 |
| VACANT | 238 | 1018 | 2x2 | 0.00 | 795.00 | 795.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 239 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Ahsan(TC), Brenda | 240 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 175.00 | 650.00 | 0.00 | 0.00 |
| Barrow, Richara | 241 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Burnside, Jimmie | 242 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 5.00 | 820.00 | 5.00 | 0.00 |
| Vaquez, Leonardo | 243 | 1200 | 2x2.5 | 0.00 | 825.00 | 797.50 | -842.50 | 870.00 | 180.00 | 0.00 |
| Luna, Armando | 244 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 100.00 | 0.00 |
| Rodriguez, Noemi | 245 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 50.00 | 775.00 | 0.00 | 0.00 |
| VACANT | 246 | 1018 | 2x2 | 0.00 | 795.00 | 795.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contreras, David | 247 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -25.00 | 850.00 | 0.00 | 0.00 |
| Jones, Francine | 248 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| Jackson, Angela | 249 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 0.00 | 0.00 |
| VACANT | 250 | 1018 | 2x2 | 0.00 | 795.00 | 795.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Case 4:22-cv-01145-P    Document 1-4    Filed 12/23/22    Page 113 of 135    PageID 1446

| Name | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| VACANT | 251 | 792 | 2x1 | 0.00 | 730.00 | 730.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VACANT | 252 | 1200 | 2x2.5 | 0.00 | 825.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Jimenez, Mariano | 253 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Melendez, Elizabeth | 254 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | 870.00 | 10.00 | 0.00 |
| Malama, Niche Beautiful | 255 | 792 | 2X1 A | 0.00 | 793.00 | 0.00 | 18.00 | 775.00 | 0.00 | 0.00 |
| VACANT | 256 | 1018 | 2x2 | 0.00 | 795.00 | 795.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Espinoza, Guillermo | 257 | 1018 | 2x2 | 0.00 | 795.00 | 0.00 | -25.00 | 820.00 | 0.00 | 0.00 |

| Name | | | | Held | Rented | Loss | Lease | | Charges | Charges | | Credits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VACANT | 258 | 720 | 1x1 A | 0.00 | 720.00 | 720.00 | 0.00 | | 0.00 | 0.00 | | 0.00 |
| Mendez, Gladis | 259 | 715 | 1x1 | 0.00 | 715.00 | 0.00 | 105.00 | | 610.00 | 0.00 | | 0.00 |
| VACANT | 260 | 735 | 1x1 B | 0.00 | 735.00 | 735.00 | 0.00 | | 0.00 | 0.00 | | 0.00 |
| Brooks, Juana | 261 | 715 | 1x1 | 0.00 | 715.00 | 452.83 | 0.00 | | 262.17 | 185.00 | | 0.00 |
| VACANT | 262 | 715 | 1x1 | 0.00 | 715.00 | 715.00 | 0.00 | | 0.00 | 0.00 | | 0.00 |
| Hooks, Keandre | 263 | 720 | 1x1 A | 0.00 | 720.00 | 408.00 | 0.00 | | 312.00 | 320.00 | | 0.00 |
| Obeng-Appau, Mercy | 264 | 792 | 2X1 A | 0.00 | 793.00 | 502.23 | 0.37 | | 290.40 | 0.00 | | 0.00 |
| Burch, Cynthia | 265 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | -45.00 | | 870.00 | 0.00 | | 0.00 |
| Shortnacy, Kenneth | 266 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 477.00 | | 348.00 | 300.00 | | 0.00 |
| Murillo, Jose | 267 | 1200 | 2x2.5 | 0.00 | 825.00 | 0.00 | 5.00 | | 820.00 | 0.00 | | 0.00 |
| VACANT | 268 | 792 | 2X1 A | 0.00 | 793.00 | 793.00 | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | **168** | | | 0.00 | 131,309.00 | 34,849.67 | -1,714.12 | # | 98,173.45 | 6,325.18 | | -1,520.00 |

|  | Held | Rented | Loss | Lease | | Charges | Charges | | Credits |
|---|---|---|---|---|---|---|---|---|---|
| **Totals for report** | 0.00 | 131,309.00 | 34,849.67 | -1,714.12 | # | 98,173.45 | 6,325.18 | | -1,520.00 |
| | **Total Units:** 168 | | **Vacant Units:** | 35 | | **Vacant Rent:** | 34,849.67 | | |

### Unit Mix

| Unit type | Number of units | Sq Ft |
|---|---|---|
| 1x1 | 34 | 715 |
| 1x1 A | 16 | 720 |
| 1x1 B | 6 | 735 |
| 2x1 | 2 | 792 |
| 2x1 A | 8 | 792 |
| 2x2 | 20 | 1018 |
| 2x2 A | 9 | 1032 |
| 2x2 .5 | 73 | 1200 |

| Prior Balance | Total Charged | Total Paid |
|---:|---:|---:|
| 0.00 | 792.00 | 792.00 |
| 0.00 | 970.00 | 970.00 |
| 285.00 | 348.00 | 633.00 |
| 0.00 | 870.00 | 870.00 |
| 0.00 | 843.00 | 843.00 |
| 0.00 | 0.00 | 795.00 |
| 474.00 | 870.00 | 396.00 |
| -435.00 | 870.00 | 435.00 |
| -35.00 | 895.00 | 860.00 |
| 0.00 | 970.00 | 970.00 |
| 0.00 | 223.32 | 0.00 |
| 0.00 | 735.93 | 735.93 |
| 0.00 | 750.00 | 750.00 |
| 0.00 | 715.00 | 175.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 840.00 | 840.00 |
| 0.00 | 850.00 | 850.00 |
| -14.00 | 870.00 | 870.00 |
| 0.00 | 780.00 | 780.00 |
| 0.00 | 840.00 | 840.00 |
| 0.00 | 840.00 | 840.00 |
| 0.00 | 1,040.00 | 1,040.00 |
| 0.00 | 905.00 | 905.00 |
| -2.00 | 930.00 | 928.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 3,086.25 | 0.00 |
| 0.00 | 700.00 | 700.00 |
| 0.00 | 715.00 | 715.00 |
| -5.00 | 715.00 | 770.00 |
| 0.00 | 640.00 | 640.00 |
| -10.00 | 890.00 | 0.00 |
| 0.00 | 555.00 | 555.00 |
| 0.00 | 500.00 | 500.00 |
| -0.08 | 715.00 | 715.15 |
| 0.00 | 715.00 | 715.00 |
| 0.00 | 645.00 | 1,290.00 |
| 0.00 | 0.00 | 0.00 |
| -240.00 | 720.00 | 1,200.00 |
| 87.00 | 870.00 | 925.00 |
| 0.00 | 940.00 | 940.00 |

| | | |
|---:|---:|---:|
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 870.00 | 870.00 |

| | | |
|---:|---:|---:|
| 0.00 | 900.00 | 900.00 |
| -870.00 | 870.00 | 0.00 |
| 0.00 | 700.00 | 700.00 |
| 0.00 | 650.00 | 1,330.00 |
| 5.00 | 715.00 | 720.00 |
| 0.00 | 780.00 | 780.00 |
| 0.00 | 700.00 | 700.00 |
| 0.00 | 720.00 | 720.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 226.33 | 0.00 |
| 0.00 | 725.00 | 725.00 |
| 140.88 | 700.00 | 740.00 |
| 0.00 | 715.00 | 715.00 |
| 0.00 | 715.00 | 715.00 |
| 0.00 | 625.00 | 625.00 |
| 0.00 | 350.00 | 350.00 |
| 0.00 | 650.00 | 1,300.00 |
| 0.00 | 892.00 | 892.00 |
| -800.00 | 900.00 | 100.00 |
| 0.00 | 633.00 | 633.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 870.00 | 870.00 |
| 0.00 | 970.00 | 970.00 |
| 0.00 | 870.00 | 870.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 775.00 | 775.00 |
| 0.00 | 715.00 | 715.00 |
| -715.00 | 715.00 | 0.00 |
| 0.00 | 720.00 | 942.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 610.00 | 610.00 |
| 0.00 | 0.00 | 715.00 |
| 0.00 | 714.90 | 221.00 |
| 0.00 | 0.00 | 720.00 |
| -831.31 | 820.00 | 0.00 |
| 0.00 | 775.00 | 775.00 |
| 0.00 | 0.00 | 825.00 |
| 0.00 | 1,090.00 | 1,090.00 |
| 0.00 | 820.00 | 820.00 |
| 0.00 | 820.00 | 1,640.00 |
| 0.00 | 1,050.00 | 1,050.00 |
| 0.00 | 870.00 | 1,290.00 |
| 0.00 | 740.00 | 740.00 |
| 0.00 | 820.00 | 820.00 |
| -208.61 | 820.00 | 611.50 |
| 0.00 | 870.00 | 870.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 470.00 | 470.00 |
| -870.00 | 870.00 | 0.00 |

| | | |
|---|---|---|
| 0.00 | 820.00 | 820.00 |
| 0.00 | 348.00 | 300.00 |
| 0.00 | 800.00 | 800.00 |
| 0.00 | 785.00 | 785.00 |
| 0.00 | 820.00 | 820.00 |
| 0.00 | 0.00 | 795.00 |
| 0.00 | 0.00 | 0.00 |

| | | |
|---:|---:|---:|
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 710.00 | 710.00 |
| 0.00 | 820.00 | 820.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 825.00 |
| 0.00 | 0.00 | 825.00 |
| 0.00 | 1,030.00 | 1,030.00 |
| 0.00 | 470.00 | 470.00 |
| 0.00 | 840.00 | 840.00 |
| 0.00 | 695.00 | 695.00 |
| 922.58 | 1,353.33 | 0.00 |
| 0.00 | 880.00 | 880.00 |
| 0.00 | 700.00 | 700.00 |
| 0.00 | 650.00 | 650.00 |
| 0.00 | 775.00 | 775.00 |
| 0.00 | 760.00 | 760.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 715.00 | 715.00 |
| 0.00 | 715.00 | 715.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 760.00 | 760.00 |
| 0.00 | 770.00 | 770.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 830.00 | 830.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 870.00 | 870.00 |
| 0.00 | 870.00 | 870.00 |
| 0.00 | 600.00 | 600.00 |
| -16.00 | 820.00 | 807.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 650.00 | 650.00 |
| -2.07 | 870.00 | 870.00 |
| -5.00 | 825.00 | 820.00 |
| 0.00 | 1,050.00 | 0.00 |
| 0.00 | 970.00 | 970.00 |
| 0.00 | 775.00 | 775.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 850.00 | 1,700.00 |
| 0.36 | 870.00 | 870.36 |
| 991.00 | 870.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |

| | | |
|---:|---:|---:|
| 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 765.00 | 765.00 |
| 0.00 | 880.00 | 880.00 |
| -775.00 | 775.00 | 0.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 820.00 | 820.00 |

|  |  |  |
|---|---|---|
| 0.00 | 0.00 | 0.00 |
| 0.00 | 610.00 | 610.00 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 447.17 | 447.17 |
| 0.00 | 0.00 | 0.00 |
| 0.00 | 632.00 | 640.00 |
| 0.00 | 290.40 | 316.80 |
| -870.00 | 870.00 | 0.00 |
| 0.00 | 648.00 | 648.00 |
| 0.00 | 820.00 | 820.00 |
| 0.00 | 0.00 | 0.00 |
| -3,798.25 | 97,478.63 | 93,311.91 |

| Balance | Charged | Total Paid |
|---|---|---|
| -3,798.25 | 97,478.63 | 93,311.91 |

## **SCHEDULE 4**

## **ORGANIZATION OF BORROWER**

[Attached]

56436067v.6



## SCHEDULE 5

## DEFINITION OF SPECIAL PURPOSE BANKRUPTCY REMOTE ENTITY

(I)      A **"Special Purpose Bankruptcy Remote Entity"** means (x) a limited liability company that is a Single Member Bankruptcy Remote LLC or (y) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter;

(i)      was and will be organized solely for the purpose of (A) owning the Property or (B) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

(ii)     has not engaged and will not engage in any business unrelated to (A) the ownership of the Property, (B) acting as general partner of the limited partnership that owns the Property or (C) acting as a member of the limited liability company that owns the Property, as applicable;

(iii)    has not had and will not have any assets other than those related to the Property or its partnership or member interest in the limited partnership or limited liability company that owns the Property, as applicable;

(iv)    has not engaged, sought or consented to and will not engage in, seek or consent to any division, dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

(v)     if such entity is a limited partnership, has and will have, as its only general partners, Special Purpose Bankruptcy Remote Entities that is a limited liability company with a springing member or Single Member Bankruptcy Remote LLC;

(vi)    Reserved;

(vii)   if such entity is a limited liability company, has and will have at least one member that has been and will be a Special Purpose Bankruptcy Remote Entity that has been and will be a corporation or limited liability company and such corporation or limited liability company is the managing member of such limited liability company;

(viii)  if such entity is a limited liability company, has and will have articles of organization, a certificate of formation and/or an operating agreement, as applicable, providing that (A) such entity will dissolve only upon the bankruptcy of the managing member, (B) the vote of a majority-in-interest of the remaining members is sufficient to continue the life of the limited liability company in the event of such bankruptcy of the managing member and (C) if the vote of a majority-in-interest of the remaining members to continue the life of the limited liability company following the bankruptcy of the managing member is not obtained, the limited liability company may not liquidate the

Schedule 5-1

Property without the consent of the applicable Rating Agencies for as long as the Loan is outstanding;

(ix)     has not, and without the unanimous consent of all of its partners, directors or members, as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest (A) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or for all or any portion of such entity's properties, (C) make any assignment for the benefit of such entity's creditors or (D) take any action that might cause such entity to become insolvent;

(x)     has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations;

(xi)     has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)     has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns;

(xiii)     has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)     has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)     has held and will hold its assets in its own name;

(xvi)     has conducted and will conduct its business in its name,

(xvii)     has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

(xviii)     has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets;

(xix)     has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)     has maintained and will maintain an arm's-length relationship with its Affiliates;

(xxi)     (a) if such entity owns the Property, has not and will not have any indebtedness other than Permitted Indebtedness, or (b) if such entity acts as the general partner of a limited partnership which owns the Property, has not and will not have any indebtedness (including guaranteeing any obligation or entering into any  PACE Loan or

Schedule 5-2

similar transaction in which payment thereof is made through Taxes) other than unsecured trade payables in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred, or (c) if such entity acts as a managing member of a limited liability company which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred;

(xxii)  has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

(xxiii)  has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv)  has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks;

(xxv)  except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxvi)  has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii) has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii)has not made and will not make loans to any Person;

(xxix)  has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)  has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

(xxxi)  has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xxxii) has and will have an express acknowledgment in its organizational documents that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents; and

(xxxiii) will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable.

(II)    **"Single Member Bankruptcy Remote LLC"** means a limited liability company organized under the laws of the State of Delaware which at all times since its formation and at all times thereafter:

(i)    was and will be organized solely for the purpose of owning the Property;

(ii)    has not engaged and will not engage in any business unrelated to the ownership of the Property;

(ii)    has not had and will not have any assets other than those related to the Property;

(iii)    has not engaged, sought or consented to and will not engage in, seek or consent to any division, dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited liability company or certificate of formation;

(iv)    has not, and without the unanimous consent of all of its partners, directors, managers or members, as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest (A) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or for all or any portion of such entity's properties, (C) make any assignment for the benefit of such entity's creditors or (D) take any action that might cause such entity to become insolvent;

(v)    has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations;

(vi)    has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(vii)    has maintained and will maintain its books, records, resolutions and agreements as official records;

(viii)    has not commingled and will not commingle its funds or assets with those of any other Person;

(ix)     has held and will hold its assets in its own name;

(x)     has conducted and will conduct its business in its name,

(xi)     has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

(xii)     has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets;

(xiii)     has observed and will observe all limited liability company formalities;

(xiv)     has maintained and will maintain an arm's-length relationship with its Affiliates;

(xv)     has not and will not have any indebtedness (including guaranteeing any obligation or entering into any  PACE Loan or similar transaction in which payment thereof is made through Taxes) other than Permitted Indebtedness;

(xvi)     has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

(xvii)     has not and will not acquire obligations or securities of its partners, members or shareholders;

(xviii) has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks;

(xix)     except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xx)     has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxi)     has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxii)   has not made and will not make loans to any Person;

(xxiii)  has not identified and will not identify its members or any Affiliate of any of them, as a division or part of it;

(xxiv)  has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the

Schedule 5-5

ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

(xxv)   has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xxvi)  has and will have an express acknowledgment in its organizational documents that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents;

(xxvii) will consider the interests of its creditors in connection with all limited liability company actions;

(xxviii)has maintained and will maintain its accounts, books and records separate from any other person;

(xxix)  Reserved;

(xxx)   has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding, (A) upon the occurrence of any event that causes sole member to cease to be a member of SPE Party (other than (x) upon an assignment by sole member of all of its limited liability company interest in SPE Party and the admission of the transferee, if permitted pursuant to the organizational documents of SPE Party and the Loan Documents, or (y) the resignation of sole member and the admission of an additional member of SPE Party, if permitted pursuant to the organizational documents of SPE Party and the Loan Documents), the Person named therein shall, without any action of any Person and simultaneously with sole member ceasing to be a member of SPE Party, automatically be admitted as the sole member of SPE Party (the **"Special Member"**) and shall preserve and continue the existence of SPE Party without division or dissolution, (B) no Special Member may resign or transfer its rights as Special Member unless (x) a successor Special Member has been admitted to SPE Party as a Special Member, and (y) reserved, (C) reserved, and (D) except as expressly permitted pursuant to the terms of this Agreement, sole member may not resign and no additional member shall be admitted to SPE Party; and

(xxxi)  has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding, (A) Borrower shall be dissolved, and its affairs shall be wound up only upon the first to occur of the following: (x) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the **"Delaware Act"**) or (y) the entry of a decree of judicial dissolution under Section 18 802 of the Delaware Act; (B) upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member

Schedule 5-6

of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing to continue the existence of Borrower and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower; (C) the bankruptcy of Sole Member or a Special Member shall not cause such member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without division or dissolution; (D) in the event of dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18 804 of the Delaware Act; and (E) to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the division, dissolution, liquidation, winding up or termination of Borrower.

Schedule 5-7

## SCHEDULE 6

## SECONDARY MARKET TRANSACTION INFORMATION

(A)     Any proposed program for the renovation, improvement or development of the Property, or any part thereof, including the estimated cost thereof and the method of financing to be used.

(B)     The general competitive conditions to which the Property is or may be subject.

(C)     Management of the Property.

(D)     Occupancy rate expressed as a percentage for each of the last five years.

(E)     Principal business, occupations and professions carried on in, or from the Property.

(F)     Number of tenants occupying 10% or more of the total rentable square footage of the Property and principal nature of business of such tenant, and the principal provisions of the Leases with those tenants including, but not limited to: rental per annum, expiration date, and renewal options.

(G)     The average effective annual rental per square foot or unit for each of the last three years prior to the date of filing.

(H)     Schedule of the Lease expirations for each of the ten years starting with the year in which the registration statement is filed (or the year in which the prospectus supplement is dated, as applicable), stating:

    (1)     The number of tenants whose Leases will expire.

    (2)     The total area in square feet covered by such Leases.

    (3)     The annual rental represented by such Leases.

    (4)     The percentage of gross annual rental represented by such Leases.

56436067v.6

## **SCHEDULE 7**

## **REA SCHEDULE**

None.

## EXHIBIT A

## CAPITAL IMPROVEMENTS BUDGET

Sierra Hermosa
Capex Budget

| Roofs | 175,000 | |
|---|---|---|
| Retainer Wall | 120,000 | |
| Hvac | 50,000 | Replacement and parts |
| Kitchens | 20,000 | Cabinets and appliences |
| Structure | 50,000 | |
| Asphalt | 130,000 | |
| Windows | 10,000 | Replacement |
| Plumbing | 10,000 | Boiler and sewer repairs |
| Electrical | 200,000 | Updating current and repairs |
| Down units (6) | 40,000 | 6 Down units |
| Interior | 45,000 | 28 Vacant units at time of closing. |
| **Total** | **850,000** | |

Exhibit A

## EXHIBIT B

## ZONING NON-CONFORMANCE ADDENDUM

Under the applicable laws pertaining to zoning and use (collectively the "**Zoning Laws**"), the Property must comply with certain use and parking requirements (the "**Zoning Requirements**").  As of the date hereof, the Property is legally non-conforming with respect to the permitted use of the Property and the paring requirements under the Zoning Laws.  In certain events in connection with a Casualty, from any cause, the Property can only be fully restored and its present use fully resumed ("**Full Restoration**" and "**Fully Restored**"), if it is brought into compliance with the then applicable provisions of the Zoning Laws ("**Compliance**" and "**Compliant**"), or if Borrower obtains from the applicable Governmental Authority a variance and/or lawful exemption from the application of those requirements, in whole or in part (collectively a "**Variance**") (such Casualty shall hereinafter be referred to as a "**Threshold Casualty**").  The occurrence of a Threshold Casualty will, without prompt and Full Restoration, materially and adversely affect the value of the Property as collateral for the Loan.  Therefore, the following provisions of this Addendum are included as additional provisions of this Agreement in that regard, and shall control to the extent of any contrary provisions otherwise.

1.    Requirement of Full Restoration.  In the event that the Property suffers a Threshold Casualty, Borrower shall, to the extent allowed by then existing applicable Zoning Laws, Fully Restore the Property so that it is once again configured (including without limitation building location, dimensions, access, parking and density as it is presently configured upon the Property as of the Closing Date in all material respects (or in another configuration approved by Lender in its reasonable discretion) and Compliant at that time.

2.    Required Variance.  In the event that the Threshold Casualty shall be of an amount or nature such that Full Restoration is not permitted by the Zoning Laws without a Variance, Borrower shall promptly apply for and seek to obtain that Variance as soon as reasonably possible with diligent effort after the Threshold Casualty, and shall seek to obtain the required Variance within no less than 120 days (the "**Variance Deadline**") from the occurrence of the Threshold Casualty (subject to extension by Lender for up to an additional 60 days if Lender determines that Borrower has diligently instituted and pursued that Variance, which has been delayed, but not denied, for reasons beyond Borrower's reasonable control), and in all events in sufficient time to permit Full Restoration with continuous and diligent efforts on or before the earliest date specified in Section 8.4.1(ii) of this Agreement  (such date being the "**Restoration Deadline**").

3.    Restoration Work to Be Diligently Undertaken.  In all events, all applicable permits for Restoration shall be promptly applied for and diligently pursued, and Restoration itself (whether Full Restoration or not) shall be promptly undertaken within 30 days after the issuance of applicable building permits with respect to those elements of the Restoration that can lawfully proceed under issued permits), diligently pursued and completed in a workmanlike manner, in accordance with the provisions of Section 8.4 of this Agreement (including the Zoning Laws) and free of any liens or encumbrances (including materialmen's, contractor or subcontractor liens) against the Property. Borrower shall provide to Lender evidence (including documents, approvals, photographs, building permits, and certificates of occupancy) of the legal requirements applicable

to the Restoration, and the progress, performance and completion of the Restoration, in such form and at such times as Lender shall require.

4.      Required Paydown of Loan.  If a required Variance is denied, if a required Variance is not obtained by the Variance Deadline or if the Property is not Fully Restored by the Restoration Deadline, and (i) if Lender shall determine that upon completion of the Restoration (to whatever extent shall be applicable), the Loan to Value Ratio (as defined below), calculated as of the date of such Casualty, will be greater than either of (A) the Loan to Value Ratio as of the Closing Date, or (B) the Loan to Value Ratio as of the date that immediately precedes that date upon which such Threshold Casualty occurred, or (ii) if Lender shall determine that upon completion of the Restoration (to whatever extent shall be applicable), the Debt Yield will be less than either of (A) 7%, or (B) the Debt Yield as of the most recently completed calendar month preceding the date of the Threshold Casualty, Borrower shall pay to Lender the Required Casualty Paydown (as defined below).  In the event that Lender shall at that time have on deposit net Proceeds with respect to the related Threshold Casualty that are not then allocated by Lender for payment of certain costs of Restoration then anticipated to be payable under contracts requiring such payment, Lender shall first credit those excess net Proceeds to the Required Casualty Paydown in determining the amount of the demand upon Borrower.  Provided that no Event of Default is continuing, any such mandatory prepayment under this Addendum shall be without the payment of the Spread Maintenance Premium, but subject to the payment of the Exit Fee.

5.      Borrower's Casualty Shortfall Liability.  In the event that there shall be a Required Casualty Paydown, Borrower shall be liable for the full unpaid balance thereof at any time, as provided in Section 3.1 of this Agreement and herein referred to as "**Borrower's Casualty Shortfall Liability**".

6.      Definitions and Requirements.  In interpreting, applying and administering the provisions of this Addendum, the following additional definitions and requirements shall apply:

"**Debt Yield Requirement**" shall mean the greater of: (i) the Debt Yield of 7%, and (ii) the Debt Yield as of the most recently completed calendar month preceding the date of the applicable Threshold Casualty.

"**Loan to Value Ratio**" shall mean, as of the date of its calculation, the ratio of (i) the sum of the outstanding principal balance of the Loan as of the date of such calculation, to (ii) the fair market value of the Property, as determined, in Lender's discretion, by any commercially reasonable method.

"**Loan to Value Requirement**" shall mean the lesser of: (A) the Loan to Value Ratio as of the Closing Date, and (B) the Loan to Value Ratio as of the date that immediately precedes that date upon which the applicable Threshold Casualty occurred.

"**Required Casualty Paydown**" means that amount which, when applied in payment of the principal balance of the Loan, will bring (i) the Loan to Value Ratio to no greater than the Loan to Value Requirement and/or (ii) the Debt Yield to no less than the Debt Yield Requirement.

Exhibit B